# EXHIBIT "A"

1              IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF HAWAII

3

4   DAVID DEMAREST and GREEN        )  CASE NO.
    MOUNTAIN MYCOSYSTEMS LLC,       )  22-CV-000064 JAO KJM
5                                   )
                                    )
6              Plaintiffs,          )
                                    )
7       vs.                         )
                                    )
8                                   )
    RAIED J. ALFOUADI; UNNAMED      )
9   SAILING VESSEL in rem, Hull     )
    No. HA 6874 H; DOE DEFENDANTS   )
10  1-20, DOE CORPORATIONS 1-20,    )
    DOE GOVERNMENT AGENCIES 1-20,   )
11  DOE PARTNERSHIPS 1-20,          )
                                    )
12                                  )
               Defendants.          )
13  _____)

14

15       ZOOM 30(b)(6) DEPOSITION OF STATE OF HAWAII,

16          DEPARTMENT OF LAND AND NATURAL RESOURCES,

17          DIVISION OF BOATING AND OCEAN RECREATION

18

19  Taken on behalf of the Plaintiffs, DAVID DEMAREST and
    GREEN MOUNTAIN MYCOSYSTEMS LLC, at Honolulu, Hawaii,
20  Commencing at 10:00 a.m., on February 16, 2023,
    pursuant to notice.

21

22

23

24
    BEFORE:
25       SHEILA MOORE, RPR, RMR, CMRS, CRR, CSR No. 501

```
 1              EDWARD R. UNDERWOOD,

 2  Of lawful age, called for examination, being by me

 3  first duly sworn, as hereinafter certified, deposed

 4  and said as follows:

 5          EXAMINATION OF EDWARD R. UNDERWOOD

 6  BY MR. WASHKOWITZ:

 7    Q.  Good morning.  My name is Jared Washkowitz.

 8  I'm the attorney for the plaintiffs in the pending

 9  case.

10        Could you go ahead and state your full name for

11  the record?

12    A.  Edward R. Underwood.

13    Q.  And what's your position with the DLNR?

14    A.  I'm the administrator for the division of

15  boating and ocean recreation.

16    Q.  Okay.  And how long have you been in that

17  position?

18    A.  I've been with DLNR for 20 years.

19    Q.  Okay.  What are your job duties in that

20  position?

21    A.  I oversee the state small both harbor program

22  which includes the small boat harbors and regulating

23  offshore activities.

24    Q.  All right.  And have you ever been deposed

25  before?
```

```
 1       Q.   Who did you speak to?

 2       A.   My Lahaina Harbor agent that was involved with

 3   the vessel salvage or grounding.

 4       Q.   And what was his name?

 5       A.   Robert Abrew.

 6       Q.   Okay.  And what was the basic substance of your

 7   conversations?

 8       A.   If he could remember this vessel going aground

 9   and working with this person, and he said yes.

10       Q.   Okay.  And was there any other discussion about

11   specifics of what happened, or was it -- was it just

12   generally do you remember what happened?

13       A.   General do you remember what happened, and he

14   had forwarded us the exhibits that you have as well,

15   so I reviewed those documents.

16       Q.   Okay.  And did Mr. Abrew -- Abrow?  Abrew?

17       A.   A-b-r-e-w.

18       Q.   Abrew, okay.  Did Mr. Abrew identify anybody

19   else down in Maui who would have knowledge of the

20   actual operation that took place?

21       A.   No.

22       Q.   All right.  Did you have any personal

23   involvement with this salvage operation?

24       A.   No.

25       Q.   Did you have any knowledge about it
```

1    independently of what Mr. Abrew reported to you or,

2    you know, what you gleaned from reviewing the

3    documents?

4        A.   No.

5        Q.   All right.   And is Mr. Abrew under -- he's with

6    DLNR, correct?

7        A.   Correct.

8        Q.   Is he under DOBOR as well?

9        A.   Yes.

10       Q.   And does DOBOR handle -- what's DOBOR's

11   involvement when there's, you know, something like

12   this happens where there's a vessel that runs aground

13   near shore like what happened in this case?   What

14   typically does -- what's DOBOR's involvement, if any?

15       A.   When we receive the report we'll look up the

16   documented owner or the registrant who's with us, and

17   then we contact the vessel owner, notifying them their

18   vessel is aground and that they have 24 hours to

19   remove it, otherwise, we may need to step in.

20       Q.   Okay.   And if DOBOR steps in, what does that

21   mean?   That DOBOR takes the lead in salvage operations

22   in getting the vessel removed?

23       A.   Yes.

24       Q.   And in that situation who pays for the expense

25   of that?

1    A.   If we initiate the salvage removal, then we

2    would pay for that.

3    Q.   And would you seek reimbursement from the owner

4    for that?

5    A.   Yes.

6    Q.   Okay.  How does DOBOR typically -- I guess you

7    would contract outside companies to do this salvage or

8    are there in-house people at DOBOR that do that?

9    A.   We contract it.

10   Q.   Are there -- are there companies in Maui that,

11   as far as you know, DOBOR has used for this service in

12   prior instances?

13   A.   Yes.

14   Q.   Can you identify any of those?

15   A.   TNT Towing, if I'm not mistaken, is the name.

16   Q.   Okay.  And they're in Maui?

17   A.   They are in Maui, yes.

18   Q.   To your knowledge has -- has DOBOR ever had any

19   dealings with the plaintiff in this case David

20   Demarest or his company Green Mountain Mycosystems

21   prior to this incident?

22   A.   Not that I'm aware of.

23   Q.   And to the best of your knowledge in this case,

24   the salvage operation started before -- I mean, was

25   DOBOR the one that notified the owner first that they

 1    had to commence salvage or was -- did the salvor

 2    notify DOBOR of what happened?

 3        A.    I don't know how that occurred.

 4        Q.    Okay.  All right.  And before I get too far

 5    ahead of myself, I did email a bunch of exhibits to

 6    the depo prior to -- I mean, yesterday and this

 7    morning.

 8              MR. WASHKOWITZ:  So, Sheila, I think you

 9        said you got those.  Did you get Exhibits A

10        through K?

11            (Discussion had off the record.)

12            (Plaintiff's Deposition Exhibit A was

13             marked for purposes of identification.)

14    BY MR. WASHKOWITZ:

15        Q.    Can you guys all see this?

16        A.    Yes.

17        Q.    Okay.  So this is Exhibit A, and I'm just kinda

18    trying to make a clean record here, but this is

19    Exhibit A, the amended depo notice; which does say via

20    Zoom, sorry, Dan.

21            Okay, so, Mr. Underwood, you know, so the depo

22    notice asked for the DLNR to produce a person most

23    knowledgeable regarding category 1 right here, facts

24    and circumstances involving this salvage.  I mean, are

25    you the person that has the most knowledge regarding

1    that, or would you say Mr. Abrew is more knowledgeable

2    on that because he was more involved?

3        A.  I would say Mr. Abrew, because he was there on

4    island.

5        Q.  Okay.  And what was his -- do you know from

6    talking to him what his involvement was?  Did he

7    actually go on site or was his involvement just, like,

8    discussions with my client and the vessel owner?

9        A.  I believe it was discussions with your client

10   and the person that did the salvage.

11       Q.  Okay.  As far as you know, did he go on site at

12   all or, like, actually physically inspect how the

13   salvage was going at any time?

14       A.  I do not know.

15       Q.  Okay.  And in this category number 2, any and

16   all potential fines and penalties that the owner of

17   the vessel incurred or could have incurred as a result

18   of the wreckage, is that something you can testify to?

19       A.  Yes.

20       Q.  Okay.  Is there -- all right.  Now, I guess,

21   let me ask you this -- and I'd like -- this will be

22   Exhibit A by the way.  We'll just call this Exhibit A.

23       Can you talk about that?  What, you know,

24   you've reviewed the documents and have an

25   understanding of where the wreckage was and kinda the

1  circumstances surrounding it, correct?

2     A.  Correct.

3     Q.  And what kind of potential fines or penalties

4  would apply in this situation if the wreck had not

5  been removed?

6     A.  I don't believe there would be fines and

7  penalties.  What we would be asking for is

8  reimbursement of all costs associated with removal of

9  the vessel.

10    Q.  And is that -- that's based on a statutory

11 section?  Is that -- to your knowledge, is that based

12 on HRS 200-47.5?

13    A.  Yes.

14    Q.  Okay.  So -- whoops, you guys don't need to see

15 all that.

16        Okay, so -- so your statement, you know, the

17 fines and penalties would have been costs of removal

18 of the vessel, but the state didn't incur any costs

19 because that was handled by my client, correct?

20    A.  Yes.

21    Q.  What about, you know, stuff like pollutants in

22 the ocean and damage to the reef; is that something

23 that your department handles or is that handled

24 outside of your department?

25    A.  The department would handle it, but a different

1   DOBOR in that situation work with these other agencies

2   and say there's this incident here, we're cleaning it

3   up, you guys might want to check out whether there was

4   any damage, you know?

5          Is that something, like, would you work with

6   the other agencies on that?

7       A.   It would be on a case-by-case basis, but, yes.

8       Q.   Okay.   And do you happen to know what statute

9   the division of aquatic resources works off of when

10  determining fines and penalties that might apply?

11      A.   I do not, no.

12      Q.   Okay.   Okay.   And as far as the division of

13  boating and ocean recreation goes, the only things

14  that that division would seek to recoup is the actual

15  costs incurred in cleaning up the mess, correct?

16      A.   Yes.

17      Q.   Is there ever a situation where the division of

18  boating and ocean recreation would issue a fine or

19  penalty in this kind of situation, like, you know,

20  this similar type of situation?

21      A.   I don't recall any instance where we would do

22  that.

23      Q.   Okay.   So, you know, some of my exhibits are,

24  like, news articles where other companies were fined

25  by the DLNR for damaging reef and things like that.

1    Q.  Okay.  And is this -- the area around the

2    wharf, do you have any knowledge of whether that's,

3    you know, if there's reef under there or if it's --

4    what kind of marine life is around there?

5    A.  Yes, there is coral in that area.

6    Q.  Okay.  Do you have any knowledge as to whether

7    this area is used as a, you know, for, like,

8    snorkeling or fishing or any recreational purpose by

9    locals or visitors?

10    A.  It's possible, but most of the activity takes

11    place on the other side of the wharf.

12    Q.  Okay.  So the side that this boat is on, in

13    this picture, which we'll mark as Exhibit C, I guess

14    that would be the north side?

15    A.  Yes, it's adjacent to the launch ramp.

16    Q.  Okay.

17    A.  Which is right next to it.

18    Q.  And then there is -- most of the activities

19    would be on the opposite side?

20    A.  Yes.

21    Q.  How close to, you know, do the recreational

22    activities get to the wharf?  Are people snorkeling

23    right up next to it and around it, or is it a ways

24    off?

25    A.  Yes, they usually -- the beach is right on the

1   other side of the wharf in this picture, and they walk
2   into the water and they go to the end of the pier.
3   That's where the snorkeling and scuba diving takes
4   place.

5        Q.  Okay.  So let me stop this sharing and I'm
6   gonna -- I'm gonna pull up another image.
7              (Plaintiff's Deposition Exhibit F was
8               marked for purposes of identification.)
9   BY MR. WASHKOWITZ:
10       Q.  Okay.  Can you guys see this one?
11       A.  Yes.
12       Q.  Okay.  So is this -- is this kinda of -- is
13   this an accurate depiction of the aerial view of the
14   wharf?
15       A.  Yes.
16       Q.  All right.  And then in the picture we were
17   just looked at before, it looked like the boat was
18   kinda like around here where my cursor is, right?
19       A.  Yes.
20       Q.  And you said most of the activity of snorkeling
21   and all that stuff happens on this side?
22       A.  Yes.
23       Q.  So you said that people just walk off the
24   beach, I guess there's a beach down here close to
25   where it says Captain Steve's rafting?  People come

```
 1   from this beach and just walk out?

 2       A.  Yes.

 3       Q.  And then you'll see on this picture kinda right

 4   under the word Mala Historic Wharf, under Mala

 5   there's, like, a bunch of reef you can see.

 6           Is that where people are snorkeling and

 7   exploring?

 8       A.  Yes.

 9       Q.  Okay.  And do you -- do you have knowledge of

10   exactly where the vessel wreckage was on this map when

11   it initially happened?  Was it on the right side or

12   the left side?

13       A.  I do not know.

14       Q.  Okay.  All right.  On this little triangle here

15   on the right side, do you see where my cursor is?

16       A.  Yes.

17       Q.  So I guess it's just, to use words to describe

18   it, it's, like, to the right of the wharf there's,

19   like, a little triangle inlet bordered on the right

20   by, like, a rock jetty kinda thing.

21           But does anybody use this little triangle area

22   for anything, as far as you know?

23       A.  As far as I know, no.

24       Q.  Okay.  And then the boat launch is right here

25   where it says blue water?
```

```
 1      A.  Yes.

 2      Q.  And what's that boat launch called?

 3      A.  Mala Wharf Launch Ramp.

 4      Q.  Okay.  Is this reef, like, on the left of the

 5  Mala Wharf, is that ever accessed by, like, tour

 6  companies who take people out for snorkeling where

 7  they would, like, anchor and people snorkel here?

 8      A.  Yes, but it's more towards the end of the Mala

 9  Wharf.

10      Q.  Like out where my cursor is?

11      A.  Yes.

12      Q.  Okay.  All right.  Let me just check on some

13  other photos here.  Hold on, bear with me for a

14  second.  All right.

15          And that last photo, I don't know if I attached

16  that as an exhibit, I think I had it listed on my

17  email as Exhibit F, so we'll just -- can we just call

18  it Exhibit F, even though it's out of order?  Okay,

19  let's call that Exhibit F.

20          And then this next exhibit is -- I have it

21  called as Exhibit G.

22          (Plaintiff's Deposition Exhibit G was

23          marked for purposes of identification.)

24  BY MR. WASHKOWITZ:

25      Q.  Okay.  You guys can see this?
```

1      A.   Yes.

2      Q.   Okay, so this looks like an email between my

3   client and Russell Sparks.

4           Do you know who Russell Sparks is?

5      A.   Yes.   He's the marine biologist I believe for

6   aquatic resources.

7      Q.   Okay.   So that's the aquatic resources

8   division?

9      A.   Yes.

10      Q.   Is he -- who's Kristy Stone?

11      A.   I don't know.

12      Q.   Okay.   Have you seen this email before, or take

13   a minute to read it first, but have you seen this

14   email before?

15      A.   I saw it this morning as we were heading to

16   your office.

17      Q.   Okay.   I highlighted this part here that says

18   as far as DLNR is concerned the responsible party is

19   completely responsible for removing the vessel and any

20   hazards and also for any environmental impacts the

21   incident caused both from the grounding and/or from

22   the salvage.

23           Do you disagree with that or have any reason to

24   disagree with that?

25      A.   No.

1    Q.   He says we don't normally go after individuals

2    in unfortunate accidental grounding cases like this.

3         My question to you is, if there's a case where

4    a grounding is the result of an owner's, like,

5    negligence, they did something, you know, unlawful, or

6    that was not reasonable care that caused the

7    grounding, does that change the determination as to

8    whether DLNR will pursue fines or penalties?  Does

9    that factor into it at all; do you know?

10   A.   It may, but that would be at the discretion of

11   aquatic resources.  We would not be involved.

12   Q.   Okay.  All right.  He also -- I mean, he

13   referenced -- I think my client had asked him if, you

14   know, you can see in the -- lower down on this exhibit

15   and that will be Exhibit G -- and, again, these are

16   all -- it's not gonna be in order, but that's how I

17   labeled them so we'll just call it Exhibit G.  But

18   down here you can see that my client asked, you know,

19   if there's any surveys of the marine life around the

20   wharf to determine, you know, what -- what that -- if

21   it's a fragile ecosystem or anything like.  And he

22   referenced him to this website.

23        I didn't realize it was actually linked, but do

24   you have any idea what this survey that he's referring

25   to is?  He says there's an extensive study done by the

1    knowledge of, you know, community concerns that were

2    expressed regarding this situation?

3        A.  No.

4        Q.  Okay.  Have you spoken with Russell Sparks at

5    all about the case?

6        A.  No.

7        Q.  I mean, you're familiar with that area in

8    general, correct?

9        A.  Yes.

10       Q.  And would it -- I mean, does it surprise you at

11   all or shock your conscience that the community would

12   be concerned if there's a vessel washed up there?

13       A.  No.

14       Q.  And why is that?

15       A.  The entire area around the Mala Wharf does have

16   a lot of live rock and coral, so I could see the

17   community being concerned with the vessel being left

18   there for any length of time.

19       Q.  Okay.  Are there situations where the ocean

20   around the wharf can get unruly, or is it super

21   protected from swells and wind and stuff like that?

22       A.  It gets very rough around the wharf.

23       Q.  Okay.  And more so in winter than summer, or

24   does it matter depending on the swell?

25       A.  Depending on the swell.

1    quality of the work that was done in handling this

2    situation by my client?

3        A.   No.

4        Q.   Have you been made aware that there was any

5    damage to the reef or surrounding area, or do you not

6    know?

7        A.   I do not know, no.

8        Q.   Okay.   Have you been contacted by -- as far as

9    you know, was the Coast Guard in touch with either the

10   DLNR, any division of the DLNR, regarding this

11   incident at all?

12       A.   I'm not aware if they were or not.

13       Q.   And what about the Hawaii Department of Health?

14       A.   No.

15       Q.   Not aware, or they did not?

16       A.   Not aware.

17       Q.   Okay.   And had the vessel just been left where

18   it was, how long before DOBOR would have taken action

19   to remove it itself, or DLNR?

20       A.   We're required to wait 24 hours.   We would most

21   likely stepped in right away due to the location of

22   the vessel.

23       Q.   Okay.   And do you have, you know -- you have

24   some experience with this kinda situation happening

25   before, correct?

1    A.  Yes.

2    Q.  Have you had experiences where DOBOR has had to

3    take a lead in removing a vessel of a similar size to

4    this vessel?

5    A.  Yes.

6    Q.  Have you ever had -- has DOBOR ever had to do

7    that in that same location at Mala Wharf?

8    A.  I don't recall in the same location.  No.

9    Q.  Okay.  And the location would effect, like, the

10   circumstances of the operation, how long it takes, and

11   how difficult it is, correct?

12   A.  Correct.

13   Q.  Do you -- as we sit here today, are you aware

14   of DLNR or DOBOR having any issues with how plaintiff

15   conducted the operation or, you know, the timeliness

16   of it or anything like that?

17   A.  No.

18   Q.  You're not aware, or there were no issues?

19   A.  I heard no issues being raised.

20   Q.  Okay.  And has DLNR or DOBOR had any

21   communications with the vessel owner regarding this

22   incident, as far as you know?

23   A.  I don't know, but they would have contacted the

24   vessel owner as soon as they got word that a vessel

25   went aground.

1    Q.   Okay.  In a situation where, you know, if DOBOR

2    did have to take the lead in handling the situation,

3    would -- would DOBOR reach out to the owner's

4    insurance company and work with the insurance company

5    to be remunerated for their expenses, or how does that

6    usually work?

7    A.   That is one of the first things we tried to

8    ascertain, is whether they have insurance or not.  And

9    then we would work with our Deputy Attorney General's

10   Office on contacting the insurance company, notifying

11   them they need to pay for this removal.

12   Q.   Okay.  And in your experience if -- I mean,

13   have you ever been involved in a situation where

14   division of aquatic resources has issued a fine or,

15   you know, penalty related to damage to the

16   environment?

17   A.   I don't recall one, no.

18   Q.   Okay.  All right.  Let me -- I'm gonna defer to

19   the other counsel to see if they have any follow-up

20   questions, and while they do that I'll review my notes

21   to see if I have anything else, but I think that's the

22   bulk of my questions and I'll just let other counsel

23   go ahead and then come back.

24            MS. MACDONALD:  Sure, I'm gonna have a few

25        questions.

```
 1                 EXAMINATION OF EDWARD UNDERWOOD

 2   BY MS. MACDONALD:

 3       Q.   My name is Erin Macdonald and I represent the

 4   defendant in this case, Raied Alfouadi, and I just

 5   wanted to follow up on a few things that you testified

 6   about earlier.

 7            Now, you testified about this 24-hour period

 8   after DOBOR is notified of a vessel aground and the

 9   24-hour wait period before DOBOR will step in.

10            If you have a situation where after that

11   24-hour period passes the vessel owner is working to

12   remove the vessel, would DOBOR still step in?

13       A.   No.

14       Q.   What -- what standard does DOBOR look at for

15   whether they step in or not?

16       A.   We -- as long as the vessel owner is doing what

17   they can to remove the vessel, and the salvage plan

18   that they give us isn't gonna damage natural resource

19   or at least minimize damage, we allow them to remove

20   their own vessel.

21       Q.   What does the salvage plan involve?

22       A.   Basically them telling us how they plan on

23   removing the vessel from the water.

24       Q.   How do they tell you?  You know, does it have

25   to be in writing?  Can it be just speaking to an agent
```

1    through the state for their expenses?

2        A.  Not that I'm aware of.

3        Q.  Okay.  Is there a public adjuster with the

4    state who addresses the expenses of vessel removal?

5        A.  Not that I'm aware of.

6        Q.  And in this case, is there -- sorry, let me

7    restart.

8            In this case is it possible there was a salvage

9    plan beyond what was documented in the written emails?

10       A.  It's possible, but I am not aware of it.

11       Q.  Okay, but it could be the agent and the harbor

12   discussing with the people who are working on the

13   salvage?

14       A.  Yes.

15       Q.  And that wouldn't necessarily then be

16   documented, correct?

17       A.  May not, correct.

18       Q.  I think I wanted to ask you a few follow-up

19   questions about Exhibit C.

20               MS. MACDONALD:  Jared, would you be able

21       to share that?  I can try, but I think it'll take

22       me a lot longer than you.

23               MR. WASHKOWITZ:  Yes, I will.  Exhibit C?

24               MS. MACDONALD:  Yes, Exhibit C, if you can

25       put it on the screen.

```
 1   BY MS. MACDONALD:
 2       Q.   All right, Mr. Underwood, can you see the
 3   photo?
 4       A.   Yes.
 5       Q.   Okay.   I believe you testified earlier that
 6   there is coral in the area shown in the photograph; is
 7   that accurate?
 8       A.   Yes.
 9       Q.   Is there coral in the area specifically where
10   the boat is in that photograph?
11       A.   I don't know.
12       Q.   Okay.  And you testified earlier that when
13   people snorkel in the Mala reef area, they're
14   snorkeling on the opposite side of the pier from where
15   the boat is in this photograph, correct?
16       A.   Yes.
17       Q.   And you testified they go to the end of the
18   pier to snorkel, and I just wanted to clarify -- I'm
19   sorry -- is that correct, they go to the end of the
20   pier to snorkel?
21       A.   Yes.
22       Q.   I wanted to clarify then as we're looking at
23   this photograph, are you talking they go all the way
24   down to the end of this wharf, the farthest into the
25   ocean side of this wharf before they snorkel?
```