# EXHIBIT "C"

Case 1:22-cv-00064-JAO-KJM   Document 261-3   Filed 10/15/25   Page 1 of 18

```
 1                IN THE UNITED STATES DISTRICT COURT

 2                         STATE OF HAWAII

 3

 4    DAVID DEMAREST and GREEN    ) Case No.:

 5    MOUNTAIN MYCOSYSTEMS LLC,   ) 22-CV-00064

 6                                ) JAO KJM

 7              Plaintiffs,       )

 8                                )

 9         vs.                    )

10                                )

11    RAIED J. ALFOUADI; UNNAMED  )

12    SAILING VESSEL in rem,      )

13    Hull No. HA 6874 H; DOE     )

14    DEFENDANTS 1-20, DOE        )

15    CORPORATIONS 1-20, DOE      )

16    GOVERNMENT AGENCIES 1-20,   )

17    DOE PARTNERSHIPS 1-20,      )

18                                )

19              Defendants.       )

20    _____)

21           DEPOSITION OF RAIED J. ALFOUADI,

22    Taken on behalf of Plaintiffs David Demarest and

23    Green Mountain Mycosystems LLC, via ZOOM, commencing

24    at 1:16 p.m., on March 22, 2024, pursuant to Notice.

25
```

*RALPH ROSENBERG COURT REPORTERS, INC.*
*(808) 524-2090/hawaiicourtreporters.com*

```
 1    tell you exactly what it's worth.  But to me, it's
 2    worth a lot, you know.
 3         Q.   But I'm not asking what insurance -- if
 4    insurance is going to pay for --
 5         A.   I can tally up the stuff for you, if you
 6    want, you know.
 7         Q.   Well, give me your best estimate right now
 8    of what you think that the stuff, the possessions --
 9         A.   All I can tell you is basically the value
10    has -- the market value of the boat is 20,000.  That
11    boat, because of the work that I've done on it is
12    about 22,000.
13         Q.   And again, I'm not talking about the boat.
14    I'm talking about the items that were on the boat.
15    Give me your best --
16         A.   The contents are irreplaceable, because
17    that was my home.
18         Q.   Well, okay.  What was the monetary value
19    -- I'm not talking about the emotional value, but --
20              MR. MYHRE:  Objection.  Lacks foundation.
21    Calls for speculation.
22         A.   So I would say the value, the exact value
23    is priceless.
24    BY MR. WASHKOWITZ:
25         Q.   Okay.  You can't --
```

```
 1    boat.
 2    BY MR. WASHKOWITZ:
 3        Q.    All right.  What about clothes?  Did you
 4    have a bunch of clothes on the boat?
 5        A.    Yes.  A lot of clothes on the boat.
 6        Q.    All right.  Did you have like kitchen
 7    items like pots and pans and --
 8        A.    Yes.  A lot of that.
 9        Q.    Did you have any electronics on the boat?
10        A.    Yes, I did.
11        Q.    Can you tell me what kind of electronics
12    you had?
13        A.    Lots of laboratory equipment.  I had a
14    couple of laptops.  I had some cell phones.
15        Q.    Anything else?  Any like televisions or
16    anything like that?
17        A.    No.  I don't watch TV.  I don't waste
18    time.
19        Q.    Radios?
20        A.    I had a ham station and an FM/AM radio and
21    a marine VHF radio.
22        Q.    This lab equipment that you mentioned, can
23    you describe what the lab equipment was?
24        A.    I don't recall exactly the name brand of
25    what it's called, but I can tell you what it does.
```

```
 1        Q.    That's fine.
 2        A.    So one is a laser, medical laser
 3   calibration device.  You can check the nanometers,
 4   which is the wavelength of the output of the medical
 5   laser and you can calibrate that to the precise
 6   therapeutic laser.  So it's a very sophisticated
 7   equipment.  Do you need to know more?
 8              I had another device that can measure the
 9   time intervals to very small fractions -- like
10   smaller than nanoseconds.
11        Q.    Did you have any kind of tools on the
12   boat?
13        A.    I have all kind of tools on the boat.
14        Q.    Like what kind?
15        A.    Anything to do with marine repairs, engine
16   repairs.
17        Q.    What about like fishing gear?
18        A.    I had a lot of fishing gear, trolling,
19   light stuff for like fishing for bait or things like
20   that.
21        Q.    Diving gear?
22        A.    Yes, I did.
23        Q.    Any tanks?
24        A.    Yes.
25        Q.    How many?
```

```
 1          A.      Three tanks.
 2          Q.      What about cash?  Like did you keep cash
 3   on the boat?
 4          A.      I had about $300 cash, and there was an
 5   envelope of cash that I got from Jeff Pratt.  But I
 6   don't know how much was in it.  The deal between us
 7   was 3,000, but I think he paid more, so I never
 8   opened the envelope, because I never had the chance.
 9   When I got to the ATM, it didn't have a deposit slot
10   and it was Friday, late Friday.
11          Q.      What about like jewelry, anything like
12   that?
13          A.      No.  I don't wear jewelry.
14          Q.      Any kind of weapons like firearms or
15   anything?
16          A.      No, I don't.
17          Q.      How about extra sailing gear, like extra
18   sails or that kind of thing?
19          A.      Yes.
20          Q.      Can you describe what you had?
21          A.      I had about seven sails total.  They all
22   were in used condition.
23          Q.      Okay.  What were you planning to do with
24   all your personal belongings once you got to the Big
25   Island?  Were you going to put it back in storage or
```

1    move to an apartment.

2         A.    Well, the storage -- the stuff that came

3    from storage was going to a storage on the Big

4    Island.  Once I got there, I would basically go to

5    the closest place and then just -- where I was

6    heading is Hilo.  I only lived on the Kona side on

7    the Big Island before, so -- but I know -- I've been

8    to Kona a few times, but never lived there, so I was

9    going to arrive in Kona, put the stuff in storage

10   and put the -- get a slip for the boat and then from

11   there on I was going to go around the island.

12        ==Q.    How big was the storage space in Oahu that==

13   ==you took all the stuff out of?==

14        ==A.    It was about a car garage worth.==

15        Q.    Did you have any vehicles on your boat

16   when this incident happened?

17        A.    Vehicles, like what kind?

18        Q.    I don't know.  Like any kind of motorized

19   skateboard or like foldable bike --

20        A.    No, I don't.

21        Q.    -- or anything like that?

22        A.    No, I didn't.

23        Q.    So back to when the incident happened --

24   you were thinking about kayaking out, but you said

25   it was windy, big waves.  So what happened?

```
 1   this was happening, do you know?
 2        A.    I wouldn't know.  Oh, I think, yeah, no,
 3   he was on his boat.  Yeah.
 4        Q.    He was on his boat?
 5        A.    Yeah.
 6        Q.    Where was his boat?
 7        A.    His boat is at Lahaina Welding.
 8        Q.    It's on land; right?
 9        A.    Yes.  That's on land.  And it's not in
10   view of the Mala ramp, because there is a cemetery
11   in between and there is a lot of -- there are a lot
12   of trees.  So you couldn't see the ramp area from
13   Mr. Demarest's boat.
14             MR. WASHKOWITZ:  Can you guys just hold
15   on?  Give me one second.  I'll be right back.  I
16   just need 30 seconds.
17                  (Discussion off the record.)
18   BY MR. WASHKOWITZ:
19        Q.    Going back to when Mr. Pratt called you
20   about your vessel -- you went to see what was going
21   on.  You're saying Mr. Demarest was in his boat?
22        A.    Yes.
23        Q.    So walk me through -- I guess this was
24   January 2nd, 2022.  Correct?
25        A.    Yes.  That's correct.
```

1    Q.    All right. Walk me through what happened
2  next.
3    A.    Okay.  So both Jeff and I ran on the rock
4  wall all the way out.  And meanwhile, we tried to
5  get -- summon people, both me and Jeff tried to
6  summon people to see if they could help with the
7  boat.  And nobody was willing, even though the boat
8  was going right by them across the channel.  And we
9  both ran to the end.  I handed Mr. Pratt my phone
10 and my wallet, and I jumped in the water and he
11 cheered me on, Go, go, go.
12          And I had to be safe.  It was not easy
13 getting on the boat, but I did manage to get on the
14 boat, transom side.  I started the engine and I
15 started to reverse.  A big wave came and filled up
16 the entire cockpit with water and some water went
17 inside also.  And then I started to start the engine
18 again, but because the wave was so big, it flooded
19 the engine.  I finally got the engine to start again
20 and then I started reversing.  Yet another bigger
21 wave came and slammed right into the boat and just
22 basically cutting off the engine.  No one else was
23 willing to help and stuff.  And so basically, I
24 pointed out to -- am I going too fast?
25    Q.    No.

```
 1        A.    Okay.  I pointed out to Jeff my friend's
 2   dinghy, which had a motor on it, right there at the
 3   ramp, and I said, Jeff, go see if you can grab that,
 4   because nobody was willing to help out pull the
 5   boat.  There was at least five, six boats.
 6              My bum luck was my good friend, commercial
 7   captain, had just pulled out his boat earlier.  So
 8   had he been still there, he would have recognized
 9   the boat. He would have assisted and didn't have to
10   happen.
11              But anyways, Jeff ran to that dinghy,
12   tried to start it and couldn't start it.  Meanwhile,
13   I was trying my best to restart the engine.  Things
14   were just too overwhelming.  Jeff came back,
15   realizing that it's not going to happen and that the
16   boat had -- because once the boat filled up with
17   water from the waves, it became a lot heavier, so
18   there's no way, you know, to even pull it out.
19              And I have a lot of experience with
20   basically being on incidents with boats.  Every time
21   I see somebody in trouble -- are you still with us?
22   Okay.
23        Q.    Yeah.  I'm here.
24        A.    Every time I see somebody in trouble, I
25   basically go out to help, and that's what the whole
```

```
 1     sleeping at night?

 2          A.    I was at Lahaina Welding.

 3          Q.    Okay.  Do you remember on that Tuesday

 4     after the incident how late you were up?  Were you

 5     working all night or did you call it an early night?

 6          A.    Tuesday after the incident, what date is

 7     that?

 8          Q.    That's the 4th.

 9          A.    On the 4th.

10          Q.    Yeah.  So the incident happened on the

11     2nd, and then the next day would have been the 3rd.

12          A.    So on the 4th, basically, that was the --

13     -- so, I mean, I must have been working -- I was

14     working day and night, so I would still be out there

15     until after dark.

16          Q.    What time do you normally go to bed?

17          A.    Normally, like every day, like right now?

18          Q.    Yeah.

19          A.    Like shortly after dark.  And I'm up very

20     early.

21          Q.    Okay.  And while this was happening with

22     your boat, were you keeping regular sleeping hours

23     or was it different?

24          A.    Absolutely not, no.

25          Q.    Mr. Demarest says that Wednesday, January
```

```
 1    5th -- well, he says he worked all through the night
 2    Tuesday and into Wednesday morning to catch flotsam
 3    from the boat breaking apart due to high surf.  Do
 4    you remember seeing him doing that?
 5         A.   No.  Because I'm not out there late at
 6    night when -- the time he goes.
 7         Q.   Okay.
 8         A.   From his videos that I watched, okay, it's
 9    apparently he's out there at night.  What normal
10    human being is going to work on a boat at night?
11    Why would he do it at night instead of the day?
12    Doesn't make sense.
13         Q.   I mean, that helps explain things, though.
14    Because he would be out there at night a lot and
15    maybe you weren't there; right?
16         A.   On his video, he shows a lot of night
17    videos.  Was he working?  Is there proof that he's
18    working in the videos?  No.  He's just shooting a
19    laser around and stuff like that, playing around.
20    That's all.  Doesn't showing him working.  It's not
21    proof of him working.  If he went to visit at night
22    instead of going to a bar, how is that pertinent to
23    me?
24         Q.   But you can only testify about stuff you
25    saw; right?  If you didn't see him, you can't say
```

```
 1    normal procedure for this, if the owner doesn't show
 2    up within 24 hours, the State takes over.  Okay?  If
 3    the insurance company refuses to pay for the
 4    removal, then the State works with the owner, okay,
 5    to bill the insurance company, okay, after they went
 6    and put out the bid for contractors and then they
 7    select whichever the salvage company is going to be.
 8    It has to be a State-registered, State-approved,
 9    State-licensed company.  Then they would give them
10    the job.  They remove the thing.  The State would go
11    and bill the insurance company.  That is the norm
12    and that's how it always happens.
13              I've been in so many different wrecks.
14    I've helped so many people.  I know the ins and outs
15    of this thing, more than your client does.  Strike
16    that.
17         Q.   You had a lay net on board the vessel when
18    this incident happened?
19         A.   Yes, sir, I did.
20         Q.   Twelve and a half feet long?
21         A.   I'm sorry?  What?
22         Q.   Wait.  125 feet long?
23         A.   Yes.  That's correct.
24         Q.   Seven feet high?
25         A.   That's correct.
```

```
 1        Q.    And you had a permit for this; correct?
 2        A.    Yes.  That's correct.  Many years.
 3        Q.    How much does something like that cost?
 4        A.    I don't know.  It was -- I think it was
 5   given to me, so I didn't buy it.
 6        Q.    I'm going to show you -- I'm going to
 7   screen share.
 8              MR. MYHRE:  What exhibit is this?
 9              MR. WASHKOWITZ:  H.
10              (Exhibit H marked for identification.)
11   BY MR. WASHKOWITZ:
12        Q.    These are notes written by Jeff Pratt on
13   his help here.  Can you just take a look at this and
14   let me know if you are disputing any of this time
15   that Jeff Pratt says he spent helping out?
16        A.    Jeff Pratt helped a lot, so whatever he
17   put down is probably minimal.  So at least from the
18   2nd to the 6th, I can testify.  The man done a great
19   job, both him and his family.
20        Q.    So would you say these entries from
21   January 2nd to January 6th, you're not disputing
22   anything he wrote down there?
23        A.    No, I'm sure not, you know, but I'm sure
24   he worked a lot more than that.
25        Q.    Okay.
```

1           Q.      Hold on.  Mr. Alfouadi, let me finish my
2    question, please.
3                   Maritime law recognizes him as the first
4    boots on the ground; thus, he is the salvager on
5    record and no one, to my knowledge, has challenged
6    his right to the salvage.
7                   You wrote that to Mr. McCarthy; correct?
8           A.      Yeah.  That's the last part of January.  I
9    was not aware that he lied to me about him being the
10   salvager of record.  I was still under the
11   impression that he was approved by the State of
12   Hawaii Boating Division to be the salvager of
13   record.  He cheated me.
14                  So in my impression, in my head, that just
15   says that I'm honest.  Okay?  It says in my head I'm
16   thinking he's approved by the State already.
17   Because obviously, I'm working overtime and he's
18   driving back and forth to the harbor office,
19   bringing forms or whatever, you know.  So obviously,
20   they approved him.
21                  And I had advised him before to go to
22   Maalaea, to the head office, okay, and ask who's in
23   charge of the insurance, okay, to see if the State
24   can approve him, okay, for his work.
25          Q.      So you're saying this text was sent in

```
 1    and I'm this and that.

 2              He's never had a company doing salvage.

 3    He doesn't have experience doing salvage.  He's just

 4    a fraud.  That's the problem I'm having here, is --

 5        Q.    Remember what we said?  Remember our deal?

 6        A.    Okay.  Yeah.  Go ahead, please.

 7        Q.    Okay.  You filed your own answer to the

 8    complaint in this case back on March 3rd, 2022.  Do

 9    you remember that?

10        A.    Yes.

11        Q.    And then you said, on page seven, on the

12    last sentence of that answer, that everyone involved

13    in the salvage, including the plaintiff, understood

14    that the plaintiff was going to bill the insurance

15    company.

16        A.    That's correct and accurate statement,

17    yes.

18        Q.    Remind me, was the reason Matthew McCarthy

19    was the go-between, was that because you and

20    Mr. Demarest had that falling out back on January

21    6th?

22        A.    That's correct.  I was never gonna speak

23    to him, and I've still -- never want to speak to him

24    until the day I die.  What he did was really low

25    class for somebody who I helped so much.  I'm
```

*RALPH ROSENBERG COURT REPORTERS, INC.*
*(808) 524-2090/hawaiicourtreporters.com*

1  entitled to be hurt.

2     Q.    I mean, he was trying to prevent

3  environmental damage.  Is that low class?

4     A.    What environmental --

5           MR. MYHRE:  Argumentative.

6     A.    What environmental damage?  We were doing

7  the work, not him.  Up until that point, me and Jeff

8  were the main people, and all my friends and

9  neighbors.  The first set of divers he took, they

10 lived right there across from us on 1233 Front

11 Street.

12 BY MR. WASHKOWITZ:

13    Q.    I understand.

14    A.    They're all my neighbors.  I've done them

15 favors and stuff.  They came out to help me, not to

16 help him.

17    Q.    I know.  But Mr. Alfouadi, your vessel was

18 very -- the wreckage of the vessel was very close to

19 some live reef, wasn't it?

20    A.    No.  It's all manmade rocks.  There's no

21 reef in that.

22    Q.    But on the other side of the wharf,

23 there's --

24    A.    On the other side, what does it got to do?

25 You obviously have these concrete piles and the

```
 1    structure that's remaining from the wharf is not
 2    going to allow the boat to go to the other side, and
 3    it never did.  Did anybody pick up a piece from
 4    there that -- does your client have any evidence
 5    that anybody picked up anything from that side?
 6         Q.    You don't think it's possible that debris
 7    from the boat could have drifted over to the reef?
 8         A.    Sure.  Some flotsam, a piece of wood, a
 9    floating orange or a baseball or something like
10    that.  Yeah, sure, wood.  Because all of that got
11    picked up by Pratt's family multiple times on the
12    first day, with no effect to the tourists or anybody
13    using the boat, because they picked it up as it came
14    in.  They swam out with the kayak that Jeff and I
15    had took back.  Okay?  I helped Jeff, and Jeff took
16    the rest of it and took it out to shore.  And we
17    filled that with haz-mat from the boat, okay, and
18    that's how that lime green yellowish kayak got to
19    shore.  Jeff took it over there after we loaded it
20    with haz-mat and stuff.
21         Q.    The last time you went to the wreck site,
22    you have said multiple times, was January 6th.
23    That's correct; right?
24         A.    Yes.  That's correct.
25         Q.    At that point, January 6th, the vessel was
```