Of Counsel:
MYHRE & STORM

JAMES V. MYHRE#5092-0
jmyhre@mtmhawaiilaw.com
BRENT K. WILSON      #10518-0
bwilson@mtmhawaiilaw.com
1003 Bishop Street, Suite 1290
Honolulu, Hawaii 96813
Telephone (808) 524-2466

Attorneys for Defendant
RAIED J. ALFOUADI

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| DAVID DEMAREST and GREEN MOUNTAIN MYCOSYSTEMS LLC, | CASE NO. 22-CV-00064-JAO-KJM (In Admiralty) |
| Plaintiffs, | |
| vs. | DEFENDANT RAIED J. ALFOUADI'S CLOSING ARGUMENT REGARDING ALL COUNTS IN PLAINTIFF GREEN MOUNTAIN MYCOSYSTEMS LLC'S FIRST AMENDED COMPLAINT; CERTIFICATE OF SERVICE |
| RAIED J. ALFOUADI; UNNAMED SAILING VESSEL in rem, Hull No. HA 6874 H; DOE DEFENDANTS 1-20; DOE CORPORATIONS 1-20; DOE GOVERNMENT AGENCIES 1-20; DOE PARTNERSHIPS 1-20, | |
| Defendants. | |
| | Trial:    October 20, 2025 |
| | Judge:   Honorable Jill A. Otake |

**DEFENDANT RAIED J. ALFOUADI'S CLOSING ARGUMENT
REGARDING ALL COUNTS IN PLAINTIFF GREEN MOUNTAIN
MYCOSYSTEMS LLC'S FIRST AMENDED COMPLAINT**

Defendant RAIED J. ALFOUADI ("Alfouadi"), by and through his attorneys, Myhre & Storm, hereby respectfully submits his written closing argument regarding all Counts in Plaintiff GREEN MOUNTAIN MYCOSYSTEMS LLC's ("GMM") First Amended Complaint.

## I.    INTRODUCTION

Its undisputed that as of January 2, 2022, former plaintiff and sole member of GMM, David Demarest ("Demarest") and Alfouadi were not friends, and they did not care for each other. Their relationship ended one year earlier, in January 2021, following a severe argument. Prior to that occurrence, Demarest exploited Alfouadi having Alfouadi work on Demarest's sailboat for six months without Demarest paying Alfouadi a dime for his work.

It is also undisputed that on January 2, 2022, when Mr. Jeff Pratt ("Pratt") notified Alfouadi that his sailboat was being pushed towards the rocks at Mala Wharf, that Alfouadi and Pratt immediately ran onto the rock jetty, Alfouadi dove into the water, got onto his boat, and attempted to start the engine to salvage his boat. Once the boat went up on the rocks, Alfouadi and Pratt immediately began removing hazardous materials, and picked up flotsam, with the assistance of Pratt's family members and other members from the community. Alfouadi and Pratt also removed the boat's mast and secured the boat to the rock jetty using ropes, chains, and equipment from Alfouadi's boat.

It is inconceivable that Alfouadi, who did not get along with Demarest, would leave his boat and the wharf area with Pratt to ask Demarest for help when they clearly did not like

each other. It is also inconceivable that Demarest would immediately drop what he was doing, grab his snorkel gear, and go to the wharf area where he claims he jumped into the water to snorkel around the boat while the storm was ongoing.

Similarly, it is inconceivable that Demarest, shortly upon his arrival to the Wharf would offer to "stick his neck out" for Alfouadi. Alfouadi expressly denied that occurred and Pratt testified that Demarest made no mention of salvage until months after the wreck removal. Alfouadi acknowledges that during the evening of January 3, 2022 Demarest asked to do the salvage of Alfouadi's boat, bill Alfouadi's insurer, and provide Alfouadi with an unethical/illegal kickback which Alfouadi expressly told Demarest, twice, that he would not agree to such.

Alfouadi and Pratt testified that they continued to work on the wreck removal every day without the assistance of Demarest.  Alfouadi expressly denies entering into any oral or implied contract with Demarest and Plaintiff GMM. Alfouadi testified that the first mention of any involvement by GMM was when Alfouadi received Plaintiff GMM's complaint.

GMM has failed miserably in its burden of proving its claims for breach of oral and implied contract, quantum meruit, pure salvage, and it is not entitled to any damages. GMM's case is based primarily on the testimony of Demarest, who completely lacks credibility. Demarest has admitted to making intentional misrepresentations during January 2022 to get what he wanted. Such actions became more evident following his voluntary dismissal of his individual claims with prejudice, subsequent to the deemed admissions. Demarest's efforts to work around the legal effects of those admissions has caused him to take factual positions that are inconsistent with those taken previously; the timing of which is highly suspect.

Consequently, Demarest's trial testimony defies common sense and is contradicted by his prior testimony under oath, his deposition, interrogatories, and in court filings. Further, Demarest's testimony is contradicted by the credible testimony of Alfouadi, Pratt, and the physical evidence. Accordingly, the Court should enter judgment in favor of Alfouadi on all Counts.

## II.    ARGUMENT

### A.    GMM Never Had An Oral Salvage Contract With Alfouadi

GMM failed to establish that it entered into a valid and binding oral salvage contract with Alfouadi. Under Hawai'i law, to prevail on a breach-of-contract claim, a party must prove: "(1) the contract at issue; (2) the parties to the contract; (3) whether Plaintiff performed under the contract; (4) the particular provision of the contract allegedly violated by Defendants; and (5) when and how Defendants allegedly breached the contract." *Evergreen Eng'g, Inc. v. Green Energy Team LLC,* 884 F. Supp. 2d 1049, 1059 (D. Haw. 2012); *see also Au v. Au,* 63 Haw. 210, 221, 626 P.2d 173, 181 (1981).

#### 1.    GMM Was Not A Party To Any Alleged Oral Contract With Mr. Alfouadi

At no time was GMM a party to the alleged January 2, 2022 oral salvage contract with Alfouadi. Demarest's testimony regarding the issue only undermines his credibility.

From the inception of this litigation, until after Demarest voluntarily dismissed his individual claims against Alfouadi with prejudice, Demarest never deviated from the claim that he entered into the alleged January 2, 2022 oral salvage contract with Alfouadi *in his individual capacity*, not as GMM.

For example, in his sworn answers to Alfouadi's interrogatories, Ex. 203; 1-162:21 to 1-163:14, interrogatory No. 5 asked, *inter alia*, how Demarest became involved in the alleged salvage operations, how Alfouadi authorized Demarest to perform salvage operations, and the nature and timing of any arrangements with Alfouadi. 1-163:19 to 1-164:1. At trial, Demarest admitted that his sworn response to Interrogatory No. 5 stated, in relevant part, "*I offered to stick my neck out to take on environmental salvage and wreck removal responsibility*; . . . ." (emphasis added), yet nothing was stated in his interrogatory response with respect to GMM doing the salvage or being involved in any way. 1-162:13 to 1-165:6.

Demarest also admitted at trial that during his deposition, he testified that because GMM was not registered to do business on January 2, 2022, he took on the salvage *as an individual*, not as GMM. 1-165:7 to 1-166:1.

Furthermore, Demarest represented to this Court, both in his testimony at trial and Motion For Voluntary Dismissal With Prejudice, marked as Ex. 336, that "the alleged original meeting of the minds" was "between [himself], *as an individual*, and Alfouadi on January 2, 2022 . . . ." (Emphasis added). Demarest's attempt to now paint the fact that he was acting in his individual capacity, with respect to the "alleged original meeting of the minds" language, as false by ascribing the statement in Ex. 336 to Alfouadi, *see* 2-40:5-9, is unbelievable in light of the context of the full paragraph read into evidence. *See* 1-168:22 to 1-169:11. It also erodes his credibility further.

The Court should take judicial notice of the fact[1] that lines 1-7 of page 2 of Ex. 336 were written by Demarest as a basis for explaining to the Court why he lacked standing to

---

[1] The Court may take judicial notice *sua sponte* at any stage of the proceedings.  FRE 201(c), (d).

pursue his individual claims against Alfouadi, in support of his Motion for Voluntary Dismissal With Prejudice ("Motion"). To that end, Mr. Demarest represented that "the rights permanently transferred from Plaintiff Demarest to Plaintiff GMM . . . included the alleged original meeting of the minds between Mr. Demarest, *as an individual* and Mr. Alfouadi . . . ." Ex. 336 (emphasis added). The only reasonable interpretation of this language, within the context of the entire paragraph and intent of Demarest's Motion, is that Demarest entered into the alleged January 2, 2022 oral salvage contract with Alfouadi *as an individual*, not as GMM. Were it not so, as Demarest impliedly testified at trial under oath, *see* 2-40:5-9, then there would have been no rights to transfer to GMM. In other words, if Demarest was acting in his official capacity on behalf of GMM on January 2, 2022, then the representations made to the Court by Demarest in Ex. 336, in support of the Motion, were false and violated FRCP Rule 11.

Any alleged statement made by Alfouadi, with respect to this issue, appears in the quoted language within the paragraph. *See* Ex. 336, lines 4-6; 1-167:1-11. Alfouadi allegedly stated that "[Plaintiff] was under the understanding that once a claim was filed, *he* [Demarest] can bill for his hours . . . ." *See* Ex. 336, lines 4-5. The quoted language makes reference to "he" and not GMM, which in the context of the evidence presented, can only mean Demarest. Furthermore, Alfouadi's statement was made after Demarest had made the intentional misrepresentation that he was the salvor on record. As such, Demarest's rebuttal testimony regarding this issue is untenable, uncredible, and should be afforded no weight.

Demarest's credibility and believability on this issue was further diminished by his constant self-correction. Towards the beginning of his trial testimony, Demarest would

continually stop himself after making a statement that could be attributed to him in his individual capacity, and then restate what he said in terms of GMM.  The following are examples:

> Q     And how did all of this stuff get into this pile at Lahaina Welding?
>
> A     *My team, you know, myself*, Andre, other volunteers that he brought in, Matthew McCarthy, Ryan Murphy, a number of different people all really did an amazing job helping make it happen. *But I was the core -- my business was the core* means of making it happen by having the efficient process by which to remove so much debris in a quick manner.  1-90:9-16 (emphasis added).

> Q     So what was it that happened on the 6th that was a disagreement between you and Mr. Alfouadi?
>
> A     We had a disagreement as to the safe use of the equipment that was being used *that I was -- my business and I were* providing. . . . 1-91:12-16 (emphasis added).

> Q     How did that big piece of the boat get onto the back of your girlfriend's pickup?
>
> A     *Me and my team. My business and my business's team*.  1-105:21-23 (emphasis added).

Towards the middle of his direct exam, after making a concerted effort to correct himself, Demarest tended to revert back to his individual capacity:

> Q     Do you know how those large pieces of the boat were removed from the site?
>
> A     *My team* removed them. There are a couple videos of towing them out as well, I believe.  1-110:7-10 (emphasis added).

> [while testifying about Plaintiff's Ex. 103]
> And you can proceed. Oh, actually, you'll note that you can see divers in the area. So that was another factor that *my team* had to navigate. 1-120:2-4 (emphasis added).

> [while testifying about Plaintiff's Exhibit 5]

> So the solution *my team* did, with me and Andre being central to it, was having half-inch long length chain with shackles and turnbuckles, so with the right length of chain we were able to tighten the chain to the keel so there was absolutely no slack by tightening the turnbuckles.  1-123:12-16 (emphasis added).

Q     So it looks like this is a very short video. Can you tell us what Exhibit 108 is?
A     This is an example of how *my team* was removing the larger pieces.  1-130:16-19 (emphasis added).

Whether GMM was a party to any enforceable salvage contract with Alfouadi is a highly disputed issue of fact in this matter. Demarest's manner while testifying—intentionally trying to avoid testifying in terms of his individual capacity at first, and then reverting back later—however, is not consistent with GMM being a party to the alleged oral salvage contract. It only lends credibility to the conclusion that at all relevant times, Demarest was acting in his individual capacity.

Lastly, GMM presented no evidence that proves, by a preponderance, that it entered into a valid and binding salvage contract with Alfouadi, independent of the alleged contract negotiations that took place on January 2, 2022 between Alfouadi and Demarest, in his individual capacity.  As no contract between GMM and Alfouadi was formed, no breach could occur.  Count I, therefore, fails because GMM cannot establish that it was party to any valid and binding oral salvage contract with Alfouadi.  *Evergreen,* 884 F. Supp. 2d at 1059; *Au,* 63 Haw. at 221.

### 2.    GMM Presented No Evidence of a Valid Offer or Consideration

With respect to the first element, "[i]n order for an oral contract to be enforceable, there must be an offer, an acceptance, and consideration." *Douglass v. Pflueger Hawaii, Inc.,*110

Hawai'i 520, 525, 135 P.3d 129, 134 (2006), *as corrected* (May 30, 2006) (recognizing the

elements of a valid oral contract as offer, an acceptance, and consideration).

The Hawai'i Supreme Court defines an offer as:

> the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that the person's assent to that bargain is invited and will conclude it. While particular words and formalities are not required, the communication must be sufficiently definite to manifest the maker's intent to bestow upon the addressee the power of acceptance.

*Willis v. Swain,* 112 Hawai'i 184, 190, 145 P. 3d 727, 733 (2006) (citing *Restatement (Second)*

*of Contracts* § 24; *Wong Kwai v. Dominis,* 13 Haw. Terr. 471, 476 (1901)) (internal quotation

marks and alterations omitted)).

GMM failed to establish, by a preponderance of the evidence, that it extended a valid

offer to Alfouadi.  Demarest testified that on January 2, 2022, GMM's alleged offer to

Alfouadi, in the presence of Pratt, was "to have my company take responsibility to be

conducting an environmental salvage and wreck removal, in exchange for him quickly

opening a claim with his insurance company." 1-61:11-14.  Both Alfouadi, *see* 3-141:8-18,

and Pratt, *see* 2-186: 18-22, denied under oath that any such offer was made.  GMM presented

no further evidence of the offer.

That GMM, through Demarest, offered to do anything to help Alfouadi lacks

credibility given the history between Demarest and Alfouadi before January 2, 2022.  From

June to December of 2020, Alfouadi performed significant repairs to Demarest's boat with

absolutely no monetary compensation from Demarest for his work. 1-183:11 to 1-186:14.

Things soured between them and as January 2021, Demarest and Alfouadi were no longer

friends due to a prior dispute that arose from a roofing job at Lahaina Welding. 1-186:15-20.
According to Demarest, the friendship "dissolve[ed]" and "evaporate[d]" to the point that
Demarest no longer trusted Alfouadi. 1-186:23 to 1-187:17; 3-114:5 to 3-115:3.  Aside from
necessary communication with Demarest as a tenant at Lahaina Welding, Alfouadi and
Demarest were not talking to each other before January 2, 2022.  3-115:1 to 3-116:12.
Alfouadi "lost all respect for [Mr. Demarest.]" 3-116:12. Against this evidentiary backdrop,
Alfouadi's alleged agreement to assist Demarest with the wreck removal, *see* 1-62:16-21, is
utter nonsense. Under these factual circumstances, without more, GMM's sole allegation of
an offer, *see* 1-61:11-14, to Alfouadi is not believable or credible, and fails to satisfy this
essential contract element by a preponderance.

Furthermore, Demarest's alleged statement to Alfouadi on January 2, 2022 does not
amount to an offer for contract purposes. "[S]ince an offer must be a promise, a mere
expression of intention or general willingness to do something on the happening of a particular
event or in return for something to be received does not amount to an offer." *Beverage
Distribs., Inc. v. Olympia Brewing Co. ("Olympia")*, 440 F.2d 21, 29 (9th Cir. 1971) (citations
omitted); *Willis v. Swain*, 112 Haw. 184, 190, 145 P.3d 727, 733 (2006) (a "general expression
of willingness to bargain [does] not constitute an offer.") (citations omitted). Demarest's
"offer[] to have [his] company take responsibility to be conducting an environmental salvage
and wreck removal, in exchange for [Alfouadi] quickly opening a claim with his insurance
company[]" *see* 1-61:11-14, is not a *promise* to do something, rather, it is a "willingness to
do something on the happening of a particular event or in return for something to be

9

received[,]" such as, the opening of an insurance claim. *Olympia*, 440 F.2d at 29. Thus, it is not a valid offer. *Id.*

As for consideration, where "the promisor retains the unlimited right to decide later the nature and extent of his performance the promise is illusory." *Olympia*, 440 F.2d at 30. "Where the apparent assurance of performance is illusory, it is not consideration for a return promise. *Balogh v. Balogh*, 134 Haw. 29, 58-59, 332 P.3d 631, 660-61 (2014). For example, a promise to "work hard in a marriage" is illusory because the promisor reserves a right to alternative performances—i.e. divorce or separation—which would not constitute consideration. *Id.* at 59. Furthermore, the promisor's performance of the "promise" is entirely optional; that is, there is no consequence or detriment to the promisor for a decision to "breach" the contract by not working hard in the marriage. *Id.*

Here, on its face, GMM's performance with respect to any alleged oral contract with Alfouadi is entirely optional in that there is no consequence or detriment to GMM for a decision to breach the contract by NOT taking responsibility for the salvage wreck removal. *See id.* "[A] promise of return performance that allows for alternative performances that include not performing, cannot constitute consideration." *Id.* GMM did not make a valid return promise in exchange for Alfouadi's alleged promise to open a claim with his insurance company.

Moreover, GMM could not suffer a detriment due to Alfouadi not opening an insurance claim. Demarest testified that upon Alfouadi's "okay" which Demarest alleged indicated Alfouadi's acceptance of the offer, Demarest "understood that to mean that in return [Alfouadi] would open up a claim so [Demarest] could get compensated for [his] work." 1-

62:1-11. This is nonsensical. There was no discussion of compensation in Demarest's offer. Also, the ultimate decision as to whether Demarest/GMM would actually be paid, even if Alfouadi opened an insurance claim, was not Alfouadi's, but rather, State Farm's. As such, consideration is also too indefinite to be binding because it is not solely based on Alfouadi's performance. GMM, therefore, failed to satisfy its evidentiary burden, by a preponderance, with respect to offer and consideration.

### 3. GMM Presented No Evidence Of A Valid Acceptance By Alfouadi And Mutual Assent To Essential Terms

"There must be a mutual assent or a meeting of the minds on all essential elements or terms to create a binding contract." *Earl M. Jorgensen Co. v. Mark Const., Inc.,* 56 Haw. 466, 470, 540 P.2d 978, 982 (1975) (finding it clear from undisputed facts that party's submission of purchase order was a manifestation of intent to accept offer); *see also* Restatement (Second) of Contracts § 50(1) ("Acceptance of an offer is a manifestation of assent to the terms thereof made by the offeree in a manner invited or required by the offer.").

The existence of mutual assent or intent to accept "is determined by an objective standard." *Earl M. Jorgensen,* 56 Haw. at 470, 540 P.2d at 982. "A party's words or acts are judged under a standard of reasonableness in determining whether he has manifested an objective intention to agree. All reasonable meanings will be imputed as representative of a party's corresponding objective intention." *Id.* The Hawai'i Supreme Court emphasizes that "[c]ontracting is a sentient process. There must be objective proof of a meeting of the minds. The prospective contracting parties are not expected to engage in telepathy. There must be a confluence of assent *around specific terms." United Pub. Workers, AFSCME, Loc. 646, AFL-*

*CIO v. Dawson Int'l, Inc.,* 113 Hawai'i 127, 141, 149 P.3d 495, 509 (2006) (internal quotation

marks, alterations, and citations omitted) (emphasis added).

     Based on the evidence presented by GMM at trial, telepathy is the only way by which

a "meeting of the minds" as to all the essential terms of a binding oral salvage contract could

have formed between GMM and Alfouadi. Most glaringly, GMM failed to establish an

agreement with Alfouadi as to the terms of payment.[2]  At trial, Demarest did not refute that

payment for the alleged oral salvage contract was "*presumed* to be based on Lloyds open

forum with SCOPIC clause[,]" as stated in GMM's original complaint and First Amended

Complaint. 1-203:5-12.  Demarest also "accept[ed] responsibility for [the] presumption"

which he further affirmed as "correct."  1-203:17-18; *see also* 2-31:25 to 2-32:1 ("And its true

that I presumed SCOPIC would apply at the very beginning of this matter."). In fact, Demarest

also admitted to:  not discussing an hourly rate for services with Alfouadi, *see* 1-195:8-11;[3]

not discussing additional purchases of equipment to do the salvage with Alfouadi, *see* 1-

196:3-5; not discussing the hiring of paid-third-party labor and associated pay rates with

Alfouadi, *see* 1-195:20-25; not discussing the additional uplift charge on all expenses with

Alfouadi, *see* 1-198:8-12; and not providing even a rough ballpark estimate of cost to

Alfouadi, *see* 1-196:23 to 1-197:1 (collectively "Essential Terms"). Instead, Demarest "relied

on [Alfouadi's] understanding *that I believed he had* from prior interactions I had with him."

1-197:1-3 (emphasis added).  This is not compelling and lacks credibility because neither was

---

[2] *See* ECF No. 76 at 18 (explaining that an agreement with respect to the terms of payment is an essential term).
[3] Thus, Mr. Demarest did not discuss the use or application of the Coast Guard hourly BOA rates with Mr. Alfouadi.

a friend with nor was speaking to the other before January 2, 2022. Demarest's *belief* acknowledges that there was no reasonably objective understanding between the parties, merely speculation and presumption by Demarest.

The evidence clearly demonstrates that there were no negotiations between the parties with respect to the Essential Terms. GMM's own expert, Mr. Sebastian Coppes, testified that with respect to salvage contracts "at the start of any salvage job, everything is open for negotiation." 2-68:17-18. This applies to both emergent and large-scale catastrophic salvage operations; there is still a negotiation between the boat owner and the salvage company. 2-95:16 to 2-96:2. It also applies to the rates charged. 2-96:24 to 2-97:3. Here, there was no discussion or negotiation with Alfouadi as to the Essential Terms—Demarest just made them up as he went.

The evidence fails to show that Alfouadi knew, or should have known, that any of the above terms were an essential assumption of the alleged agreement. Demarest admitted that he did not discuss the Essential Terms with Alfouadi. As such, GMM has produced no evidence of "words or acts" for the Court to determine that both GMM and Alfouadi objectively manifested an intent to accept or mutually assent to employ GMM's salvage services on certain specified terms. *Earl M. Jorgensen,* 56 Haw. at 470, 540 P.2d at 982.

### 4.    GMM Presented No Evidence of a Specific Provision Breached

At trial, GMM proffered no admissible evidence of the particular provision of the oral contract allegedly violated by Alfouadi. *See Evergreen,* 884 F. Supp. 2d at 1059; *Au,* 63 Haw. at 221, 626 P.2d at 181. GMM's Exhibit 59 was presented as "the breach by Mr. Alfouadi showing that as of January 19, 2022, he had not made a claim with State Farm, which is

precisely what we claim was his obligation under the oral contract." 1-149:15-18. The Court, however, sustained Alfouadi's objection on hearsay grounds and Exhibit 59 was not admitted into evidence. 1-149:13 to 1-151:7. No additional evidence of the particular oral contract provision allegedly breached by Alfouadi was presented by GMM. Accordingly, GMM failed to satisfy its burden, by a preponderance of the evidence, as to Count I and is not entitled to damages.

**B.    GMM Failed To Satisfy Its Burden With Respect To Count II: Breach of Implied Contract**

The same result applies to Count II. In Hawaiʻi, an implied contract exists:

> where the intention of the parties is not expressed, but an agreement in fact, creating an obligation, is implied or presumed from their acts, as in the case where a person performs services for another, who accepts the same, the services not being performed under such circumstances as to show that they were intended to be gratuitous, or where a person performs services for another on request.

*Kemp v. State of Hawaiʻi Child Support Enf't Agency,* 111 Hawaiʻi at 391, 141 P.3d at 1038 (quoting *Durette v. Aloha Plastic Recycling,* 105 Hawaiʻi 490, 504, 100 P.3d 60, 74 (2004)) (emphasis removed). The "essential element of an implied contract" is a "*mutual intent to form a contract"* that is implied from the *"actions of the parties."* Id. (emphasis in original).

As argued above, there was no meeting of the minds as to the Essential Terms. *see* Section II(A)(3)*, supra,* and no valid offer or consideration*. See* Section II(A)(2) *supra.* The evidence does not allow the Court to draw a reasonable inference as to GMM's and Alfouadi's mutual intent to imply a contract on any clear terms. *Kemp,* 111 Hawaiʻi at 391, 141 P.3d at 1038. Accordingly, GMM fails to satisfy its burden, by a preponderance, as to Count II and is not entitled to damages.

14

### C.    GMM Fails To Satisfy Its Burden With Respect To Count III: Quantum Meruit

Demarest's unclean hands preclude GMM's recovery under quantum meruit.  In Hawai'i, "'[t]he basis of recovery on quantum meruit is that a party has received a benefit from another which it is unjust for him to retain without paying therefor[e].'" *Hawaii Ventures, LLC v. Otaka, Inc.,* 114 Hawai'i 438, 164 P.3d 696, 742 (2007) (quoting *Maui Aggregates, Inc. v. Reeder,* 50 Haw. 608, 610, 446 P.2d 174, 176 (1968)). "Under Hawaii law, whether the [d]efendants received some benefit in the exchange is key." *UCSF-Stanford Health Care v. Hawaii Mgmt. All. Benefits & Servs., Inc.,* 58 F.Supp.2d 1162, 1171 (D. Haw. 1999) (citation omitted). "If a party derives any benefit from services rendered by another, the law reasonably implies a promise to pay on the part of the one who has received such benefit, such amount as it is reasonably worth." *Maui Aggregates, Inc.,* 50 Haw. at 610, 446 P.2d at 176 (citation and internal quotation marks omitted).

It is also well established that he who comes into equity must come with clean hands. *7's Enters., Inc. v. Del Rosario*, 111 Hawai'i 484, 494, 143 P.3d 23, 33 (2006). The maxim "is confined to misconduct in regard to, or at all events connected with, the matter in litigation, so that it has in some measure affected the equitable relations subsisting between the two parties, and arising out of the transaction[.]" *Id*. at 494-95, 143 P.3d at 33-34. The doctrine "closes the door of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." *AIG Haw. Ins. Co. v. State Farm Ins. Cos.*, No. 27789, 2008 Haw. App. LEXIS 627, at *21 (App. Oct. 8, 2008) (citation omitted).

GMM, having proven no valid oral or implied salvage contract with Alfouadi, should be barred from equitable relief due to Demarest's unclean hands. Admissions Nos. 26 - 35 of Alfouadi's Exhibit 204, his First Request For Answers To Admissions to Demarest, were admitted into evidence and conclusively established, as a matter of law, Demarest's intentional misrepresentations to Alfouadi on January 6, 2022 and Alfouadi's detrimental reliance on said misrepresentations (collectively "Misrepresentations"). 2-10:5 to 2-18:3. The evidence is clear that but for Demarest's January 6, 2022 Misrepresentations to Alfouadi, GMM would neither have been involved nor able to seize control of the wreck removal.

As discussed above, prior to January 2, 2022, Demarest and Alfouadi were not friends. Neither party denies this. Demarest no longer trusted Alfouadi. 1-186:23 to 1-187:17; 3-114:5 to 3-115:3. The two of them were not talking to each other. 3-115:1 to 3-116:12. Alfouadi "lost all respect for [Mr. Demarest.]" 3-116:12. Demarest's testimony that Alfouadi asked him to assist with the wreck removal, or agreed to assist Mr. Demarest in that endeavor, therefore is completely unbelievable.

Moreover, from January 2, 2022 to January 6, 2022, Demarest admitted that Alfouadi was a "hard worker," was working very diligently to make things right as possible, and preoccupied with harm reduction. 1-216:8-25; 1-217:12-16. Demarest was even impressed with Alfouadi's efforts "given the dire circumstances he was under" because most boat owners would have simply walked away. 1-217:17-21. Combined with Alfouadi's undisputed education, extensive sailing and salvage experience, ownership of his own salvage tools and unfettered access to Lahaina Welding's salvage tools, the assistance of Pratt, his family, other volunteer labor from the Lahaina boating community, Alfouadi's plans of how to remove the

keel, diesel gas tank, and motor from water, and having already extricated 80% of the boat by January 6, 2022,[4] the evidence clearly establishes that at no time did Alfouadi have any intention or reason to walk away from the wreck removal until it was completed. Without Demarest's Misrepresentations, that he was the "salvor on record," Alfouadi would have never relinquished control of the wreck removal to Demarest/GMM and left the site.

In addition to the admissions, the evidence also establishes that Alfouadi's reliance on the Misrepresentations was reasonable. During the evening of January 2, 2022, State of Hawaii Department of Land and Natural Resources ("DLNR") officer Cory Fernandez, a DLNR trainee officer, and Demarest came to Alfouadi's boat for a brief conversation essentially about the status of hazmat removal. 3-148:2-20. On January 4, 2022, Demarest presented Alfouadi with a U.S. Coast Guard Recreational Boating Accident Report, Exhibit 248, and requested that Alfouadi fill out the report, per the request of the State of Hawaii. 1-138:18 to 1-139:13.

The evidence also makes clear that at all relevant times, Alfouadi's understanding of the term "salvor of record" or "salvager of record" was that the State of Hawaii had officially selected that individual to do the salvage. *See* 4-97:24 to 4-104:13. Therefore, on January 6, 2022, when Demarest announced to Alfouadi that he was the "salvager on record. If anything happens to you here, I am responsible[,]"[5] Alfouadi's belief in Demarest's statement was reasonable in light of Demarest being accompanied by Officer Fernandez on January 2, 2022 and then Demarest advising Alfouadi to fill out the boating accident report on January 4, 2022

---

[4] *See* Section D(1), *infra*, for citations to the transcript.
[5] *See* 3-192:11-14.

at the request of the State.  Alfouadi's belief was further confirmed when on January 7, 2022, Officer Fernandez returned with Demarest to discuss the status of Alfouadi's boat insurance because according to Officer Fernandez, it was invalid, and Alfouadi needed to send proof of valid insurance to Officer Fernandez immediately. *See* 3-234:17 – 3-237:4.

Demarest's unclean hands are further established by the fact that GMM failed to rebut Alfouadi's evidence that on June 6, 2022, about 45 minutes after Alfouadi left the job site, having previously extracted 80% of the boat from the water up onto the rock jetty, sections of the hull were intentionally released back into the water. 3-233:7-16.  It is undisputed that Demarest was in control of the wreck removal at this time. This act significantly complicated matters, extended the time, and increased the cost to complete the job.  The only interest served by doing this was Demarest's/GMM's pecuniary gain.

Extending the time to complete the job an additional 11 days beyond the date  Alfouadi could have completed the wreck removal, and significantly increasing the cost of doing it, conferred no benefit on Alfouadi.  Demarest's unclean hands flow to GMM because its involvement in the wreck removal arose solely from Demarest's Misrepresentations.  At trial, GMM presented no evidence to the contrary, therefore, Demarest's unclean hands "closes the door" to GMM's equitable relief under Count III.  *AIG Haw. Ins. Co.*, No. 27789, 2008 Haw. App. LEXIS 627, at *21.

## D.    GMM Failed To Satisfy Its Burden With Respect To Count IV: Pure Salvage

GMM's pure salvage claim fails as well. A pure salvage award is "the compensation allowed to persons by whose *voluntary assistance* a ship at sea or her cargo or both have been saved in whole or in part from impending sea peril."  ECF No. 76 at 26 (citing *The Sabine*,

101 U.S. 384, 384 (1879) (emphasis added))). In "[t]he most recent complete judicial definition in this circuit of the elements for a [pure] salvage claim," *Bay & Delta Tractor Tug Co. v. Barge Pac. Trader,* 1997 WL 797935, at *1 (N.D. Cal. Dec. 16, 1997), the Ninth Circuit held:

> [t]he elements of a salvage claim are as follows: [(1)] There must be a maritime peril from which the ship or other property *could not have been rescued without the salvor's assistance*.[6] [(2)] The salvor's act *must be voluntary*—that is, he must be under no official or legal duty to render the assistance. [and (3)] The act must be successful in saving, or in helping to save, at least a part of the property at risk.

Id. (citing *U.S. Dominator, Inc. v. Factory Ship Robert E. Resoff,* 768 F.2d 1099, 1104 (9th Cir. 1985), *superseded by statute on other grounds* (quoting *The Law of Admiralty* § 8–2 (2d ed. 1975) (citing 3A *Benedict on Admiralty* § 2 (1983)) (internal quotation marks omitted and emphasis added).

### 1.  Alfouadi Did Not Require GMM's Assistance

At trial, GMM failed to present any evidence that Alfouadi could <u>not</u> have rescued his own boat <u>without</u> GMM's assistance. The evidence admitted clearly established Alfouadi's education, 60 years of relevant experience, ownership of and/or access to the needed tools and equipment, and volunteer assistance from Pratt, his family, and the general Lahaina Maui

---

[6] "[A] salvor is . . . a person who, without any particular relation to the ship in distress, proffers useful service and gives it as a volunteer adventurer without any pre-existing contract that connected him with the duty of employing himself for the preservation of the vessel." *The Clarita,* 90 U.S. (23 Wall.) 1, 16 (1874). With respect to the "necessity" requirement in the first element, the Court acknowledged that it is bound to follow on-point Ninth Circuit precedent, which maintains the necessity requirement. ECF No. 76 at 27, n.9 (referring to <u>U.S. Dominator</u> and quoting <u>Zuniga v. United Can Co.</u>, 812 F.2d 443, 450 (9th Cir. 1987) (stating that district courts are "bound by the law of their own circuit" and "are not to resolve splits between circuits no matter how egregiously in error they may feel their own circuit may be."))).

boating community, were readily available to Alfouadi and effectively utilized from January 2, 2022 to January 6, 2022. Alfouadi had everything he needed to complete the wreck removal, sans GMM, by or before January 8, 2022.

Alfouadi testified that he is educated in civil engineering, mechanical engineering, and applied physics. He also worked in residential and commercial construction management which provided extensive experience with an array of hand tools, power tools, electrical and gas-powered cutting equipment, and heavy machinery including but not limited to cranes, hoists, and forklifts, amongst other things.

Sailing from his childhood days, Alfouadi testified that he is an experienced life-long sailor. As a young adult in California, Alfouadi worked as a crew member and/or captain of private-owned boats, and logged thousands of miles of sailing up and down the west coast of the United States from Oregon to San Diego. Alfouadi also has extensive inter-island sailing experience in Hawaii.

Alfouadi has owned multiple boats over his lifetime, including two sailboats. The first, a Cal 25, was purchased in California where Alfouadi employed his extensive skill in all aspects of boat repair and maintenance to completely hull out, refurbish, and paint the boat before sailing it for 20 days by himself across the Pacific to Hawaii. Similarly, the second sailboat, the subject Cal 29, was extensively repaired an refurbished by Alfouadi, which included the mast, rigging, halliards, ropes, the bow and bowsprit, quadrant, rudder, electrical instruments, plumbing, motor, and fiberglass work. Alfouadi also sailed the Cal 29 from California to Hawaii by himself.

Prior to January 2, 2022, Alfouadi was involved in at least 30 salvage and wreck removal jobs. He also had extensive voluntary and paid experience in salvage and wreck removal in the Lahaina-Kaanapali area. The evidence shows that Alfouadi was paid to assist Mr. Brent Hartwig with the salvage of the Sophia, owned by Mr. Matthew McCarthy, when the Sophia, a 40' sailboat, went aground on the reef near Front Street in Lahaina. Alfouadi immediately assisted with the removal of hazardous materials and personal items from the Sophia. He also fabricated a chain-linked string of several tires and placed them under the Sophia to protect the hull from cracking against the reef. This was done by using lift bags to carefully raise the boat and then slipping the tires underneath to cushion the hull.

The evidence also shows that approximately one month before the subject incident on January 2, 2022, a storm caused Alfouadi's neighbor, Mala Dave's, boat to run aground on the beach fronting the Kaanapali hotels, north of the Mala mooring field. Again, Alfouadi assisted by immediately removing the hazardous materials, personal items, and valuable electronic equipment from Mala Dave's boat.

Additionally, through Alfouadi's relationship with Mr. Drake Thomas, owner of Lahaina Welding, Alfouadi was contracted by Lahaina Welding/Drake Thomas to do the work salvaging a trimaran[7] that went ashore a few blocks away from Lahaina Welding. This matter required both dive work and shore work. Alfouadi spent hours diving to retrieve the batteries and other heavy items that had sunk as a result of the grounding. Using a forklift and truck, Alfouadi salvaged the boat and its contents, transported them to a processing site, cut them

_____

[7] A trimaran is a multi-hulled boat characterized by a main hull and two smaller outrigger hulls.

down, an disposed of the items accordingly.  This process was then repeated until the job was completed.

Aflouadi also testified that his personal and business relationship with Drake Thomas provided Alfouadi with access and authority to use the full array of tools, including but not limited to: a welding shop; mechanic bay; generators; compressors; and salvage tools necessary to do any salvage job.  Alfouadi also owned his own tools, large lift bags rated at 4400 lbs., and diving equipment stored at Lahaina Welding.

Furthermore, on the day of the grounding, Mr. Alfouadi's friendship with Pratt, a former residential/commercial contractor and experienced boater, provided qualified assistance with assessing the fluid situation, developing a plan to retrieve and remove the boat, and safeguarding the Mala Wharf.  From January 2, 2022 to January 6, 2022, both Alfouadi and Pratt, in addition to assistance from Pratt's family members and other general volunteers from the local Lahaina boating community, worked tirelessly, efficiently, and effectively to complete 80% of the job by January 6, 2022.  Only the keel, empty diesel tank, diesel engine, and small miscellaneous hardware items remained in the water.  But for Mr. Demarest's Misrepresentation on January 6, 2022, Alfouadi would have completed the job by January 8, 2022.

GMM presented no evidence either rebutting the above facts or establishing the necessity requirement. *See U.S. Dominator*, 768 F.2d at 1104. Thus, GMM's salvage claim fails because the evidence does not establish, by a preponderance, that Alfouadi could not have rescued/salvaged his own boat without GMM's assistance.

### 2. GMM Failed To Prove That Its Was A Volunteer

Equally fatal, GMM presented no evidence at trial, that at any relevant time, it was a volunteer.  GMM's failure to address this element alone dooms its pure salvage claim. *See U.S. Dominator*, 768 F.2d at 1104.

### 3. GMM's Pure Salvage Claim Is Barred By Mr. Demarest's Unclean Hands

Under federal admiralty law,"[t]he salvor who seeks a reward for his services in rescuing property on navigable waters[] must act in entire good faith and with honesty of purpose. He must come into court with clean hands." *Columbus-America Discovery Grp ("Columbus-America"). v. Atl. Mut. Ins. Co.*, 56 F.3d 556, 569 (4th Cir. 1995) (citing 3A Martin J. Norris, Benedict on Admiralty § 99 (7th ed. 1993).  As discussed in Section II(C), *supra*, GMM's authority, if any, to perform salvage work was undoubtedly fruit procured by means of fraud and misrepresentation. Such iniquitous actions, cannot be sustained in equity and warrant no damages. Thus, GMM fails to satisfy its burden as to Count IV and judgment in favor of Alfouadi should be entered.

### E. GMM's Alleged Damages Are Further Evidence Of The Ongoing Misrepresentation In This Matter And Should Not Be Awarded

While GMM failed to establish a basis for liability against Alfouadi and the Court need not address the issue of damages, the amounts, means, and methods employed by GMM/Demarest to calculate its damages lack credibility and are further evidence of the ongoing intentional misrepresentation in this matter.

There is no evidence in record that Demarest, at any time, provided an invoice for the work done to either Alfouadi or State Farm. What is well established, and has been

consistently alleged in GMM's original and First Amended Complaints, is that the alleged salvage contract was "presumed to be based upon the Lloyds Open Form with SCOPIC clause . . . ." 1-199:19 to 1-201:7. Demarest confirmed the presumption in the complaints and affirmed it was correct, "accept[ing] responsibility for that presumption[.]" 1-203:13-17.

Nonetheless, the SCOPIC spreadsheet, Ex. 264, upon which GMM bases its alleged damages, was prepared by Demarest for this litigation. *See* 2-103:4-6. Contrary to Demarest's standing presumption, he used U.S. Coast Guard BOA (hourly) rates instead to calculate damages. Demarest also selected and assigned the <u>highest</u> hourly BOA PT rates to his damages despite the complete lack of supporting documentation, time sheets, and/or evidence of the requisite educational/professional qualifications generally associated with those jobs— e.g. a salvage master.[8] Why? According to Mr. Coppes, GMM's expert, Demarest used the highest BOA rates possible to simply "maximize his return." *See* 2-118:14-16. And to top it all off, the only remaining SCOPIC-related element in Demarest's SCOPIC spreadsheet is the 25% uplift. *See* Ex. 264. Why? Uplift does not apply to BOA hourly rates, 2-109:15-23, and an additional 25% on top of the already inflated damages would only "maximize [Demarest/GMM's] return" even more.

Mr. Coppes' is complicit in Demarest's scheme. At trial, with respect to the application of SCOPIC uplift to BOA hourly rates, Coppes was asked "[s]o, from your own testimony, you knew that was wrong, correct? If you're applying basic order agreement rates,

---

[8] Coppes testified that before becoming a salvage master himself, he earned a 4-year bachelors of science degree and worked 11 years in the salvage industry. 2-89:19 – 2-90:6. Thus, Demarest's charges for hours allegedly worked, at the salvage master rate, are not credible given his severe lack of qualifications and experience.

correct?" 2-110:25 – 2-111:1-4. Coppes responded, "If -- if you're hundred percent on basic order agreement rates, yes." *Id.* Coppes merely relied on Demarest's reported hours and BOA PT rates with no independent review or verification. *See* 2-103:22-25; 2-104:1-3; 2-116:18-22; 2-117:4-8.  Demarest even admitted at trial that "there were some days where [he] did not work full days []." 1-157:24 to 1-158:1. Coppes' reports and trial testimony amount to nothing more than a rubberstamp on Demarest/GMM's alleged damages.

Demarest's actions here are consistent with the ongoing intentional misrepresentation in this matter. Awarding damages, under these factual circumstances, will only reward Demarest for seizing upon Alfouadi's misfortune and taking advantage of his own wrong.

## III.   <u>CONCLUSION</u>

Based on the evidence before the Court, judgment in favor of Alfouadi should be entered as to all Counts.

DATED:  Honolulu, Hawaii, October 30, 2025.

/s/ Brent K. Wilson
JAMES V. MYHRE
BRENT K. WILSON
Attorneys for Defendant
RAIED J. ALFOUADI

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| DAVID DEMAREST and GREEN MOUNTAIN MYCOSYSTEMS LLC, | )<br>)<br>)<br>) |
| Plaintiffs, | )<br>) |
| vs. | )<br>) |
| RAIED J. ALFOUADI; DOE DEFENDANTS 1-20, DOE CORPORATIONS, 1-20, DOE GOVERNMENT AGENCIES 1-20, DOE PARTNERSHIPS 1-20, | )<br>)<br>)<br>)<br>) |
| Defendants. | )<br>)<br>)<br>)<br>) |

CASE NO. 22-CV-00064-JAO-KJM
(In Admiralty)

CERTIFICATE OF SERVICE

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the foregoing

document was duly served upon the following parties via CM/ECF on October 30,

2025

KEVIN W. HERRING, ESQ.
kherring@awlaw.com
RYAN M. TOYOMURA, ESQ.
rtoyomura@awlaw.com
First Hawaiian Center
999 Bishop Street, Suite 1400
Honolulu, Hawaii 96813

GLENN KATON, ESQ. (*Pro Hac Vice*)
385 Grand Ave. Suite 200
Oakland, CA 94610

Attorneys for Plaintiff
GREEN MOUNTAIN MYCOSYSTEMS

DATED:  Honolulu, Hawaii, October 30, 2025.

/s/ Brent K. Wilson
JAMES V. MYHRE
BRENT K. WILSON
Attorneys for Defendant
RAIED J. ALFOUADI

2