GLENN KATON  *Admitted Pro Hac Vice*
Katon.Law
385 Grand Avenue, Suite 200
Oakland, California  94610
Telephone:  (510) 463-3350
Facsimile:  (510) 463-3349

ASHFORD & WRISTON
A Limited Liability Law Partnership LLP

KEVIN W. HERRING          6722-0
kherring@awlaw.com
RYAN M. TOYOMURA      11300-0
rtoyomura@awlaw.com
First Hawaiian Center
999 Bishop Street, Suite 1400
Honolulu, Hawaii  96813
Telephone:  (808) 539-0400

Attorneys for Plaintiff
  GREEN MOUNTAIN MYCOSYSTEMS LLC

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| DAVID DEMAREST AND GREEN MOUNTAIN MYCOSYSTEMS LLC | CIVIL 1:22-cv-00064-JAO-KJM (In Admiralty) |
| Plaintiffs, | PLAINTIFF'S CLOSING ARGUMENT; CERTIFICATE OF SERVICE |
| vs. | |
| RAIED J. ALFOUADI, ET. AL., | Trial Date: October 20, 2025 Trial Judge: Hon. Jill A. Otake |
| Defendants. | |

# PLAINTIFF'S CLOSING ARGUMENT

## I.   INTRODUCTION

Plaintiff Green Mountain Mycosystems LLC (GMM) proved at trial that it had a contract with Defendant Alfouadi in which GMM agreed to lead the salvage of Alfouadi's wrecked boat, which included removing from the water the boat debris and Alfouadi's personal belongings that, according to him, could fill a garage, purchase the necessary equipment, and assume all the potential liability for the operation. Alfouadi agreed to open a claim with his insurer so GMM could get paid for its work. The contract did not specify an amount of payment, so the Court, as finder of fact, must decide on a reasonable amount of payment.

GMM successfully led the demanding salvage operation to great success. Nevertheless, Alfouadi refused to open an insurance claim and GMM has neither been paid for its work nor reimbursed for its expenses. GMM prepared a detailed "SCOPIC" spreadsheet the items through which it is seeking payment of $126,410.75, and GMM's expert witness with decades of experience as a salvage master, manager of salvage masters, and insurance representative, testified that GMM's fees were eminently reasonable.

Even if the Court finds that there was no contract, it should award GMM a reasonable payment of $126,410.75, based upon GMM's alternative claims for Breach of Implied Contract, Quantum Meruit, or Pure Salvage.

## II.    BREACH OF CONTRACT

The evidence and testimony prove that Alfouadi breached the oral contract for salvage and wreck removal services with GMM, resulting in damages in the amount of $126,410.75. GMM proved, by a preponderance of the evidence, each element of the breach of oral contract claim. That is, (1) GMM and Alfouadi entered into an oral contract for the salvage of Alfouadi's yacht, (2) the parties to the oral contract were GMM and Alfouadi, (3) GMM successfully performed the salvage operations, (4) Alfouadi promised to file a claim with his insurer to compensate GMM for the salvage work it performed, and (5) Alfouadi failed or refused to file a claim with its insurer as promised in the oral contract. *See Evergreen Eng'g, Inc. v. Green Energy Team LLC*, 884 F. Supp. 2d 1049, 1059 (D. Haw. 2012) (defining the elements of a breach of contract claim as "(1) the contract at issue; (2) the parties to the contract; (3) whether Plaintiff performed under the contract; (4) the particular provision of the contract allegedly violated by Defendants; and (5) when and how Defendants allegedly breached the contract.") (citations omitted); *Calipjo v. Purdy*, 144 Haw. 266, 273, 439 P.3d 218, 225 (2019) (in a breach of contract claim the plaintiff must prove "the existence of the contract; and, two, plaintiff's performance; and, three, defendants' failure to perform an obligation under the contract; and, four, defendants' failure to perform the legal cause of damage to plaintiff's [sic]; and, five, the damage was of the

nature and extent reasonably foreseeable by defendants at the time the contract was entered into.").

**A. Alfouadi entered an oral contract with GMM**

Under Hawai'i law, an oral contract must contain the following elements for it to be enforceable: (1) an offer, (2) an acceptance, and (3) consideration. *See Queen's Med. Ctr. v. Kaiser Found. Health Plan, Inc.*, 948 F. Supp. 2d 1131, 1144 (D. Haw. 2013). GMM, through its managing director, David Demarest, made an offer to Alfouadi shortly after discovering the wreck to assume responsibility for conducting an environmental salvage and wreck removal of his yacht in exchange for Alfouadi opening a claim with his insurance company. Tr. 1-62/3-21. GMM further promised to do everything it could to save Alfouadi's belongings on the yacht. *Id*. GMM told Alfouadi and his friend, Jeff Pratt, that it would need their help to conduct the salvage operation due to the sheer amount of work to be done. Tr. 1-62/16-21. Alfouadi accepted the offer and suggested that Demarest "stop talking so much and get to work." 1-62/2-11. Alfouadi never objected to GMM taking responsibility for the salvage operation. *Id*. In exchange for the work GMM promised to perform, Alfouadi agreed to open a claim with his insurance company. 1-61/3-21; 1-62/2-11.

In fact, Alfouadi's admission at trial that he was going to "file a claim on the boat [so] whomever wants to get paid for the work, they can get paid for – for the work [,]" is proof of Alfouadi's agreement to the contract. 4-69/14-19. Alfouadi

4

also testified that everybody understood that GMM (via Demarest) intended to bill the insurance company for his salvage work. 4-52/24-25, 4-53/1-6.

Although this contract by and between GMM and Alfouadi was never memorialized in writing, in Hawaii, "[I]t is well settled that '[a] contract need not be in writing unless a statute requires it.'" *Credit Assocs. of Maui, Ltd. v. Carlbom*, 98 Haw. 462, 467, 50 P.3d 431, 436 (Ct. App. 2002). Given the exigencies of the circumstances at the time Alfouadi's yacht ran aground, which created the potential for significant environmental harm and loss of personal property, it is unsurprising that the parties reached an oral agreement, as time was of the essence.

### B.    GMM and Alfouadi were parties to the oral contract

The testimony and other evidence at trial prove that GMM, not Demares, was the party to the oral contract. Demarest testified that he offered to have "my company" take responsibility for the environmental salvage operations and wreck removal in exchange for Alfouadi opening an insurance claim. Tr. 1-61/11-14. Demarest also made clear that he was acting on behalf of GMM in his communications with State Farms Insurance and employees of the Department of Land and Natural Resources (DLNR), evidenced by the signature block in each email. *See* Exs. 7, 23, and 24. GMM also testified that it purchased salvage equipment for its operations, not for Demarest personally, and that it paid Andre Espiritu for his work from its company bank account. *See* Ex. 2; 1-52/4-5.

Alfouadi did not offer any credible evidence or testimony to refute the fact that these conversations were between GMM, State Farms Insurance, and DLNR. In fact, Alfouadi admitted that before they stopped talking on January 6, 2022, Demarest told him, in connection with his work, "I'm a company." Tr. 4-75/12-25.

Notwithstanding Demarest's acknowledgment that, starting with the litigation, he received conflicting information about whether GMM could enter into contracts in Hawaii as of January 2, 2022, the great weight of the evidence demonstrates that GMM was the party from the time it entered into the contract with Alfouadi to provide the salvage and wreck removal.

### C. GMM successfully performed the salvage and wreck removal of Alfouadi's yacht

GMM established at trial that it performed its side of the contract to successfully manage and conduct the salvage and wreck removal of Alfouadi's yacht and his personal belongings. GMM coordinated and oversaw the salvage activities and assembled the manpower to assist. One of the first things he did was get into the water to retrieve items that were in it. Tr. 1-73/2-7. Demarest collected flotsam, handed it to Alfouadi on the boat, who passed it up to Pratt on the wharf. 1-73/2-18. He and Pratt also walked the beach to collect flotsam. 1-74/2-12. They then removed the mast that was slamming into the wharf. 1-74/18-25.

On the second day, GMM set up scaffolding to go from the wharf to land to ensure easy access to the wreck site. Ex. 101; Tr. 1-115/21-25; 1-116/1-12. GMM

set up machinery and other equipment near the wreck site, including generators, dust extractors, and a circular saw used to cut the boat into pieces so the pieces could be transported. Ex. 103; Trs. 1-119/14-25, 1-120/1-25.

Over the first few days of the salvage operation, GMM collected, organized, and disposed of nets and other entanglements, as well as hazardous materials such as epoxy and batteries that posed a significant environmental threat to a variety of native and protected marine life. Tr. 4-132/24-25, 4-133/1-4; Ex. 293 at:13. GMM also collected countless flotsam and other debris, such as plastic bags from the ocean. Ex. 293; Tr. 4-139/19-25, 4-140/1-9. In addition to smaller debris and flotsam that could be mistaken as food by sea turtles and monk seals, GMM collected and disposed of much larger and heavier pieces of Alfouadi's yacht. GMM testified about the challenges it faced in removing the boat's extremely heavy keel. Because the yacht was in relatively shallow water, using float bags to move the keel was technically challenging. Ex. 5; Tr. 1-222/12-24; 1-123/1-24. GMM and the team it assembled used chains, shackles, and turnbuckles to move the keel, along with the lift bags, to the boat ramp. *Id*. At that point, West Side Tow, which GMM paid for, was able to remove the keel from the area. *Id*. To remove other large pieces, GMM and its team used lift bags and a dinghy to bring pieces to land for disposal. Ex. 108; Tr. 1-130/17-25. Importantly, at no time did Alfouadi ask GMM or Demarest to stop working on the salvage operation. Tr. 1-156/1-5.

In order to dispose of the debris from the wreck, GMM rented two large dumpsters to properly dispose of nearly 16 cubic yards of vessel debris above and beyond the keel and items salvaged from the vessel. GMM was also required to purchase equipment and other materials for the salvage, which is evidenced by the expense sheet admitted as Exhibit 2. The items purchased included, amongst other things, a dust extractor, wheeled carts, marine debris collection bags, and lift bags. Ex. 2.

Witness Andre Espiritu, a master diver with substantial knowledge of the Mala wharf area surrounding the wreck site, confirmed the work that he did with GMM. Espiritu testified that he and Demarest collected debris from the ocean, put it into lobster bags, and maneuvered other large pieces of the boat past the coral up the boat ramp. Tr. 1-22/21-25; 1-23/1-4. Having worked at the wreck site for over 40 hours over approximately 10 days, Espiritu testified that he used scuba gear to pick up small pieces of debris, such as forks, cups, and plastic bags, and used lift bags for the engine, which had leaking oil. Tr. 1-25/12-25; 1-27/16-26, 1-28/1-19.

All the work that GMM did under the oral contract with Alfouadi was successful, according to expert witness Sebaastian Coppes. Mr. Coppes, with real-world experience as a salvor and salvage master, consistently opined that GMM's work was reasonable in the light of the circumstances. Tr. 2-85/12-18.

**D.    Alfouadi breached the contract by failing to open an insurance claim**

8

Having agreed to a contract for salvage and wreck removal and accepting the work of GMM, Alfouadi admitted he breached his promise to open a claim with his insurance provider. When questioned by his counsel about whether he tried to facilitate a claim with the insurance company, Alfouadi replied:

> So I promised my insurance agent -- he was asking me to file a claim. He said, I can take it for you, or you can file over the phone, or you can go over the internet. *I said, right now I don't want to. I'm involved in wreck removal. I don't want to do any of that.*

Tr. 3-240/11-15. (emphasis added). Even after January 6, 2022, when he stopped working on the salvage, he did not open a claim.

Alfouadi tried to explain that he did not open a claim because he was "intimidated with all the legalities" of it, even though his agent told him he could take it for him, or he could open the claim over the phone or online. 4-66/9-10; 3-240/8-15. Alfouadi testified that he retained a "public adjuster" to help him, but neither he nor the public adjuster opened the claim with the insurer. It was not until much later that GMM's lawyer opened the claim. 4-56/11. Tellingly, Alfouadi was not too intimidated by the process when he tried to open a claim for himself so he could submit his own hours to get paid by the insurance company, nor did he seek the help of a public adjuster. 4-71/14-21.

## E.  Alfouadi's breach of the oral contract damaged GMM

Based on the SCOPIC sheet GMM prepared, the damages caused by
Alfouadi's breach of the contract are $126,410.75, exclusive of attorneys' fees,
costs, and applicable interest. Ex. 264.

The SCOPIC sheet contains the reasonable hourly rates for all personnel,
third-party costs, and other out-of-pocket costs paid by GMM to conduct the
salvage operations successfully. GMM claims 194.25 hours for Demarest's work
on the operation at the rate of $365.00 per hour, six hours for the underwater repair
work of Matthew McCarthy's vessel in exchange for his time spent on the
operation, and 30 hours at a rate of $378.00 for the dive work of Andre Vargas. *Id*.
GMM's out-of-pocket costs for materials and other supplies total $15,689.28. *Id*.;
Ex. 2.

Sebastian Coppes, GMM's expert, who has decades experience as a salvage
master, director of salvage and wreck removal operations for boats of all sizes, and
a special casualty representative experienced in SCOPIC and Basic Order
Agreements, attested to the reasonableness of the rates, work, expenses, and total
amount requested under the SCOPIC sheet.

Coppes testified that, given the high cost of living in Hawaii, the rates on the
invoice sheet were reasonable based on his industry experience. Tr. 2-72/23-25; 2-
73/1-7. GMM used an hourly Basic Order Agreement rate rather than the daily
SCOPIC rate and added a 25% uplift, which is typically applied to the SCOPIC
daily rate, totaling $126,410.75. Coppes testified that this amount was reasonable

based on the totality of circumstances and the amount of work accomplished. Tr. 2-78/1-9.

The amount submitted by GMM was also reasonable, given the significant liability it assumed by leading the operation. Coppes testified that the liabilities of a salvage operation, including injury to people, environmental harm, and damage to property fall on the salvor. Tr. 2-64/4-25. Therefore, based upon the totality of the circumstances, the amount GMM sought in the SCOPIC sheet is the reasonable amount of damages requested in this case, exclusive of attorneys' fees, costs, and applicable interest.

## III.   BREACH OF IMPLIED CONTRACT

If the Court does not find that GMM and Alfouadi had an oral contract, the evidence proves they had an implied contract. Under Hawaii law, an implied contract can be found where the intentions of the parties are not expressed, "but an agreement in fact, creating an obligation, is implied or presumed from their acts." *Durette v. Aloha Plastic Recycling, Inc.*, 105 Hawai'i 490, 504, 100 P.3d 60, 74 (2004). The elements of a breach of an implied contract are nearly identical to those of a breach of contract. *See Cumis Ins. Soc'y, Inc. v. Vallatini*, No. CV 17-00538 DKW-KJM, 2018 WL 3430672, at *3 (D. Haw. July 16, 2018).

A contract can readily be inferred from GMM and Alfouadi's actions. Notwithstanding the fact that GMM made an express offer that Alfouadi accepted as discussed *supra*, Alfouadi's actions demonstrate an assent to GMM's salvage

11

work. Throughout the nearly three weeks of the salvage operation, GMM performed extensive salvage work, including removing hazardous materials, entanglements, and large vessel debris. GMM also coordinated manpower, set up workstations and equipment, and procured the necessary supplies to conduct the salvage operations successfully. At no point did Alfouadi tell GMM to stop doing the work. Tr. 1-156/1-5. Alfouadi did not contest this fact. Alfouadi also understood that GMM expected to be paid for its work. Tr. 4-52/24-25; 4-53/1-6.

Therefore, an implied contract was formed because Alfouadi "*requested* plaintiff to render the services or *assented* to receiving their benefit under circumstances negativing any presumption that they would be gratuitous," *Durette v. Aloha Plastic Recycling, Inc.*, 105 Haw. 490, 504, 100 P.3d 60, 74 (2004), <u>as corrected</u> (Nov. 1, 2004) (emphasis in original). Having proved an implied contract existed, GMM incorporates its arguments, *supra*, which proves all other essential elements of a breach of contract claim.

## IV.   QUANTUM MERUIT

This Court explained the quantum meruit claim in a previous decision in this case as:

> In Hawai'i, " '[t]he basis of recovery on quantum meruit is that a party has received a benefit from another which it is unjust for him to retain without paying therefor[e].' " *Hawaii Ventures, LLC v. Otaka, Inc.*, 114 Hawai'i 438, 164 P.3d 696, 742 (2007) (quoting *Maui Aggregates, Inc. v. Reeder*, 50 Haw. 608, 610, 446 P.2d 174, 176 (1968)). "Under Hawaii law, whether the [d]efendants received some benefit in the exchange is key." *UCSF-Stanford Health Care v.*

*Hawaii Mgmt. All. Benefits & Servs., Inc.*, 58 F.Supp.2d 1162, 1171
(D. Haw. 1999) (citation omitted). "If a party derives any benefit from
services rendered by another, the law reasonably implies a promise to
pay on the part of the one who has received such benefit, such amount
as it is reasonably worth." *Maui Aggregates, Inc.*, 50 Haw. at 610, 446
P.2d at 176 (citation and internal quotation marks omitted).

*Demarest v. Alfouadi*, No. CV 22-00064 JAO-KJM, 2025 WL 2083159, at *10 (D.

Haw. Apr. 1, 2025).

Here, if the Court finds there is no contract between GMM and Alfouadi, it

should require Alfouadi to pay for the benefits he received under quantum meruit.

All the work GMM did was for Alfouadi's benefit. Alfouadi received all the

benefits of that work, including recovery of his property, avoiding liability to

others for dangerous conditions in the water, and avoiding massive exposure for

the environmental harm that would have been caused by Alfouadi's boat and its

contents were it not for GMM's efforts. Thus, the law implies to Alfouadi a

promise to pay GMM such amount as its work is reasonably worth.

## V.    MARITIME PURE SALVAGE

If the Court determines that GMM is not entitled to relief pursuant to the

claims set forth above, it should provide GMM a maritime pure salvage award. As

this Court has found: "There are three elements to a valid salvage claim: (1)

property in peril on navigable waters; (2) voluntary services; and (c) success in

whole or in part." *Demarest v. Alfouadi*, No. CV 22-00064 JAO-KJM, 2025 WL

2083159, at *11 (D. Haw. Apr. 1, 2025) (*citing* Saint Paul Marine Transp. Corp. v.

Cerro Sales Corp., 332 F.Supp. 233, 238 (D. Haw. 1971) (citation omitted)).

In addition, under the International Convention on Salvage ("Convention"), Apr. 28, 1989, S. Treaty Doc. No. 102–12, 1953 U.N.T.S. 193, a reward shall be fixed with a view to encouraging salvage operations, taking into account ten specific factors, including several that are particularly relevant here, such as the skill and efforts of the salvors in preventing or minimizing damage to the environment, the time used and expenses and losses incurred by the salvors, and the promptness of the services rendered. [1] *See Sunglory Mar., Ltd. v. PHI, Inc.*, 212 F. Supp. 3d 618, 653 (E.D. La. 2016); *see also Margate Shipping Co. v. M/V JA Orgeron*, 143 F.3d 976, 988 (5th Cir. 1998) ("there is no principled reason to distinguish between the costs imposed by the risk of injury or death, and those costs imposed by the risk of negligence liability or strict environmental damage liability").

GMM in this case easily satisfies the three elements for a pure salvage award. First, under the Convention: "Salvage operation means any act or activity undertaken to assist a vessel or any other property in danger in *navigable waters or in any other waters whatsoever*." Convention, Ch. I, Art. I(a). Second, GMM's services were voluntary because, assuming the Court finds no contract between GMM and Alfouadi, GMM was under no duty to perform the salvage. *See New*

---

[1] The Convention has no requirement for a pure salvage claim that a vessel in peril could *only* be saved by the salvor. Indeed, that there may be more than one salvor available does not eliminate the availability of a pure salvage award for the salvor that did the salvage.

*Bedford Marine Rescue, Inc. v. Cape Jeweler's Inc.*, 240 F. Supp. 2d 101, 113 (D. Mass. 2003). Finally, the salvage was a success in part because GMM saved a significant amount of Alfouadi's property, including an outboard motor and many bags of personal items GMM recovered and returned to Alfouadi. Ex. 9; 1-95/13-18; 1-151/9-20.

"A salvage award should be *liberal*, based not only on services rendered, but on the notion that *salvors should receive a bounty in order to encourage others to help vessels that are in distress*." *Id*. at 115 (emphasis added) (citing *The J.C. Pfluger*, 109 F. 93, 95 (N.D. Cal. 1901). "Therefore, the award should not be computed based on a quantum meruit principle but rather as a reward." *Id*. (citing *The Blackwall*, 77 U.S. 1, 14 (1869). GMM submits that the appropriate salvage award is $126,410.75, based upon GMM's skill and efforts in preventing or minimizing damage to the environment, the time used, expenses and losses incurred by GMM, and the promptness of the services rendered.

## VI.    DEFENDANT ALFOUADI'S STORY OF THE SALVAGE IS NOT CREDIBLE

Defendant Alfouadi began his case by overpromising during his opening what he could deliver at trial. He claimed that Demarest "intentionally misrepresent[ed] to Mr. Alfouadi that he had been awarded the salvage contract by the State of Hawaii and was now the salvager on record." Tr. 1-14/10-12. On cross-examination, Alfouadi specifically denied that Demarest told him he had a

contract with the state. Tr. 4-97/24 to 4-98/2. Alfouadi also noted during the
opening and throughout the trial that GMM was not registered to do business in
Hawaii until six days after Alfouadi and Demarest stopped talking on January 6,
which implies, incorrectly, that GMM could not have entered into a contract with
Alfouadi until it was registered. Tr. 1-12/24-25. The law is clear, however, that
"the failure of a foreign corporation to obtain a certificate of authority does not
impair the validity of its corporate acts." H.R.S. § 414-432(e). In addition,
Alfouadi told the court during opening that "Mr. Demarest also admitted that his
salvager on record statement was false and was intended to invoke Mr. Alfouadi's
reliance." That bold statement was not supported by any evidence at trial.

The most far-fetched of Alfouadi's claims is that Demarest "sabotaged" the
salvage effort by throwing parts of the boat that Alfouadi had retrieved back into
the water so he could "unnecessarily extend[] the [salvage] effort an additional 11
days." Tr. 1-14/21 (sabotaged); *id*. 1-15/4-8 (extend the effort). Alfouadi testified
that as of January 6, when he left the area of the wreck for good, he and Pratt had
removed parts of the boat debris onto the rock jetty next to the wreck and secured
them with ropes and chains. 3-211/24 to 3-212/23. He further testified that, in the
video, about 45 minutes after he left, parts of the boat could be seen in the water.
*Id*.; 4-109/19-23. That included several sections of the fiberglass hull, a piece of
the transom, a foldable seat, an outboard bracket, the foredeck, and a piece of the
cockpit.

Consideration of the circumstances surrounding Alfouadi's accusation shows how ridiculous it is. First, the rock jetty that Alfouadi refers to is wide open, as shown by several exhibits. Exs. 8, 15, 295. No wall or obstruction would conceal the shocking act of someone untying and throwing numerous pieces of debris into the water in full view of a busy boat ramp and wharf area where people boat, swim, dive, and there is significant tourist activity. Tr. 1-124/23 to 1-125/10; 2-170/13-16; 3-92/11-17; 3-108/7-13. In addition, Alfouadi testified that Matthew McCarthy was on the rock jetty when he left the area, and McCarthy can be seen in the video about which Alfouadi was testifying. 3-197/6-16; Ex. 295 (at 1:42). McCarthy would, therefore, have had to have helped or at least observed Demarest commit the despicable act of throwing several pieces of boat debris into the water, some of which are quite large. Alfouadi's friend Jeff Pratt was also in the vicinity and could have seen Demarest and possibly McCarthy toss items he had just retrieved and tied down to the rocks into the water.

As of January 6, there was still an enormous amount of boat debris and personal belongings to be removed from the water. Exs. 29, 31, 33, 68, 108, 110, 111. There was no reason for Demarest to conspire with McCarthy to throw into the water boat debris that had been retrieved and secured on the rocks. Even if Demarest were inclined to commit such an immoral and illegal act, the high likelihood of being caught by someone in the area would be a strong deterrent.

Another tactic Alfouadi used that undermines his credibility was showing a series of photographs of work being done on the first day his boat ran aground and pointing out that Demarest cannot be seen working in those photos. Exs. 209-221. However, the metadata from those 13 photos makes clear that they were taken over a total of four minutes. Exs. 209-213 (4:26 p.m.); 214-218 (4:48 p.m.); 219-221 (5:08-5:09 p.m.).

Similarly, Alfouadi's attempt to falsely portray Demarest as doing no significant work between January 2 and January 6 involved admitting to having seen him on three occasions on January 2, under circumstances that belie his claim that Demarest was doing nothing significant. 4-105/2-4. First, Alfouadi saw Demarest on the rocks where the boat crashed within the first hour after the crash. 4-18/16 to 4-19/4; 4-22/15-18. He claims Demarest said only a few words and asked about insurance, like everyone else who approached him. 4-21/5-15. Alfouadi testified that he next saw Demarest when the mast of the boat was slamming into Mala Wharf. 4-22/19 to 4-23/17. He testified further that Demarest approached Alfouadi and Pratt, offered a suggestion for stopping the mast from hitting the wharf, and, when Alfouadi disagreed with that suggestion, Demarest supposedly left, his feelings hurt. *Id*. Shortly after that, Demarest purportedly returned to carry a second part of the mast with Pratt. 4-24/11 to 4-25/3. The third time Alfouadi claims he saw Demarest was on January 2, at night, while he was on the boat. 4-28/23 to 4-29/1. Officer Fernandez of the Department of Land and

18

Natural Resources walked across the rocks to where the boat was. 4-29/12-19.

Alfouadi first testified that he got out of the boat and climbed onto the rocks to

greet the officer, answered a few questions, then jumped back on the boat. *Id*. at 4-

29/22 to 4-30/2. He also testified that he was on the boat when he spoke with

Officer Fernandez. 4-30/20-22. Regardless, Alfouadi testified that Demarest was

standing there, about three feet away, not working and not saying anything. 4-30/4-

11; 4-31/5-16.

That Demarest would have been on the rocks, asking Alfouadi a couple of

questions, soon after the boat crashed, is not unusual, but Alfouadi's account of

Demarest's other "appearances" is bizarre. According to Alfouadi, Demarest

showed up uninvited at the wharf, not in the context of working with Alfouadi and

Pratt on the mast or working in the water to remove debris, and provided his

opinion on stopping the mast from hitting the wharf. He then walked away, only to

return a little while later and help Pratt carry something not to be seen again until

that night. Alfouadi was trying so hard not to acknowledge Demarest's role in

salvaging the wreck – going so far as describing Demarest as a "bystander" not

involved in the salvage – that his testimony was not credible. 4-26/19-21

Even less credible was Alfouadi's description of the encounter with Officer

Fernandez, since the officer's report contradicts Alfouadi's testimony. Fernandez

"observed two males, later identified as Raied ALFOUADI and David

DEMAREST, standing on the breakwall looking at the vessel." Ex. 50, at 2.

19

Fernandez "made contact with ALFOUADI and DEMERAST. I introduced myself and asked *them* if *they* know the vessel owner. ALFOUADI related that he is the owner of the vessel." *Id*. (emphasis added). In addition, Fernandez noted that the photos he took show "the debris of the vessel removed by *DEMAREST* and ALFOUADI." *Id*. at 3 (emphasis added). Again, Alfouadi strained so hard to deny Demarest's work on the salvage that his testimony was implausible.

## VII.   CONCLUSION

For all the foregoing reasons, the Court should render judgment in favor of Plaintiff Green Mountain Mycosytems LLC in the amount of $126,410.75, plus interest and attorney fees as provided by law.

DATED:  Honolulu, Hawaii; October 30, 2025.

/s/ Ryan M. Toyomura
KEVIN W. HERRING
RYAN M. TOYOMURA
Ashford & Wriston, LLLP

GLENN KATON
Katon Law

Attorneys for Plaintiffs
GREEN MOUNTAIN
MYCOSYSTEMS, LLC

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| DAVID DEMAREST AND GREEN MOUNTAIN MYCOSYSTEMS LLC | ) ) ) | CIVIL 1:22-cv-00064-JAO-KJM (In Admiralty |
| Plaintiffs, | ) ) | CERTIFICATE OF SERVICE |
| vs. | ) ) ) | |
| RAIED J. ALFOUADI, ET. AL., | ) ) | |
| Defendants. | ) | |

CERTIFICATE OF SERVICE

The undersigned hereby certifies that service of the foregoing document was

made upon the parties below by the United States District Court for the District of

Hawaii's Case Management/Electronic Case Files ("CM/ECF") system:

> JAMES V. MYHRE, ESQ.          jmyhre@mtmhawaiilaw.com
> BRENT K. WILSON, ESQ.         bwilson@mtmhawaiilaw.com
> Myhre & Storm
> 1003 Bishop Street, Suite 1290
> Honolulu, Hawaii 96813
>      Attorneys for Defendant
>      RAIED J. ALFOUADI

DATED:  Honolulu, Hawaii; October 30, 2025.

> /s/ Ryan M. Toyomura
> KEVIN W. HERRING
> RYAN M. TOYOMURA
> Ashford & Wriston, LLLP
> GLENN KATON
> Katon Law
> Attorneys for Plaintiffs
> GREEN MOUNTAIN MYCOSYSTEMS, LLC