Of Counsel:
MYHRE & STORM

JAMES V. MYHRE    #5092-0
jmyhre@mtmhawaiilaw.com
BRENT K. WILSON  #10518-0
bwilson@mtmhawaiilaw.com
1003 Bishop Street, Suite 1290
Honolulu, Hawaii  96813
Telephone (808) 524-2466

Attorneys for Defendant
RAIED J. ALFOUADI

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| DAVID DEMAREST and GREEN MOUNTAIN MYCOSYSTEMS LLC, | CASE NO. 22-CV-00064-JAO-KJM (In Admiralty) |
| Plaintiffs, | DEFENDANT RAIED J. ALFOUADI'S [**PROPOSED**] FINDINGS OF FACT AND CONCLUSIONS OF LAW; ORDER; CERTIFICATE OF SERVICE |
| vs. | |
| RAIED J. ALFOUADI; UNNAMED SAILING VESSEL in rem, Hull No. HA 6874 H; DOE DEFENDANTS 1-20; DOE CORPORATIONS 1-20; DOE GOVERNMENT AGENCIES 1-20; DOE PARTNERSHIPS 1-20, | |
| | Trial:    October 20, 2025 |
| Defendants. | Judge:  Honorable Jill A. Otake |

Of Counsel:
MYHRE & STORM

JAMES V. MYHRE    #5092-0
jmyhre@mtmhawaiilaw.com
BRENT K. WILSON  #10518-0
bwilson@mtmhawaiilaw.com
1003 Bishop Street, Suite 1290
Honolulu, Hawaii  96813
Telephone (808) 524-2466

Attorneys for Defendant
RAIED J. ALFOUADI

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| DAVID DEMAREST and GREEN MOUNTAIN MYCOSYSTEMS LLC, | ) ) ) | CASE NO. 22-CV-00064-JAO-KJM (In Admiralty) |
| Plaintiffs, | ) ) ) | FINDINGS OF FACT AND CONCLUSIONS OF LAW; ORDER |
| vs. | ) ) ) | |
| RAIED J. ALFOUADI; UNNAMED SAILING VESSEL in rem, Hull No. HA 6874 H; DOE DEFENDANTS 1-20; DOE CORPORATIONS 1-20; DOE GOVERNMENT AGENCIES 1-20; DOE PARTNERSHIPS 1-20, | ) ) ) ) ) ) ) | |
| | ) | Trial:    October 20, 2025 |
| Defendants. | ) ) ) | Judge:  Honorable Jill A. Otake |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter came on for a jury-waived trial before the Honorable Jill A. Otake, beginning on October 20, 2025 and concluding on October 23, 2025. Plaintiff Green Mountain Mycosystems LLC ("GMM"), who was present for the trial, was represented by Mr. Glenn Katon, Esq. and Ryan M. Toyomura, Esq.   Former plaintiff, Mr. David

Demarest ("Demarest"), the sole member of GMM, was also present. Defendant Raied J. Alfouadi ("Alfouadi"), represented by Mr. James V. Myhre, Esq. and Mr. Brent K. Wilson, Esq., were also present.

The Court has considered all the evidence presented, observed the demeanor of witnesses and evaluated their credibility and candor, and considered the arguments of counsel and the applicable law. Pursuant to *Federal Rule of Civil Procedure* Rule 52, the Court makes the following Findings of Fact and Conclusions of Law, and hereby FINDS in favor of Alfouadi, and against GMM, as to Counts I, II, III, and IV in GMM's First Amended Complaint.

Any finding of fact that should more appropriately be deemed a conclusion of law, and any conclusion of law that should more appropriately be deemed a finding of fact, shall be so construed.

## RELEVANT PROCEDURAL HISTORY

1.      GMM and former-plaintiff Demarest, in his individual capacity, originally filed suit against Alfouadi on February 14, 2022. ECF No. 1. Pursuant to the operative Third Amended Rule 16 Scheduling Order, ECF No. 46, the discovery cutoff and dispositive motions deadline were March 22, 2024. *Id.* ¶¶ 5(a), 6.

2.      On February 21, 2024, Alfouadi served GMM and Demarest with his First Request for Answers to Admissions ("1RFA"), which required a response 30 days after service. ECF Nos. 55, 110-2, 110-3; Rule 36(a)(3).

3.      On March 22, 2024, Alfouadi moved for partial judgment on the pleadings, seeking to dismiss Counts I (breach of oral salvage contract), II (breach of implied salvage contract), IV (pure salvage), and V (in-rem maritime lien) of the Complaint. ECF No. 67. Count III, quantum meruit, was not included. *Id.* The Court ultimately granted Alfouadi's motion as to Counts I and II, with leave to amend, and denied the motion as to Count IV. ECF No. 76. The Court dismissed Count V with prejudice. *Id.* at 31, 36.

4.    Neither GMM nor Demarest responded to 1RFA by the March 22, 2024 deadline. ECF Nos. 97 at 2; 119 at 2.

5.    On June 20, 2024, GMM and Demarest filed their First Amended Complaint, ECF No. 77 ("FAC"), which asserted Counts I - IV against Alfouadi.

6.    On July 2, 2024, Alfouadi filed his Final Pretrial Statement in preparation for the July 9, 2024 Final Pretrial Conference, and therein, disclosed that GMM and Demarest failed to timely respond to 1RFA, listed the individual admissions, and contended that the matters in 1RFA were deemed admitted and undisputed, by operation of law, for purposes of trial. ECF No. 82 at 5-10.

7.    On July 9, 2024, during the Final Pretrial Conference, neither GMM nor Demarest raised the issue of the matters deemed admitted in 1RFA or any forthcoming motions related to amending the operative scheduling order or withdrawing or amending 1RFA.  ECF Nos. 85; 119 at 3.

8.    On July 19, 2024, months after the 1RFA deadline, Demarest belatedly served his response to 1RFA. ECF Nos. 88; 97-3.

9.    On July 22, 2024, Alfouadi filed his Motion In Limine No. 1, requesting that GMM and Demarest be precluded from introducing evidence and argument contrary to the matters deemed admitted in 1RFA.  ECF No. 91.

10.    On July 22, 2024, GMM and Demarest filed their Motion to Amend Scheduling Order to Permit Filing of Motion To Withdraw Or Amend Any Requests for Admissions That Defendant Contends Have Been Deemed Admitted ("Motion to Amend Scheduling Order").  ECF No. 97.

11.    On August 5, 2025, the Honorable Magistrate Judge Kenneth J. Mansfield denied GMM and Demarest's Motion to Amend Scheduling Order ("Order Denying Motion to Amend Scheduling Order"). ECF. No. 119.

12.    On August 7, 2025, GMM and Demarest filed their Objection to the Order

Denying Motion to Amend Scheduling Order ("Objection") for which the Court heard argument on the Objection from both parties on the same day and orally overruled the Objection. ECF No. 123. The Court also granted Alfouadi's MIL No. 1. *Id.* The Court subsequently memorialized its Order overruling the Objection. ECF No. 125.

13.    On August 12, 2024, GMM and Demarest filed two motions. First, to seek reconsideration of both: (1) the Court's order overruling their objection to Magistrate Judge Kenneth J. Mansfield's decision to deny their request to amend the Rule 16 scheduling order, *see* ECF Nos. 125; 122; 119; and (2) the Court's order granting Alfouadi's MIL No. 1. ECF No. 133 at 1-2. Second, GMM and Demarest asked the Court to stay the proceedings and permit them to file an interlocutory appeal of the Order Overruling Objection and the order granting MIL No. 1 (collectively "August 12, 2024 Motions"). *Id.* at 2.

14.    On August 23, 2024, the Court denied the August 12, 2024 Motions. ECF No. 133.

15.    On September 25, 2024, GMM and Demarest's former counsel, Mr. Jared A Washkowitz, Esq., filed his Motion to Withdraw As Counsel. ECF No. 142. The Court granted the motion as to Demarest individually, however, denied the motion as to GMM. *See* ECF No. 146.

16.    On November 12, 2024, Demarest, as an individual, moved for voluntary dismissal with prejudice under Rule 41(a)(2) on the basis that "all the rights and responsibilities which were *initially accepted individually by Plaintiff Demarest* on January 2, 2022 were fully and completely transferred to GMM on January 12, 2022." ECF No. 154 (emphasis added) ("Rule 41(a)(2) Motion")).

17.    Demarest further represented to the Court that "[n]otably, the rights permanently transferred from Plaintiff Demarest to Plaintiff GMM on January 12, 2022 *included the alleged original meeting of the minds between Mr. Demarest, as an*

*individual, and Mr. Alfouadi on January 2, 2022 . . . .*" *Id.* (emphasis added).

18.    On this basis, Demarest conceded that he lacked Article III standing to assert Counts I-IV against Alfouadi because he assigned all of his individual claims to GMM as of January 12, 2022. *Id.* The Court granted Demarest's Rule 41(a)(2) Motion, with prejudice, and decided that "th[e] dismissal does not affect any rights of Defendant Raied J. Alfouadi." ECF Nos. 157; 158.

19.    On November 22, 2024, Alfouadi filed his Motion To Amend The Third Amended Rule 16 Scheduling Order And Reopen The Dispositive Motions Deadline, *see* ECF No. 162, which was granted by the Court on December 10, 2024.  ECF No. 165.

20.    On January 10, 2025, Alfouadi moved to dismiss, or in the alternative, for summary judgment as to Counts I-IV in GMM's First Amended Complaint. ECF No. 166 ("Motion to Dismiss/MSJ").  The Court heard the parties' oral arguments on March 7, 2025.  ECF No. 179.

21.    On April 1, 2025, the Court ultimately denied Alfouadi's Motion to Dismiss/MSJ. ECF No. 180. In its Order, however, the Court decided that the admissions in 1RFA were directed to Demarest as an individual, and therefore, were not attributable to GMM.  ECF No. 180 at 20. According to the Court, this meant that Demarest admitted, *inter alia*: "(1) there was no contract between [Demarest] and Alfouadi, *see* ECF No. 168-4 ¶¶ 20–23, 35–37; (2) Demarest misrepresented to Alfouadi that he had been awarded a salvage contract by the State of Hawaiʻi even though this was not true, and Alfouadi detrimentally relied on this misrepresentation, *see id.* ¶¶ 26–27, 30–34; (3) prior to January 2, 2022, Demarest [] had no professional experience in the business of marine salvage and had never worked for a marine salvage company and [], *see id.* ¶¶ 11–14; and (4) the Vessel was a total loss, *see id.* ¶¶ 39–41, 44."

22.    On September 2, 2025, the Court granted Alfouadi's MIL No. 7,[1] to preclude GMM from offering evidence or argument relating to unpled theories, in its FAC, of contractual or equitable standing, including but not limited to Demarest's alleged assignment of his individual claims to GMM on January 12, 2022, at trial. ECF No. 231.

23.    On September 8, 2025, GMM filed its Motion For Reconsideration of the Court's Order Granting Alfouadi's MIL No. 7 on the basis of manifest error of law. *See* ECF No. 241 ("Motion for Reconsideration").

24.    On September 10, 2025, the Court denied GMM's Motion for Reconsideration.  ECF No. 248.  The Order reaffirmed the Court's prior ruling going into trial that "[b]ecause of the deemed admissions, Demarest had no valid rights to assign . . . . The import of the Court's previous order was that there is still a factual question as to whether GMM has its own rights, i.e., was a party to the purported contract. *See* ECF No. 180 at 22."  ECF No. 248 at 5.  Thus, at trial, GMM was precluded from presenting evidence or argument that it was assigned Demarest's contract rights. *Id.* at 6.

25.    As a result of the procedural history above, the sole plaintiff remaining in this matter is GMM and the only claims remaining for adjudication are GMM's Counts I-IV against Alfouadi as alleged in the FAC.

## FINDINGS OF FACT

## I.    THE PARTIES

### A.    GMM

1.    GMM is a single-member limited liability corporation first incorporated in 2004 in the state of Vermont. 1-158:12-21.

2.    GMM is engaged in the business of raising mushrooms, producing teas and extracts, and consulting on mushroom production and fungi used to break down toxic

---

[1] *See* ECF No. 203. GMM filed no Motions in Limine.

waste. 1-159:13-20.

3.      Prior to January 2, 2022, GMM was never a salvor or record for a boat salvage wreck removal and was never paid for any salvage wreck removal.  1-171:22-25; 1-172:7-9.

4.      As of January 2, 2022, GMM had no liability insurance, worker's compensation insurance, or Hawaii General Excise Tax Number. 1-169:16 to 1-170:5.

5.      As of January 2, 2022, GMM had no registered trade name in any state pertaining to it performing maritime salvage operations. 1-170:6-9.

6.      GMM was not licensed to do business in the State of Hawaii until January 12, 2002. 1-161:15-23; Ex. 259.

7.      Demarest is, and at all relevant times was, the sole-member of GMM.  GMM had no employees. 1-158:19-21; 1-159:8-12.

8.      The Court had the opportunity to observe and hear the testimony of Demarest.

9.      The Court found Demarest to be generally not credible and  unbelievable based on the Court's observation of Demarest's demeanor, and the several inconsistencies between Demarest's trial testimony, versus, the evidence adduced at trial and prior sworn testimony under oath.

10.     Demarest's frequent self-correction—stopping himself after making a statement that could be attributed to him in his individual capacity, and then correcting himself and restating what he said in terms of GMM—undermined credibility. *See e.g.* 1-90:9-16 ("Q  And how did all of this stuff get into this pile at Lahaina Welding?; A  *My team*, you know, myself, Andre, other volunteers that he brought in, Matthew McCarthy, Ryan Murphy, a number of different people all really did an amazing job helping make it happen. *But I was the core* -- my business was the core means of making it happen by having the efficient process by which to remove so much debris in a quick manner."); 1-

91:12-16; 105:21-23.

11.    Towards the middle of his direct exam, after making a concerted effort to correct himself, Demarest tended to revert back to his individual capacity. *See* 1-110:7-10; 1-120:2-4; 1-123:12-16; 1-130:16-19.

**B.    Alfouadi**

12.    The Court found Alfouadi to be a credible witness based on its observation of his demeanor and consistency of his testimony.

13.    Alfouadi is a resident of Lahaina, Maui, State of Hawaii, and the owner of the subject boat, a 29' 1975 CAL Farryman DSL A30 ("Boat"). 3-163:9-12; Exhibit 228. Prior to January 2, 2022, Alfouadi lived on his Boat which was moored at the Mala mooring fields, located near the Mala Wharf, Lahaina, Maui. 3-96:1-11.

14.    Alfouadi attended college at the Illinois Institute of Technology, Chicago IL., and studied civil engineering, mechanical engineering, and applied physics for about four years.  2-201:12-20.

15.    Alfouadi has an extensive background of work experience in the construction industry, in residential and commercial construction management. 2-202:17 - 2-205:10.

16.     His work experience included the use of an array of hand tools, power tools, electrical and gas-powered cutting equipment, and heavy machinery including but not limited to cranes, hoists, and forklifts, amongst other things. 2-208:16 - 2-210:8.

17.    Alfouadi is an experienced sailor, sailing for the vast majority of his life. As a young adult in California, Alfouadi  worked as a crew member and/or captain of private-owned boats, and logged thousands of miles of sailing up and down the west coast of the United States from Oregon to San Diego. Alfouadi also has extensive inter-island sailing experience in Hawaii. 2-205:13 – 2-207:5.

18.    Alfouadi has owned multiple boats over his lifetime, including two sailboats. The first, a Cal 25, was purchased in California where Alfouadi employed his extensive

skill in all aspects of boat repair and maintenance to completely hull out, refurbish, and paint the boat before sailing it for 20 days by himself across the Pacific to Hawaii. Similarly, the second sailboat, the subject Cal 29, was extensively repaired an refurbished by Alfouadi, which included the mast, rigging, halliards, ropes, the bow and bowsprit, quadrant, rudder, electrical instruments, plumbing, motor, and fiberglass work. Alfouadi also sailed the Cal 29 from California to Hawaii by himself. 3-78:2 – 3-81:18.

19.    Prior to January 2, 2022, Alfouadi was involved in at least 30 salvage and wreck removal jobs. He also had extensive voluntary and paid experience in salvage and wreck removal in the Lahaina-Kaanapali area. The evidence shows that Alfouadi was paid to assist Mr. Brent Hartwig with the salvage of the Sophia, owned by Mr. Matthew McCarthy, when the Sophia, a 40' sailboat, went aground on the reef near Front Street in Lahaina. Alfouadi immediately assisted with the removal of hazardous materials and personal items from the Sophia. He also fabricated a chain-linked string of several tires and placed them under the Sophia to protect the hull from cracking against the reef. This was done by using lift bags to carefully raise the boat and then slipping the tires underneath to cushion the hull. 3-86:10 – 3-90:23.

20.    The evidence also shows that approximately one month before the subject incident on January 2, 2022, a storm caused Alfouadi's neighbor, Mala Dave's, boat to run aground on the beach fronting the Kaanapali hotels, north of the Mala mooring field. Again, Alfouadi assisted by immediately removing the hazardous materials, personal items, and valuable electronic equipment from Mala Dave's boat. 3-91:6 – 3-92:25.

21.    Additionally, through Alfouadi's relationship with Mr. Drake Thomas, owner of Lahaina Welding, Alfouadi was contracted by Lahaina Welding/Drake Thomas to do the work salvaging a trimaran that went ashore a few blocks away from Lahaina Welding. This matter required both dive work and shore work. Alfouadi spent hours diving to retrieve the batteries and other heavy items that had sunk as a result of the grounding.

Using a forklift and truck, Alfouadi salvaged the boat and its contents, transported them to a processing site, cut them down, an disposed of the items accordingly. This process was then repeated until the job was completed. Alfouadi was paid $120 - $150 per hour depending on the type of work performed. 3-94:18 - 3-95:23.

22.     Aflouadi also testified that his personal and business relationship with Drake Thomas provided Alfouadi with access and authority to use the full array of tools, including but not limited to: a welding shop; mechanic bay; generators; compressors; and salvage tools necessary to do any salvage job. 3-185:25 – 3-186:7; 3-188:2-5.

23.     Alfouadi also owned his own tools, large lift bags rated up to 4400 lbs., 3-185:6-10, and diving equipment stored at Lahaina Welding. 3-229:19-25.

## II.   THE RELATIONSHIP BETWEEN DEMAREST AND ALFOUADI BEFORE JANUARY 2, 2022

24.     From June to December of 2020, Alfouadi performed significant repairs, over the course of many months, to Demarest's boat, including but not limited to, fiberglass lay-up work, fabrication and installation, of composite bow rollers, and interior painting, with no monetary compensation from Demarest for his work. 1-183:11 to 1-186:14.

25.     Thereafter, the relationship soured between them and as of January 2021, Demarest and Alfouadi were no longer friends due to a prior dispute that arose from a roofing job at Lahaina Welding. 1-186:15 to 1-187:1.

26.     According to Demarest, the friendship "dissolve[ed]" and "evaporate[d]" to the point that Demarest no longer trusted Alfouadi due the argument they had at Lahaina Welding. 1-186:23 to 1-187:17; 3-114:5 to 3-115:3.

27.     According to Demarest, his friendship with Alfouadi ended following the argument. 1-187:10-12.

28.     Alfouadi also "lost all respect for [Mr. Demarest.]" 3-116:12.

10

29.    Aside from necessary communication with Demarest as a tenant of Lahaina Welding, Alfouadi and Demarest were not talking to each other before January 2, 2022. 3-115:1 to 3-116:12; *see* 1-197:5-8.

## III.    COUNTS I – IV OF GMM'S FIRST AMENDED COMPLAINT

30.    GMM alleges under Counts I and II that it entered into a valid and binding oral or implied salvage contract with Alfouadi on January 2, 2022. ECF No. 77.

31.    Alfouadi's Boat was covered by liability insurance only through State Farm. 3-156:4-8; 3-237:17-22.

32.    Alfouadi's understanding of the liability coverage for his Boat was that he was "not entitled to any money" because he did not have full coverage at the time of loss. 3-156:4-16.

33.    Demarest told Alfouadi that he was "sorry for [Alfouadi's] loss." 1-61:1-8.

34.    Demarest's understanding of Alfouadi's liability insurance coverage was "that [Alfouadi's] boat, [Alfouadi's] home was not going to be able to be reimbursed by his insurance." 1-61:1-8.

35.    Demarest testified that on January 2, 2022, GMM's alleged salvage contract offer to Alfouadi, while at the Mala Wharf observing the Boat, in the presence of Pratt, was "to have my [Demarest's] company take responsibility to be conducting an environmental salvage and wreck removal, in exchange for him [Alfouadi] quickly opening a claim with his insurance company." 1-61:11-14.

36.    In addition, Demarest testified that he "would do everything in [his] power to save as much of what could be saved . . . [Demarest] would do everything he could so [Alfouadi] wouldn't lose everything." 1-61:15-18.

37.    Demarest testified that Alfouadi stated "okay" which Demarest alleges was an indication of Alfouadi's  acceptance of the offer; Demarest "understood that to mean

that in return [Alfouadi] would open up a claim so [Demarest] could get compensated for [his] work." 1-62:1-11.

38.    Both Alfouadi, see 3-141:8-18, and Pratt, *see* 2-186: 18-22, deny that any such offer by GMM or Demarest was made on January 2, 2022. Alfouadi expressly denied ever entering into any agreement with Demarest or GMM to do the wreck removal. 3-244:17-20.

39.    GMM presented no further evidence of the alleged January 2, 2022 offer to and acceptance by Alfouadi, or, any other offer to enter into a valid and binding salvage contract, oral or implied, independent of the alleged January 2, 2022 offer.

40.    When asked in interrogatories how he first became involved in the alleged salvage operation, Demarest stated "*I* offered to stick my neck out to take on environmental salvage and wreck removal responsibility; Mr. Alfouadi agreed. Mr. Pratt witnessed Mr. Alfouadi agree to *my* taking on the salvage and wreck removal operation." 1-162:13 to 1-165:6 (emphasis added).

41.    The Court finds that Demarest's interrogatory response does not include any reference, express or implied, to GMM.

42.    Demarest admitted at trial that during his deposition, he testified that because GMM was not registered to do business in Hawaii on January 2, 2022, he took on the salvage as an individual, not as GMM. 1-165:7 to 1-166:6.

43.    On re-direct, Demarest proffered no testimony or evidence rebutting his deposition testimony. 2-38:1 – 2-42:23.

44.    In his Rule 41(a)(2) Motion, *see* ECF No. 154; Ex. 336, Demarest represented to this Court that "the alleged original meeting of the minds" was "between [himself], *as an individual*, and Alfouadi on January 2, 2022 . . . ." (Emphasis added).

45.     Curiously, at trial, for the first time in this litigation, Demarest testified that the quoted language above was not his statement, but rather, Demarest repeating a previous statement made by Alfouadi. 2-40:5-9.

46.     The Court finds that the language from Demarest's Rule 41(a)(2) Motion, as quoted in paragraph 78 above, does not include quotation marks in the original which would be indicative of attribution to a third-party.  *See* ECF No. 154.

47.     The Court takes judicial notice of ECF No. 154/Ex. 336.[2] On its face, lines 1-7 of page 2 of 2 were written by Demarest as a basis for explaining to the Court why he lacked standing to pursue his individual claims against Alfouadi, in support of his Rule 41(a)(2) Motion.  Demarest represented that "the rights permanently transferred from Plaintiff Demarest to Plaintiff GMM . . . included the alleged original meeting of the minds between Mr. Demarest, as an individual and Mr. Alfouadi . . . ." Ex. 336 (emphasis added).

48.     The Court finds that the only reasonable interpretation, based on its plain language, and within the context of the entire paragraph and intent of Demarest's Rule 41(a)(2) Motion, is that Demarest entered into the alleged January 2, 2022 oral salvage contract with Alfouadi as an individual, not as GMM.  This is also consistent with Demarest's admission that "all the rights and responsibilities which *were initially accepted individually by Plaintiff Demarest* on January 2, 2022 were fully and completely transferred to GMM on January 2, 2022."  ECF No. 154 at pg. 1 of 2 (emphasis added).

49.     Were it not so, as Demarest's trial testimony implies, *see* 2-40:5-9, and Demarest was acting in his official capacity on behalf of GMM on January 2, 2022, then there would have been no rights to transfer to GMM, thus rendering the representations made to the Court by Demarest in his Rule 41(a)(2) Motion, false and violative of FRCP Rule 11.

---

[2] The Court may take judicial notice *sua sponte* at any stage of the proceedings.  FRE 201(c), (d).

50.    The Court finds, that Demarest's testimony lacks credibility and is unbelievable in light of the context of the full paragraph in Ex. ECF No. 154 read into evidence, *see* 1-168:22 to 1-169: 11, the intent of the Rule 41(a)(2) Motion, and representations made by Demarest therein.

51.    The Court also finds that GMM presented no evidence that it, as opposed to Demarest in his individual capacity, was a party to the alleged January 2, 2022 salvage contract with Alfouadi, and proffered no evidence of entering into any other salvage contract with Alfouadi, independent of the alleged January 2, 2022 contract.

52.    At trial, Demarest did not refute that payment for the alleged oral salvage contract was "*presumed* to be based on Lloyds open forum with SCOPIC clause[,]" as stated in GMM's original Complaint and First Amended Complaint. 1-203:5-12.

53.    Demarest also "accept[ed] responsibility for [the] presumption" which he further affirmed as "correct."  1-203:17-18; *see also* 2-31:25 to 2-32:1 ("And its true that I presumed SCOPIC would apply at the very beginning of this matter.").

54.    Demarest also admitted to:  not discussing an hourly rate for services with Alfouadi, *see* 1-195:8-11;[3] not discussing additional purchases of equipment to do the salvage with Alfouadi, *see* 1-196:3-5; not discussing the hiring of paid-third-party labor and associated pay rates with Alfouadi, *see* 1-195:20-25; not discussing the additional uplift charge on all expenses with Alfouadi, *see* 1-198:8-12; and not providing even a rough ballpark estimate of cost to Alfouadi, *see* 1-196:23 to 1-197:1 (collectively "Essential Terms").

55.    Demarest "relied on [Alfouadi's] understanding *that I [Demarest] believed he [Alfouadi] had* from prior interactions I [Demarest] had with him [Alfouadi]." 1-197:1-3 (emphasis added).

---

[3] Thus, Mr. Demarest did not discuss the use or application of the Coast Guard hourly BOA rates with Mr. Alfouadi.

56. GMM's expert, Mr. Sebastian Coppes, testified that with respect to salvage contracts "at the start of any salvage job, everything is open for negotiation." 2-68:17-18. Such negotiations apply to both emergent and large-scale catastrophic salvage operations; there is still a negotiation between the boat owner and the salvage company. 2-95:16 to 2-96:2. Negotiations apply to the salvage rates charged. 2-96:24 to 2-97:3.

57. GMM's Exhibit 59 was presented as "the breach by Mr. Alfouadi showing that as of January 19, 2022, he had not made a claim with State Farm, which is precisely what we claim was his obligation under the oral contract." 1-149:15-18.

58. The Court, however, sustained Alfouadi's objection on hearsay grounds and Exhibit 59 was not admitted into evidence. 1-149:13 to 1-151:7.

59. No additional evidence of the particular contract provision allegedly breached by Alfouadi was presented by GMM.

60. On January 2, 2022, an unexpected afternoon storm approached from the west and caused Alfouadi's Boat to become disconnected from its anchor and drift towards the rock jetty and boat ramp. 2-149:16-25;

61. Mr. Jeff Pratt ("Pratt") testified that he was at the Mala boat ramp attending to his own boat as the storm approached. 2-160:16- 2-161:23

62. The Court found Pratt to be a credible witness based on its observation of his demeanor and consistency of his testimony.

63. After securing his own boat, Pratt observed and then recognized Alfouadi's Boat adrift, headed toward the rock jetty and Mala Wharf. 2-162:10-25.

64. Pratt called Alfouadi and advised him that the Boat was adrift. 2-162:15-19.

65. Soon thereafter, Alfouadi and Pratt ran to the rock jetty in an attempt to enlist the help of other boaters for the purpose of securing control of Alfouadi's Boat and prevent it from running aground. *See* 2-162:20-25; 3-119:25 – 3-121:2. No one rendered assistance. 3-120:19 – 3-121:2.

66.    Alfouadi dove into the water, swam to his Boat, boarded the Boat, and attempted to start the engine to reverse his Boat to safety.  Alfouadi's efforts, however, were unsuccessful. 2-166:10 – 2-167:3; 3-122:4 - 3-124:14.

67.    The grounding of Alfouadi's Boat occurred in the narrow passage between the historic Mala Wharf and the rock jetty that protects the Mala boat ramp, in Lahaina Maui. Exhibit 208; 2-164:4 – 2-165:25.

68.    Once the Boat ran aground, Alfouadi and Pratt immediately began removing hazardous materials from the Boat, and picked up flotsam with the assistance of several members of Pratt's family, in addition to, other persons from the local community and tourists. 2-171:22 - 2-179: 20. Photographs taken on Pratt's phone depict Pratt, Alfouadi, Pratt's family members, and other people in the area, but not Demarest. Exhibits 209-221.

69.    Alfouadi and Pratt also removed the Boat's mast and secured the Boat to the rock jetty using ropes, chains, and equipment from Alfouadi's Boat.

70.    While Demarest testified that on January 2, 2022, both Pratt and Alfouadi returned to Lahaina Welding/Demarest's boat, to request Demarest's assistance with Alfouadi's Boat, *see* 1-59:16 - 1-60:4, both Alfouadi and Pratt denied that happened.  3-129:10-14.

71.    During the evening of January 2, 2022, State of Hawaii Department of Land and Natural Resources ("DLNR") officer Cory Fernandez, and Demarest came to Alfouadi's Boat for a brief conversation about, *inter alia*, the status of hazmat removal. 3-148:2-20.

72.    On January 3, 2022, Alfouadi worked again from dawn until sunset, with the assistance of Pratt and several other local neighbors, taking loads from the wreck site to Lahaina Welding.  3-154:2 – 3-155:14.

73.    On January 4, 2022, Alfouadi and Pratt continued to haul debris and work on cutting up the Boat and repositioning it upon the rock jetty with come-alongs and other

equipment from Lahaina Welding. 3-157:14 - 3-166:14; Exhibits 222-228. Neighborhood volunteers continued to assist Alfouadi, some with their own vehicles, and would come and go of their own accord. 3-157:16-25. Photos taken on Pratt's phone verify Alfouadi and Pratt's work and Demarest is not depicted in any of the photographs. Exhibits 222-228

74.    Alfouadi did not hire anyone. 3-157:22.

75.    Lahaina Welding had a full range of salvage tools necessary to do any salvage. 3-158:17-18.

76.    On January 4, 2022, Demarest presented Alfouadi with a U.S. Coast Guard Recreational Boating Accident Report, Exhibit 248 ("Accident Report"), and "badger[ed]" Alfouadi to fill out the report, against Alfouadi's wishes, *see* 3-194:13 – 3-196:5, per the request of the State of Hawaii according to Demarest. 1-138:18 to 1-139:13.

77.    On January 5, 2022, Alfouadi worked again, from sunup to sundown, with Pratt's assistance, cutting the Boat into pieces and repositioning it up higher on the rocks, using come-alongs, chains, and ropes, in anticipation of using the January 6, 2022 high tide to lift the Boat further. 3-167:21 – 3-173:9; Exhibit 228.

78.    Alfouadi adduced credible testimony and evidence, using a video taken by Demarest, that by approximately 3:30 p.m. on January 6, 2022, approximately 80% of the wreck removal work was complete, with the entirety of the fiberglass hull, in three pieces, chained up on the rocks, 3-211:24 – 3-212:23; Exhibit 295, and only the keel, an empty diesel tank, and diesel engine, with miscellaneous nuts and bolts and other "knickknacks" left in the water. 3-198:1-21.

79.    Alfouadi also had a plan to remove the remaining keel, diesel tank, engine and miscellaneous knickknacks, using a combination of his own scuba tanks, lift bags, and powerful magnets, and the array of salvage equipment and forklift made available to Alfouadi by Lahaina Welding, by or before January 8, 2022. 3-227:8 – 3-233:3.

17

80.    From January 2, 2022 through January 6, 2022, Demarest admitted that Alfouadi was a "hard worker," and was working very diligently to make things right as possible, and was preoccupied with harm reduction. 1-216:8-25; 1-217:12-16.

81.    Demarest was impressed with Alfouadi's efforts "given the dire circumstances he was under" because most boat owners would have simply walked away. 1-217:17-21.

82.    Nonetheless, Demarest testified that he took control of the Boat cleanup operations on January 6, 2022 as an individual. 2-12:17-21; Exhibit 204 at Admissions Request No. 28.

83.    Demarest's control over the Boat clean-up operation was established by certain misrepresentations made to Alfouadi, set forth in Admissions Nos. 26 - 35 of Exhibit 204, Alfouadi's First Request For Answers To Admissions, and admitted into evidence. 2-10:5 to 2-18:3.

84.    Admissions Nos. 26 – 35 (collectively "Intentional Misrepresentations") conclusively establish, as a matter of law as to Demarest, that:

> No. 26:  On January 6, 2022, You[4] represented to Defendant that You had been awarded a salvage contract by the State of Hawaii
>
> No. 27:  On January 6, 2022, You represented to Defendant that You were the
> salvager-on-record with respect to the Vessel.
>
> No. 28:   On January 6, 2022, You took control of the Vessel clean-up operations.
>
> No. 29:  The State of Hawaii did not award You a salvage contract to remove the Vessel from Mala Wharf.
>
> No. 30:  You intentionally misrepresented to Defendant that You had been awarded a salvage contract by the State of Hawaii.
>
> No. 31:   Your representation to Defendant that You had been awarded a salvage contract by the State of Hawaii was false.
>
> No. 32:  You knew that Your representation to Defendant that You had been awarded a salvage contract by the State of Hawaii was false.

---

[4] "You" meaning Demarest and "Defendant" meaning Alfouadi.  *See* Exhibit 204.

No. 33:  You intended that Defendant rely on your misrepresentation that You
            had been awarded a salvage contract by the State of Hawaii.

No. 34:  Defendant detrimentally relied on Your misrepresentation that You
            had been awarded a salvage contract by the State of Hawaii.

No. 35:  There was no written contract between You and Defendant to pay
            you for your services with respect to the Vessel clean-up.

85.　On January 6, 2022, while Alfouadi was waiting for Pratt to off load sections of the Boat's hull, Demarest appeared at the worksite, the two of them got into an argument, and during the argument, Demarest advised Alfouadi that he was the "salvager-on-record," and that "if anything happens to you [Alfouadi], I [Demarest] am responsible." 3-192:9-14; *see* Exhibit 204 at No. 27.

86.　Alfouadi was "absolutely shocked" by Demarest's statement as Alfouadi had not given approval for or had any prior knowledge of the State of Hawaii recognizing Demarest as the "salvager-on-record." *See* 3-192:9-17.

87.　Based on Demarest's Intentional Misrepresentations, on January 6, 2022, Alfouadi walked off the wreck removal site and did no further work at the wreck removal site. 2-8:11 – 2-9:3; 3-168:13-16.

88.　Demarest confirmed the January 6, 2022 argument with Alfouadi, *see* 1-91:12-25, and testified "I [Demarest] had to emphatically emphasize that this was his [Alfouadi] boat, *but it was my* [Demarest] *salvage*, meaning my [Demarest] business and I, taking on that responsibility. And *as the official salvager, as already confirmed with the DOCARE[5] officer that responded on the first night*, that if anything went wrong, that was going to be all on *my* [Demarest] shoulders." *Id.* (emphasis added).

89.　GMM, however, proffered no admissible evidence of confirmation or acknowledgement by the State of Hawaii that as of January 2, 2022, GMM was the official

---

[5] Also known as the "DLNR Police," "DOCARE" is an acronym for the Division of Conservation and Resources Enforcement of the Department of Land and Natural Resources, State of Hawaii. *See* https://dlnr.hawaii.gov/docare/ last visited on November 29, 2025.

salvager on record. *See* 2-43:18 – 2-46:8 (ruling GMM's Exhibit 49 inadmissible on hearsay grounds and limiting the admissibility of Exhibit 50 to statements in the report that relate to Cory Fernandez's own observations, or statements to Fernandez by someone with a duty to report); 3-149:22 – 3-150:3.

90.    Alfouadi adduced credible testimony that his understanding of the term "salvager-on-record" on January 6, 2022 was "officially the State has recognized this person, . . . as the salvager on that particular job . . . ." 3-193:13-19.

91.    The Court finds that both Demarest and Alfouadi had a substantially similar understanding of the term "salvager-on-record," as one officially authorized by the State of Hawaii to be the salvager.

92.    The Court also finds that but for Demarest's Intentional Misrepresentations, given the facts in evidence, it is highly unlikely that Alfouadi would have relinquished control of the wreck removal to Demarest and left the site.

93.    On June 6, 2022, about 45 minutes after Alfouadi left the job site, having previously extracted 80% of the Boat from the water up onto the rock jetty, sections of the hull were intentionally released back into the water. 3-233:7-16; Exhibit 295.

94.    It is undisputed that Demarest was in control of the wreck removal site at this time. *See* 1-91:12-25.

95.    The Court finds that this act significantly complicated matters, extended the time to complete the wreck removal an additional 11 days, which dramatically increased the cost to complete the job.

96.    According to Alfouadi's expert, Mr. William Leschaeve, "where a [purported] salvor does something in the salvage process that makes the job more difficult and extends it and makes it more costly" the salvor cannot make a claim for such does because it violates the principle of "best endeavors" which states that when "you're [] on

a time and material basis, you should not do anything to try and stretch the timeline and increase your revenue." 3-42:2-15.

97.     Demarest proffered no evidence or testimony rebutting Alfouadi's allegation that sections of the hull were intentionally released back into the water after Alfouadi left the wreck removal site on January 6, 2022.

98.     On January 7, 2022, Officer Fernandez returned with Demarest to discuss the status of Alfouadi's Boat insurance because according to Officer Fernandez, it was invalid, and Alfouadi needed to send proof of valid insurance to Officer Fernandez immediately. *See* 3-234:17 – 3-237:4.

99.     Demarest did not complete wreck removal until January 19, 2022, 1-157:16-18, and now seeks damages in the amount of $126,410.75, *see* Exhibit 264, against Alfouadi, which he is not entitled to as set forth below.

## CONCLUSIONS OF LAW

## I.    JURISDICTION AND VENUE

1.      The Court has jurisdiction over the instant action under 28 U.S.C. §§ 1333 (admiralty jurisdiction) and 1367 (supplemental jurisdiction).

2.      "[S]o long as the claim asserted arises out of a maritime contract, the admiralty court has jurisdiction over it." *Archawski v. Hanioti,* 350 U.S. 532, 535 (1956). "[A] contractual claim gives rise to [28 U.S.C. §] 1333 admiralty jurisdiction when the underlying contract is 'maritime in nature.'" *ProShipLine Inc. v. Aspen Infrastructures Ltd.,* 609 F.3d 960, 967 (9th Cir. 2010) (quoting *Norfolk S. Ry. Co. v. Kirby,* 543 U.S. 14, 26 (2004)). To determine whether the underlying contract is maritime in nature, "[a court] must examine a contract to determine 'whether the principal objective of a contract is maritime commerce.'" *Id.* (quoting *Norfolk,* 543 U.S. at 25). Here, the alleged salvage contract is a maritime contract. *See The Richmond,* 60 U.S. 150, 160 (1856) (holding, in part, "[c]ourts of admiralty will enforce contracts made for salvage service and salvage

compensation"); *see also* 2 Admiralty & Mar. Law § 16:6 (6th ed.) ("[Contract salvage] is within admiralty jurisdiction."); *New Jersey Steam Nav. Co. v. Merch.'s Bank of Bos.,* 47 U.S. 344, 392 (1848) (admiralty jurisdiction extends over all contracts "to be performed upon the sea, or upon waters within the ebb and flow of the tide"). The contract at issue here is maritime because it is inherently concerned with a commercial salvage service that implicates a vessel in navigable waters.

3.    Venue is proper in the District of Hawaii under 28 U.S.C. § 1391.

## II.    COUNTS I AND II

4.    Actions arising in admiralty are governed  by the preponderance of the evidence standard. *In re Nat'l Shipping Co. of Saudi Arabia*, 147 F. Supp. 2d 425, 430 (E.D. Va. 2000) (citing *Lilienthal's Tobacco v. United States*, 97 U.S. 237, 266, 24 L. Ed. 901 (1878)). *See also Uyeda v. Schermer*, 144 Haw. 163, 174, 439 P.3d 115, 126 (2019) (explaining that the preponderance of the evidence standard applies to contract claims) (citing *Masaki v. Gen. Motors Corp.*, 71 Haw. 1, 14, 780 P.2d 566, 574 (1989)).

5.    Hawaii law applies to GMM's claims. *Norfolk,* 543 U.S. at 27 (citing *Kossick v. United Fruit Co.,* 365 U.S. 731, 735 (1961) for the proposition that where maritime contract interpretation implicates only local interests, it "beckon[s] interpretation by state law.")).

6.    The contract disputes here concern whether GMM and Alfouadi formed a binding oral or implied-in-fact contract with respect to the salvage Alfouadi's Boat at the Mala Wharf on January 2, 2002. The Court must, therefore, evaluate how the alleged oral and implied-in-fact contracts are formed. The United States Supreme Court has explained that "the general maritime law is an amalgam of traditional common-law rules, modifications of those rules, and newly created rules" drawn from state and federal sources. *E. River S.S. Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 864–65 (1986).

7.    Here, the elements of oral and implied-in-fact contract formation under

Hawai'i law appear effectively the same as the elements articulated by the Restatement (Second) of Contracts. *Compare Douglass v. Pflueger Hawaii, Inc.,* 110 Hawai'i 520, 525, 135 P.3d 129, 134 (2006), *as corrected* (May 30, 2006) (recognizing the elements of a valid oral contract as offer, an acceptance, and consideration), *and Kemp v. State of Hawai'i Child Support Enf't Agency,* 111 Hawai'i 367, 391, 141 P.3d 1014, 1038 (2006) (an implied-in-fact contract is formed when "an agreement in fact, creating an obligation, is implied or presumed from *their acts*" (emphasis in original)), *with* Restatement (Second) of Contracts § 17 (1981) ("formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration"), *and id.* § 4 ("A promise [to act in a certain way] may be stated in words either oral or written, or may be inferred wholly or partly from conduct.").

8.    The Court thus concludes that there is no conflict between state and federal maritime law here, and it will apply the oral and implied-in-fact contract formation standards articulated by the Hawaii Supreme Court.

### A.    <u>GMM Fails To Satisfy Its Burden As To Count I</u>

9.    To prevail on a breach-of-contract claim, a party must prove: "(1) the contract at issue; (2) the parties to the contract; (3) whether Plaintiff performed under the contract; (4) the particular provision of the contract allegedly violated by Defendants; and (5) when and how Defendants allegedly breached the contract." *Evergreen Eng'g, Inc. v. Green Energy Team LLC*, 884 F. Supp. 2d 1049, 1059 (D. Haw. 2012); *see also Au v. Au*, 63 Haw. 210, 221, 626 P.2d 173, 181 (1981).

### 1.    <u>GMM Was Not A Party To The Alleged January 2, 2022 Oral Salvage Contract With Alfouadi</u>

10.    Beginning with the second prong, as GMM presented no evidence at trial of it entering into a valid and binding contract with Alfouadi at any other time apart from January 2, 2022, and because Demarest was the only person who could have acted on

behalf of GMM, this issue boils down to whether Demarest was acting in his individual or official capacity on January 2, 2022. The Court concludes that GMM was not a party to the alleged January 2, 2022 oral salvage contract and Alfouadi is entitled to judgment as to Count I.

11.    GMM has proffered no credible evidence with respect to this issue.

12.    The evidence adduced at trial establishes that at all times prior to Demarest's Rule 41(a)(2) Motion, Demarest maintained that he entered into the alleged January 2, 2022 oral salvage contract with Alfouadi *in his individual capacity*, not as GMM.

13.    Demarest's trial testimony to the contrary is wholly inconsistent with his interrogatory responses, sworn deposition testimony, and Demarest's representations made to this Court in his Rule 41(a)(2) Motion for Voluntary Dismissal.

14.    Demarest's response to Interrogatory No. 5 is in the first person and makes no express or implied reference to GMM,   "*I* offered to stick my neck out to take on environ-mental salvage and wreck removal responsibility; Mr. Alfouadi agreed. Mr. Pratt witnessed Mr. Alfouadi agree to *my* taking on the salvage and wreck removal operation." 1-162:13 to 1-165:6 (emphasis added).

15.    Demarest also admitted that he previously testified during his deposition that because GMM was not registered to do business in Hawaii on January 2, 2022, he took on the salvage as an individual, not as GMM.  1-165:7 to 1-166:6.

16.    The Court is also unconvinced with respect to Demarest's attempt, for the first time, to explain away his own representations made to this Court in his Rule 41(a)(2) Motion.

17.     Even if the disputed language in the Rule 41(a)(2) Motion, specifically, "the alleged original meeting of the minds between Mr. Demarest, as an individual, and Mr. Alfouadi on January 2, 2022" was Demarest referencing a direct quote from Alfouadi, *see* 2-40:5-9, it is to no avail because Demarest nonetheless filed the Rule 41(a)(2) Motion on

the same basis when he represented to the Court that "all the rights and responsibilities *which were initially accepted individually by Plaintiff Demarest* on January 2, 2022 were fully and completely transferred to GMM on January 12, 2022[,]" *see* ECF No. 154 at 1 of 2, which necessarily admits the truthfulness of Alfouadi's alleged statement.

18.    Demarest's representations to this Court in his Rule 41(a)(2) Motion, and his trial testimony regarding same, cannot both be true.

19.    Demarest cannot walk-back his position now on nothing more than the unsubstantiated and self-serving testimony that he previously  received "conflicting information" as to whether GMM was allowed to contract as of January 2, 2022. S*ee* 2-39:7-11.  GMM proffered no evidence as to when such information was received, the nature of the alleged information, and the influence, if any, it had on Demarest's decision making.

20.    Furthermore, Demarest's manner while testifying at trial—intentionally trying to avoid testifying in terms of his individual capacity at first, and then reverting back later—also undercuts his credibility and lends greater weight to the conclusion that at all relevant times, Demarest was acting in his individual capacity, not as GMM, with respect to the alleged January 2, 2022 contract.

21.    Thus, GMM fails to establish, by a preponderance of the evidence, that it was a party to the alleged January 2, 2022 oral salvage contract with Alfouadi.

22.    As no contract between GMM and Alfouadi was formed, there can be no breach. *Moran v. Guerreiro*, 97 Hawai'i 354, 371, 37 P.3d 603, 620 (App. 2001).  Count I, therefore, fails and judgment is entered in favor of Alfouadi.  *Evergreen,* 884 F. Supp. 2d at 1059; *Au,* 63 Haw. at 221.

### 2.    GMM And Alfouadi Did Not Enter Into A Valid And Enforceable Oral Salvage Contract

23.    Even if GMM was a party to the alleged January 2, 2022 salvage contract

with Alfouadi, Count I still fails for lack of a valid and enforceable contract.

### a.    Count I Fails For Lack Of Offer

24.    "In order for an oral contract to be enforceable, there must be an offer, an acceptance, and consideration." *Douglass v. Pflueger Hawaii, Inc.*, 110 Hawaiʻi 520, 525, 135 P.3d 129, 134 (2006), as corrected (May 30, 2006) (recognizing the elements of a valid oral contract as offer, an acceptance, and consideration). The Hawaiʻi Supreme Court defines an offer as:

> the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that the person's assent to that bargain is invited and will conclude it. While particular words and formalities are not required, the communication must be sufficiently definite to mani-fest the maker's intent to bestow upon the addressee the power of acceptance.

*Willis v. Swain*, 112 Hawaiʻi 184, 190, 145 P. 3d 727, 733 (2006) (citing Restatement (Second) of Contracts § 24; *Wong Kwai v. Dominis*, 13 Haw. Terr. 471, 476 (1901)) (internal quotation marks and alterations omitted)).

25.    "[S]ince an offer must be a promise, a mere expression of intention or general willingness to do something on the happening of a particular event or in return for something to be received does not amount to an offer." *Beverage Distribs., Inc. v. Olympia Brewing Co.* ("*Olympia*"), 440 F.2d 21, 29 (9th Cir. 1971) (citations omit-ted); *Willis v. Swain*, 112 Haw. 184, 190, 145 P.3d 727, 733 (2006) (a "general ex-pression of willingness to bargain [does] not constitute an offer.") (citations omitted).

26.    GMM failed to establish, by a preponderance, that it extended a valid offer to Alfouadi.

27.    Demarest's alleged "offer[] to have [his] company take responsibility to be conducting an environmental salvage and wreck removal, in exchange for [Alfouadi] quickly opening a claim with his insurance company[]" *see* 1-61:11-14, is not a promise

to do something, rather, it is a "willingness to do something on the happening of a particular event or in return for something to be received[,]" such as, the opening of an insurance claim. *Olympia*, 440 F.2d at 29; *Willis*, 112 Haw. at 190.

28.     That GMM, through Demarest, would offer to do anything to help Alfouadi on January 2, 2022 also lacks credibility given the history between Demarest and Alfouadi and the adverse nature of their relationship before January 2, 2022.

29.     GMM proffered no evidence of any alleged offer made to Alfouadi after January 2, 2022.

30.     The offer, therefore is not valid. *Id.*

### b.     Count I Fails For Lack Of Consideration

31.     The alleged January 2, 2022 contract also fails for want of consideration.

32.     Where "the promisor retains the unlimited right to decide later the nature and extent of his performance the promise is illusory." *Olympia*, 440 F.2d at 30. "Where the apparent assurance of performance is illusory, it is not consideration for a return promise. *Balogh v. Balogh*, 134 Haw. 29, 58-59, 332 P.3d 631, 660-61 (2014).

33.     For example, a promise to "work hard in a marriage" is illusory because the promisor reserves a right to alternative performances—i.e. divorce or separation—which would not constitute consideration. *Id.* at 59. Furthermore, the promisor's performance of the "promise" is entirely optional; that is, there is no consequence or detriment to the promisor for a decision to "breach" the contract by not working hard in the marriage. *Id.*

34.     On its face, GMM's performance with respect to any alleged oral contract with Alfouadi is entirely optional in that there is no consequence or detriment to GMM for a decision to breach the contract by NOT taking responsibility for the salvage wreck removal. *See id.* "[A] promise of return performance that allows for alternative performances that include not performing, cannot constitute consideration." *Id.*

35.     GMM did not make a valid return promise in exchange for Alfouadi's

alleged promise to open a claim with his insurance company. There was no discussion of compensation in Demarest's offer.

36.    Also, the ultimate decision as to whether Demarest/GMM would actually be paid, even if Alfouadi opened an insurance claim, was not Alfouadi's, but rather, State Farm's.  As such, consideration is also too indefinite to be binding here because it is not solely based on Alfouadi's performance.

37.    GMM, therefore, failed to satisfy its evidentiary burden, by a preponderance, with respect to offer and consideration and Count I fails accordingly.

### c.    <u>Count I Fails For Lack Of Mutual Assent</u>

38.    Count I also fails for want of mutual assent.

39.    "There must be a mutual assent or a meeting of the minds on all essential elements or terms to create a binding contract." *Earl M. Jorgensen Co. v. Mark Const., Inc.,* 56 Haw. 466, 470, 540 P.2d 978, 982 (1975) (finding it clear from undisputed facts that party's submission of purchase order was a manifestation of intent to accept offer); *see also* Restatement (Second) of Contracts § 50(1) ("Acceptance of an offer is a manifestation of assent to the terms thereof made by the offeree in a manner invited or required by the offer.").

40.    The existence of mutual assent or intent to accept "is determined by an objective standard." *Earl M. Jorgensen,* 56 Haw. at 470, 540 P.2d at 982. "A party's words or acts are judged under a standard of reasonableness in determining whether he has manifested an objective intention to agree. All reasonable meanings will be imputed as representative of a party's corresponding objective intention." *Id.* The Hawai'i Supreme Court emphasizes that "[c]ontracting is a sentient process. There must be objective proof of a meeting of the minds. The prospective contracting parties are not expected to engage in telepathy. There must be a confluence of assent *around specific terms." United Pub. Workers, AFSCME, Loc. 646, AFL-CIO v. Dawson Int'l, Inc.* ("Dawson"), 113 Hawai'i

127, 141, 149 P.3d 495, 509 (2006) (internal quotation marks, alterations, and citations omitted) (emphasis added).

41.    Based on the evidence presented by GMM at trial, telepathy is the only way by which a "meeting of the minds" as to all the essential terms of a binding oral salvage contract could have formed between GMM and Alfouadi.

42.    Price is an essential term of a maritime salvage contract. *Smith v. Union Oil Co.*, 274 F. Supp. 248, 251 (W.D. Wash. 1966) ("The salvage contract need not be in writing but the terms must be clear, definite and explicit *as to the amount* and that there is a mutual understanding that the services involved are in the nature of salvage."); *Reliable Salvage & Towing, Inc. v. 35′ Sea Ray*, 2011 U.S. Dist. LEXIS 35515, at *24 (M.D. Fla. Mar. 21, 2011) ("It is apparent from the testimony that essential terms such as price were missing from the contract, therefore a meeting of the minds never occurred.").

43.    GMM failed to establish an agreement with Alfouadi as to the terms of payment.

44.    At trial, Demarest admitted that payment for the alleged oral salvage contract was "*presumed* to be based on Lloyds open forum with SCOPIC clause[,]" as stated in GMM's original complaint and First Amended Complaint. 1-203:5-12.  Demarest also "accept[ed] responsibility for [the] presumption" which he further affirmed as "correct." 1-203:17-18; *see also* 2-31:25 to 2-32:1 ("And its true that *I presumed SCOPIC would apply* at the very beginning of this matter.") (emphasis added)).

45.    Demarest also admitted to:  not discussing an hourly rate for services with Alfouadi, *see* 1-195:8-11;[6] not discussing additional purchases of equipment to do the salvage with Alfouadi, *see* 1-196:3-5; not discussing the hiring of paid-third-party labor and associated pay rates with Alfouadi, *see* 1-195:20-25; not discussing the additional

---

[6] Thus, Mr. Demarest did not discuss the use or application of the Coast Guard hourly BOA rates with Mr. Alfouadi.

uplift charge on all expenses with Alfouadi, *see* 1-198:8-12; and not providing even a rough ballpark estimate of cost to Alfouadi, *see* 1-196:23 to 1-197:1 (collectively, including SCOPIC, "Essential Terms").

46.    Instead, Demarest "relied on [Alfouadi's] understanding *that I* [Demarest] *believed he* [Alfouadi] *had* from prior interactions I [Demarest] had with him [Alfouadi]." 1-197:1-3 (emphasis added). This is exactly the type of telepathy the law forbids. *Dawson*, 113 Hawai'i at 141, 149 P.3d at 509.

47.    Demarest's "belief" acknowledges that there was no reasonably objective understanding between the parties, merely speculation and presumption by Demarest.

48.    Furthermore, the evidence clearly demonstrates that there were no discussions or negotiations between the parties with respect to the Essential Terms—Demarest just made them up as he went.

49.    GMM's own expert, Mr. Sebastian Coppes, testified that with respect to salvage contracts "at the start of *any salvage job*, *everything is open for negotiation*." 2-68:17-18 (emphasis added). Coppes testified that this applies to both emergent and large-scale catastrophic salvage operations; there is still a negotiation between the boat owner and the salvage company. 2-95:16 to 2-96:2. It also applies to the rates charged. 2-96:24 to 2-97:3.

50.    The evidence fails to show that Alfouadi knew, or should have known, of any Essential Term.

51.    As such, GMM has produced no evidence of "words or acts" for the Court to determine that both GMM and Alfouadi objectively manifested an intent to accept or mutually assent to employ GMM's salvage services on certain specified terms. *Earl M. Jorgensen,* 56 Haw. at 470, 540 P.2d at 982.

52.    Count I fails for lack of mutual assent.

> **d.    Count I Fails For Want Of Evidence Of The Particular
> Provision Allegedly Violated By Alfouadi**

53.    Count I also fails because GMM proffered no admissible evidence of the particular provision of the oral contract allegedly violated by Alfouadi.  *See Evergreen,* 884 F. Supp. 2d at 1059; *Au,* 63 Haw. at 221, 626 P.2d at 181.

54.    GMM's Exhibit 59 was presented as "the breach by Mr. Alfouadi showing that as of January 19, 2022, he had not made a claim with State Farm, which is precisely what we claim was his obligation under the oral contract." 1-149:15-18.  The Court, however, sustained Alfouadi's objection on hearsay grounds and Exhibit 59 was not admitted into evidence. 1-149:13 to 1-151:7.

55.    No additional evidence of the particular oral contract provision allegedly breached by Alfouadi was presented by GMM.

56.    Accordingly, for the foregoing reasons, the Court enters judgment in favor of Alfouadi as to Count I.

**B.    GMM Fails To Satisfy Its Burden As To Count II**

57.    The Court also enters judgment in favor of Alfouadi as to Count II.

58.    In Hawaiʻi, an implied contract exists:

> where the intention of the parties is not expressed, but an agreement in fact, creating an obligation, is implied or presumed from their acts, as in the case where a person performs services for another, who accepts the same, the services not being performed under such circumstances as to show that they were intended to be gratuitous, or where a person performs services for another on request.

*Kemp v. State of Hawaiʻi Child Support Enf't Agency,* 111 Hawaiʻi at 391, 141 P.3d at 1038 (quoting *Durette v. Aloha Plastic Recycling,* 105 Hawaiʻi 490, 504, 100 P.3d 60, 74 (2004)) (emphasis removed). The "essential element of an implied contract" is a "*mutual*

*intent to form a contract"* that is implied from the *"actions of the parties."* Id. (emphasis
in original).

59.    As concluded above, there was no meeting of the minds as to the Essential
Terms and no valid offer or consideration. Here, the evidence does not allow the Court to
draw a reasonable inference as to GMM's and Alfouadi's mutual intent to imply a contract
on any clear terms. *Kemp,* 111 Hawaiʻi at 391, 141 P.3d at 1038.  Accordingly, GMM fails
to satisfy its burden, by a preponderance, as to Count II.

### C.    GMM Fails To Satisfy Its Burden As To Count III

60.    Demarest's unclean hands preclude GMM's recovery under quantum meruit.
In Hawaiʻi, "'[t]he basis of recovery on quantum meruit is that a party has received a
benefit from another which it is unjust for him to retain without paying therefor[e].'"
*Hawaii Ventures, LLC v. Otaka, Inc.*, 114 Hawaiʻi 438, 164 P.3d 696, 742 (2007) (quoting
*Maui Aggregates, Inc. v. Reeder*, 50 Haw. 608, 610, 446 P.2d 174, 176 (1968)). "Under
Hawaii law, whether the [d]efendants received some benefit in the exchange is key."
*UCSF-Stanford Health Care v. Hawaii Mgmt. All. Benefits & Servs., Inc.*, 58 F.Supp.2d
1162, 1171 (D. Haw. 1999) (citation omitted). "If a party derives any benefit from services
rendered by another, the law reasonably implies a promise to pay on the part of the one
who has received such benefit, such amount as it is reasonably worth." *Maui Aggregates,
Inc.*, 50 Haw. at 610, 446 P.2d at 176 (citation and internal quotation marks omitted).

61.    It is also well established that he who comes into equity must come with
clean hands. *7's Enters., Inc. v. Del Rosario*, 111 Hawaiʻi 484, 494, 143 P.3d 23, 33 (2006).
The maxim "is confined to misconduct in regard to, or at all events connected with, the
matter in litigation, so that it has in some measure affected the equitable relations
subsisting between the two parties, and arising out of the transaction[.]" *Id.* at 494-95, 143
P.3d at 33-34. The doctrine "closes the door of a court of equity to one tainted with
inequitableness or bad faith relative to the matter in which he seeks relief, however

improper may have been the behavior of the defendant." *AIG Haw. Ins. Co. v. State Farm Ins. Cos.*, No. 27789, 2008 Haw. App. LEXIS 627, at *21 (App. Oct. 8, 2008) (citation omitted).

62.    Admissions Nos. 26 - 35 of Exhibit 204 conclusively establish, as a matter of law, Demarest's Intentional Misrepresentations made to Alfouadi on January 6, 2022 and Alfouadi's detrimental reliance on said misrepresentations 2-10:5 to 2-18:3.

63.    Demarest admitted that he took control of the clean-up operations on January 6, 2022 *as an individual*, not as GMM, and advised Alfouadi that Demarest was the "salvor-on-record" when he knew that was not true.

64.    Demarest's Intentional Misrepresentations bar equitable relief because his actions were clearly within the subject matter of the controversy and connected with same—the wreck removal clean-up—for which Demarest intentionally misrepresented his "salvor-on-record" status to Alfouadi, to Alfouadi's detriment, thereby undermining the equitable relations between the parties. *See 7's Enters.*, Inc., 111 Hawaii at 494-95, 143 P.3d at 33-34.

65.    GMM also failed to present evidence establishing that the State of Hawaii recognized it as the official salvager-on-record on January 2, 2022., independent of Demarest's Intentional Misrepresentations made on January 6, 2022.

66.    As such, Demarest's unclean hands necessarily flow to GMM because there is no independent basis for GMM's involvement in the wreck removal apart from Demarest's Intentional Misrepresentations. Demarest's Intentional Misrepresentations are the sole means by which GMM ultimately seized control of the wreck removal operation from Alfouadi.  The doctrine of unclean hands prevents a party from recovering where the party "engaged in, acquiesced in or benefited from the conduct at issue." *Am. Home Mortg. Holding v. Showcase of Agents, L.L.C.*, 458 B.R. 161, 174 (Bankr. D. Del. 2011); *In re Aimster Copyright Litig.*, 252 F. Supp. 2d 634, 655 (N.D. Ill. 2002).

67.    The admitted evidence allows the Court to draw the reasonable inference, by a preponderance, that but for Demarest's Intentional Misrepresentations, Alfouadi would have likely completed his own wreck removal by or before January 8, 2022.

68.    Combined with Alfouadi's undisputed education, extensive sailing and salvage experience, ownership of his own salvage tools and unfettered access to Lahaina Welding's salvage tools, the assistance of Pratt, his family, other volunteer labor from the Lahaina boating community, Alfouadi's plans of how to remove the keel, diesel gas tank, and motor from the water, and having already extricated 80% of the Boat by January 6, 2022, the evidence establishes by a preponderance that Alfouadi had no intention or reason to walk away from the wreck removal and relinquish control of it to Demarest or GMM.

69.    As discussed above, prior to January 2, 2022, there is no dispute that Demarest and Alfouadi were not friends.  Demarest no longer trusted Alfouadi. 1-186:23 to 1-187:17; 3-114:5 to 3-115:3.  The two of them were not talking to each other. 3-115:1 to 3-116:12.  Alfouadi "lost all respect for [Mr. Demarest.]" 3-116:12.

70.    The Intentional Misrepresentations notwithstanding, Alfouadi's reliance on Demarest's Intentional Misrepresentations was also reasonable under the factual circumstances given: Demarest's appearances with DOCARE officer Cory Fernandez on January 2 and 7, 2022; Demarest's insistence that Alfouadi fill out the U.S. Coast Guard Accident Report on January 4, 2022; and Alfouadi's understanding of the term "salvager-on-record."

71.    Demarest's unclean hands are further sullied by the fact that GMM failed to rebut Alfouadi's evidence that on June 6, 2022, about 45 minutes after Alfouadi left the job site, having previously extracted 80% of the Boat from the water up onto the rock jetty, sections of the hull were intentionally released back into the water.

72.    It is undisputed that Demarest was in control of the site at this time and releasing the hull back into the water only complicated the job, extended the time to

34

complete the wreck removal, and unnecessarily increased costs—all of which benefit Demarest and/or GMM, not Alfouadi.

73.    Demarest's seizure of control over the wreck removal, the necessary extension of time to complete the job an additional 11 days due to sections of the hull being released back into the water on January 6, 2022,  thereby significantly increasing the cost of completing the job, conferred no benefit on Alfouadi.

74.    Accordingly, Demarest's unclean hands flow to GMM because its involvement in the wreck removal arose solely from Demarest's Intentional Misrepresentations. GMM presented no evidence to the contrary, therefore, Demarest's unclean hands "closes the door" to GMM's equitable relief under Count III.  *AIG Haw. Ins. Co.*, No. 27789, 2008 Haw. App. LEXIS 627, at *21.

**D.    GMM Fails To Satisfy Its Burden As To Count IV**

75.    Count IV, GMM's pure salvage claim, fails as well.

76.    A pure salvage award is "the compensation allowed to persons by whose voluntary assistance a ship at sea or her cargo or both have been saved in whole or in part from impending sea peril."  ECF No. 76 at 26 (citing *The Sabine*, 101 U.S. 384, 384 (1879) (emphasis added))).

77.    In "[t]he most recent complete judicial definition in this circuit of the elements for a [pure] salvage claim," *Bay & Delta Tractor Tug Co. v. Barge Pac. Trader*, 1997 WL 797935, at *1 (N.D. Cal. Dec. 16, 1997), the Ninth Circuit held:  [t]he elements of a salvage claim are as follows: [(1)] There must be a maritime peril from which the ship or other property could not have been rescued without the salvor's assistance.[7]  [(2)] The

---

[7] "[A] salvor is . . . a person who, without any particular relation to the ship in distress, proffers useful service and gives it as a volunteer adventurer without any pre-existing contract that connected him with the duty of employing himself for the preservation of the vessel." *The Clarita*, 90 U.S. (23 Wall.) 1, 16 (1874).  With respect to the "necessity" requirement in the first element, the Court is bound to follow on-point Ninth Circuit precedent, which maintains the necessity

salvor's act must be voluntary—that is, he must be under no official or legal duty to render the assistance. [and (3)] The act must be successful in saving, or in helping to save, at least a part of the property at risk. *Id.* (citing *U.S. Dominator, Inc. v. Factory Ship Robert E. Resoff*, 768 F.2d 1099, 1104 (9th Cir. 1985), superseded by statute on other grounds (quoting The Law of Admiralty § 8–2 (2d ed. 1975) (citing 3A Benedict on Admiralty § 2 (1983)) (internal quotation marks omitted and emphasis added).

78.    Pure salvage is also an equitable doctrine. *Faneuil Advisors v. O/S Sea Hawk*, 50 F.3d 88, 92 (1st Cir. 1995).

79.    Under federal admiralty law,"[t]he salvor who seeks a reward for his services in rescuing property on navigable waters[] must act in entire good faith and with honesty of purpose. He must come into court with clean hands." *Columbus-America Discovery Grp ("Columbus-America"). v. Atl. Mut. Ins. Co.*, 56 F.3d 556, 569 (4th Cir. 1995) (citing 3A Martin J. Norris, Benedict on Admiralty § 99 (7th ed. 1993).

80.    Under prong one of *U.S. Dominator*, GMM adduced no admissible evidence that Alfouadi could <u>not</u> have rescued his own Boat <u>without</u> GMM's assistance.

81.    The admitted evidence before the Court establishes: Alfouadi's education and background in engineering and construction; decades of relevant work and sailing experience; volunteer and paid marine salvage experience in Lahaina; ownership of and access to salvage tools and equipment from Lahaina Welding; volunteer assistance from Pratt, his family, and the general Lahaina Maui boating community; and an organized and systematic plan effectively and efficiently orchestrated and managed by Alfouadi, beginning from the time of grounding on January 2, 2022, and resulted in 80% of the wreck removal completed by January 6, 2022, without GMM's assistance.

---

requirement. ECF No. 76 at 27, n.9 (referring to <u>U.S. Dominator</u> and quoting <u>Zuniga v. United Can Co.</u>, 812 F.2d 443, 450 (9th Cir. 1987) (stating that district courts are "bound by the law of their own circuit" and "are not to resolve splits between circuits no matter how egregiously in error they may feel their own circuit may be.")).

82.    Even Demarest admitted that from January 2, 2022 through January 6, 2022, Alfouadi was a "hard worker," working very diligently to make things right as possible.

83.    Alfouadi had a plan in place, and everything he needed, to complete the wreck removal, sans GMM, by or before January 8, 2022.

84.    The facts weigh heavily in favor of the conclusion that Alfouadi was very capable of salvaging his own Boat and did not require GMM's assistance to do so.

85.    Accordingly, Count IV fails under prong one. *See U.S. Dominator*, 768 F.2d at 1104.

86.    GMM also fails to establish prong two of *U.S. Dominator*.

87.    "Voluntary service, [is] the *sine qua non* of marine salvage[.]" B.*V. Bureau Wijsmuller v. United States*, 702 F.2d 333, 338 (2d Cir. 1983) (citing *The Clarita and The Clara*, 90 U.S. (23 Wall.) 1, 16-17 (1875)).

88.    Such service must be rendered in the absence of "[an] official or legal duty to render the assistance." *U.S. Dominator*, 768 F.2d at 1104.

89.    At all times, Demarest maintained that GMM took on the salvage, and all the responsibilities related thereto, "*as the official salvager, as already confirmed with the DOCARE[8] officer that responded on the first night . . . .*" 1-91:12-25, *Id.* (emphasis added).

90.    The Court previously found that both Demarest/GMM and Alfouadi had a substantially similar understanding of the term "salvager-on-record," as one officially authorized by the State of Hawaii to be the salvager.

91.    Here, the credible evidence shows that GMM acted in accordance with the understanding that it had a pre-existing official or legal duty, as the "salvager-on-record," to salvage Alfouadi's Boat.

---

[8] Also known as the "DLNR Police," "DOCARE" is an acronym for the Division of Conservation and Resources Enforcement of the Department of Land and Natural Resources, State of Hawaii. *See* https://dlnr.hawaii.gov/docare/ last visited on November 29, 2025.

92.    Lastly, GMM is precluded from equitable relief due to Demarest's unclean hands.

93.    GMM's involvement in the wreck removal arose solely from Demarest's Intentional Misrepresentations.

94.    Consequently, Demarest's unclean hands necessarily flow to GMM because there is no independent basis for GMM's involvement in the wreck removal apart from Demarest's Intentional Misrepresentations.

95.    Demarest's Intentional Misrepresentations are the only means by which GMM ultimately seized control of the wreck removal operation from Alfouadi on January 6, 2022.

96.    "Admiralty courts have traditionally been vigilant in protecting mariners from unscrupulous and dishonest salvors." *Jackson Marine Corp. v. Blue Fox*, 845 F.2d 1307, 1309 (5th Cir. 1988); *see also*, *e.g.*, *The Elfrida*, 172 U.S. 186, 194 (1891).

97.    "Given the 'heightened vulnerability' of a vessel's master when his ship . . . [is] in distress, the law takes a dim view of salvors who engage in 'dishonesty, corruption, fraud, [or] falsehood' during . . . salvage operations. *St. Clair Marine Salvage, Inc. v. Bulgarelli*, 796 F.3d 569, 575 (6th Cir. 2015) (citing *Jackson*, 845 F.2d at 1310).

98.    GMM's authority, if any, to perform the salvage work was undoubtedly fruit procured by means of Demarest's Intentional Misrepresentations.

99.    Such iniquitous actions, cannot be sustained in equity and warrant no damages.

100.    Thus, GMM fails to satisfy its burden as to Count IV and judgment in favor of Alfouadi should be entered.

       Having failed to satisfy its burden with respect to Counts I, II, III, and IV of the FAC, GMM is not entitled to damages and the Court need not address that issue.

## **CONCLUSION AND ORDER**

In accordance with the above findings of fact and conclusions of law, and for the foregoing reasons, the Court hereby ORDERS that judgment be entered in favor of Defendant Raied J. Alfouadi with respect to Counts I, II, III, and IV of Plaintiff Green Mountain Mycosystem's First Amended Complaint, and determines that Alfouadi is the prevailing party for purposes of determining Alfouadi's entitlement to attorneys' fees and costs pursuant to Rule 54 of the *Federal Rules of Procedure* which may be sought by separate motion.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii _____.

_____
22-CV-00064-JAO-KJM; *Green Mountain Mycosystems, LLC. v. Alfouadi*; Findings of Fact and Conclusions of Law

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| DAVID DEMAREST and GREEN MOUNTAIN MYCOSYSTEMS LLC, <br><br>          Plaintiffs, <br><br>          vs. <br><br> RAIED J. ALFOUADI; DOE DEFENDANTS 1-20, DOE CORPORATIONS, 1-20, DOE GOVERNMENT AGENCIES 1-20, DOE PARTNERSHIPS 1-20, <br><br>          Defendants. | CASE NO. 22-CV-00064-JAO-KJM <br> (In Admiralty) <br><br> CERTIFICATE OF SERVICE |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing

document was duly served upon the following parties via CM/ECF on December 1,

2025.

        KEVIN W. HERRING, ESQ.
        kherring@awlaw.com
        RYAN M. TOYOMURA, ESQ.
        rtoyomura@awlaw.com
        First Hawaiian Center
        999 Bishop Street, Suite 1400
        Honolulu, Hawaii 96813

GLENN KATON, ESQ. (*Pro Hac Vice*)
385 Grand Ave. Suite 200
Oakland, CA 94610

Attorneys for Plaintiff
GREEN MOUNTAIN MYCOSYSTEMS

DATED:  Honolulu, Hawaii, December 1, 2025.

/s/ Brent K. Wilson
JAMES V. MYHRE
BRENT K. WILSON
Attorneys for Defendant
RAIED J. ALFOUADI

2