# EXHIBIT "E"

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| GREEN MOUNTAIN MYCOSYSTEMS LLC,<br><br>Plaintiff,<br><br>vs.<br><br>RAIED J. ALFOUADI,<br><br>Defendant. | CIV. NO. 22-00064 JAO-KJM<br><br>FINDINGS OF FACT AND CONCLUSIONS OF LAW |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

During a storm in January 2022, Defendant Raied Alfouadi's ("Alfouadi" or "Defendant") sailboat came loose from its mooring and ran aground at Mala Wharf in Lahaina, Maui. In what remains of this case after its somewhat tortured procedural history, Plaintiff Green Mountain Mycosystems LLC ("GMM" or "Plaintiff")—managed by its sole member and Alfouadi's former friend, David Demarest ("Demarest")—seeks compensation for work allegedly performed to salvage the sailboat. GMM asserts four claims against Alfouadi for Breach of Oral Contract (Count I), Breach of Implied Contract (Count II), Quantum Meruit (Count III), and Maritime Pure Salvage Award (Count IV). *See generally* ECF No. 77.

The Court held a four-day bench trial on the matter from October 20–23, 2025, after which the parties submitted written closing arguments and proposed

**EXHIBIT "E"**

findings of fact and conclusions of law. *See* ECF Nos. 271–74. Based on the record, including the admissible testimony and exhibits, the Court finds in favor of Defendant and against Plaintiff on all counts.

The Court makes a couple observations before proceeding with its findings. First, as discussed below, and as the Court has already remarked, this case has been somewhat constrained and convoluted by Demarest's failure to respond to requests for admissions. The Court deemed those facts admitted against Demarest but not GMM. Nevertheless, as Demarest was GMM's manager and sole member, certain admissions of his effectively bind GMM as well.

Second, because the Court does not find either of the protagonists in this case—Demarest or Alfouadi—fully credible, it is difficult to say exactly what happened at Mala Wharf. Their stories are diametrically opposed in many ways, but neither story completely adds up, and the Court suspects it isn't getting the whole objective picture from the parties because of their egos and their animosity toward one another. Nevertheless, Plaintiff has the burden of proving its case and the Court found Alfouadi's version of events more plausible.

The Court suspects that what actually happened was that Demarest sensed an opportunity to make some money from Alfouadi's insurance company and swooped in to attempt the salvage operation without any agreement with Alfouadi. At first Demarest tried to include Alfouadi in his scheme, but eventually resorted

Case 1:22-cv-00064-JAO-KJM Document 283 Filed 03/11/26 Page 3 of 40 PageID.5048

to deception to seize control of the operation. Alfouadi isn't above reproach either. He had his ego bruised during the January 6, 2022 argument with Demarest and stubbornly abandoned his work on the boat without ever trying to get to the bottom of what Demarest was proposing. Still, the Court finds that Demarest's deception and opportunism outweigh Alfouadi's pettiness and concludes that (1) GMM did not have any agreement with Alfouadi and that (2) Demarest's unclean hands preclude GMM from recovering for any work it completed absent an agreement.

## RELEVANT PROCEDURAL BACKGROUND

1. At the start of this case, Demarest and GMM were both plaintiffs, and initially filed suit in February 2022, within a month of the completion of the wreck removal. *See* ECF No. 1.

2. On February 21, 2024, Alfouadi served GMM and Demarest with his First Request for Answers to Admissions ("1RFA"). *See* ECF No. 55.

3. Demarest missed the deadline to respond to the 1RFA. *See* ECF No. 88.

4. On July 22, 2024, Alfouadi sought to deem the facts in the 1RFA admitted by filing Motion in Limine ("MIL") No. 1, asking the Court to preclude GMM and Demarest "from introducing any evidence or argument contrary to the admitted matters in 1RFA." ECF No. 91-1.

5. The Court held a hearing and granted Alfouadi's MIL No. 1. ECF No. 123.

Case 1:22-cv-00064-JAO-KJM Document 283 Filed 03/11/26 Page 4 of 40 PageID.5049

6. GMM and Demarest sought to withdraw or amend their responses to the 1RFA through various filings, ECF Nos. 97, 122, 127, that the Court denied, ECF Nos. 119, 125, 133.

7. Demarest then moved to dismiss himself as a plaintiff for lack of standing "because all the rights and responsibilities which were initially accepted individually by Plaintiff Demarest on January 2, 2022 were fully and completely transferred to GMM on January 12, 2022." ECF No. 154 at 1.

8. Demarest elaborated that "the rights permanently transferred from Plaintiff Demarest to Plaintiff GMM on January 12, 2022 included the alleged original meeting of the minds between Mr. Demarest, as an individual, and Mr. Alfouadi on January 2, 2022[.]" *Id.* at 2.

9. The Court granted Demarest's Motion for Voluntary Dismissal, meaning GMM was the only remaining Plaintiff. ECF No. 157.

10. The Court then reopened the dispositive motions deadline to allow Defendant to brief the effect of the voluntary dismissal, *see* ECF No. 165, and Alfouadi filed his "Motion to Dismiss Plaintiff's First Amended Complaint, or in the Alternative, for Summary Judgment as to All Claims," ECF No. 166 ("Motion to Dismiss").

11. In opposition to the Motion to Dismiss, GMM highlighted that the 1RFA was only addressed to Demarest and not GMM. *See* ECF No. 170 at 13.

Case 1:22-cv-00064-JAO-KJM Document 283 Filed 03/11/26 Page 5 of 40 PageID.5050

12. The Court denied Alfouadi's Motion to Dismiss, ECF No. 180, teeing up the remainder of this case for trial.

13. In its order denying the Motion to Dismiss, the Court acknowledged that the "relevant 1RFA questions were indeed directed to Demarest and not GMM" and decided that it would technically "not attribute Demarest's admissions to GMM." *Id.* at 20.

14. Still, those admissions included that Demarest misrepresented to Alfouadi on January 6, 2022 that he had been awarded a salvage contract by the State of Hawaiʻi even though this was not true, and Alfouadi detrimentally relied on this misrepresentation. *See id.* at 5 (citing ECF No. 168-4 ¶¶ 26–34); *see also* Ex. 204.

15. And, as discussed more thoroughly below, the circumstances of the January 6 conversation demonstrate that Demarest's misconduct should also flow to GMM, his single-member LLC.

16. Regarding the effect of Demarest's motion for voluntary dismissal, the Court noted that GMM alleged claims on its own behalf in the operative First Amended Complaint, such that its claims were not entirely dependent on any

Case 1:22-cv-00064-JAO-KJM Document 283 Filed 03/11/26 Page 6 of 40 PageID.5051

assignment of claims from Demarest to GMM. *See* ECF No. 180 at 9.[1] In other words, the Court would hold a bench trial on GMM's own claims.

## FINDINGS OF FACT[2]

**The Parties and the Court's View of the Protagonists**

17. GMM is a single-member limited liability corporation first incorporated in 2004 in the state of Vermont. *See* ECF No. 279 at 158:12–21.

18. GMM is a company that raised mushrooms, produced teas and other extracts, and consulted on mushroom production and using fungi to break down toxic waste. *See id.* at 159:13–20.

19. GMM had never been a salvor of record for a boat salvage wreck removal before the events in this case. *See id.* at 171:22–25.

20. Demarest is the sole member and managing director of GMM. *See id.*; *see also id.* at 143:24 – 144:1.

---

[1] As the Court concludes there was no agreement between GMM and Alfouadi in any event, it need not address whether Demarest's statements in his voluntary dismissal constituted admissions that GMM was not a party to any agreement with Alfouadi.

[2] Any finding of fact that should more properly be deemed a conclusion of law and any conclusion of law that should more properly be deemed a finding of fact shall be so construed.

Case 1:22-cv-00064-JAO-KJM Document 283 Filed 03/11/26 Page 7 of 40
PageID.5052

21. While Demarest was an experienced sailor, and had assisted with salvage operations, he had not done paid salvage work or been salvor of record before the events in this case. *See id.* at 63:16 – 66:16, 171:18 – 172:6.

22. Alfouadi owned the 29-foot sailboat at the center of this case. *See* ECF No. 281 at 79:20 – 80:11.

23. Before the grounding, Alfouadi lived on the boat and kept it in the Mala mooring field off the coast of Lahaina. *Id.* at 96:6–11.

24. Alfouadi was also an experienced sailor, ECF No. 280 at 205:17 – 207:5, and had engaged in both paid and volunteer salvage work and had been involved in about 30 different salvage or wreck removal jobs, *see* ECF No. 281 at 86:13; *see also id.* at 86:13 – 92:25.

25. Demarest and Alfouadi were previously friends, but about a year before the grounding of Alfouadi's boat, their friendship dissolved over an argument they had when repairing a roof together. *See* ECF No. 279 at 186:15 – 22; ECF No. 281 at 113:3 – 115:15.

26. After that argument, Demarest no longer trusted Alfouadi, ECF No. 279 at 187:13–17, and Alfouadi lost all respect for Demarest, ECF No. 281 at 116:11–12.

**<u>The Grounding of the Boat – January 2</u>**

27. Mala Wharf is a historic pier adjacent to a boat ramp and a rock jetty on Maui. *See* Ex. 15.

28. On January 2, 2022, a storm broke Alfouadi's boat free from its mooring. *See* ECF No. 280 at 149:18–24.

29. Jeffrey Pratt, a friend of Alfouadi's, testified as to what occurred that day. The Court found Pratt generally credible based on his demeanor, consistency of his testimony, and—despite his friendship with Alfouadi—free of obvious motive to be less than truthful. *See id.*; *see also id.* at 150:5–22. He presented matter-of-fact testimony about the situation.

30. Pratt had been on the water that day on his own boat but returned to Mala Wharf when the storm arrived. *See id.* at 160:23–25.

31. Once back on land, Pratt noticed Alfouadi's boat drifting free from its mooring near Mala Wharf. *See id.* at 162:10–15.

32. He called Alfouadi, who wasn't on the boat, but was instead running toward the wharf. *See id.* at 162:15–19.

33. Pratt yelled at people to try to grab Alfouadi's boat, but it nonetheless cruised in and got stuck between the wharf and the jetty. *See id.* at 162:21–25.

34. Alfouadi jumped into the water and climbed onto the boat to try to start the outboard motor. *See id.* at 166:12–25.

35. The high waves prevented him from starting the engine and were causing the hull of the boat to bang against the rocks. *See id.*

36. Eventually, the rocks punctured the hull and the boat "sank pretty darn quick after that." *Id.* at 167:1–3.

37. At that time, only Pratt and Alfouadi were attending to the boat. *See id.* at 167:7–17.

38. Flotsam started floating out of the boat, so Pratt called his family to help gather the debris in the water and on the beach. *See id.* at 168:20 – 169:3.

39. Demarest[3] showed up and joined Alfouadi and Pratt while the mast of the boat was banging against the historic wharf. *See* ECF No. 281 at 139:12 – 140:18; Ex. 220.

40. To prevent damage to the wharf, Pratt and Alfouadi cut the mast using a grinder Pratt had in his truck. *See* ECF No. 280 at 169:9–21.

41. Demarest claims that it was around this time when he and Alfouadi, in the presence of Pratt, reached their agreement that GMM would conduct the salvage. *See* ECF No. 279 at 60:6 – 62:11.

---

[3] For the sake of readability, the Court mostly uses "Demarest" in its narrative of the facts because he was the person interacting with the other people involved in this case, and obviously the person who testified for GMM. The Court's use of "Demarest" is not meant to suggest that GMM as an entity was not doing the work—in fact the Court thinks there is decent evidence that Demarest was trying to channel the work through GMM. *See* Exs. 24, 37.

42. According to Demarest, he told Alfouadi "sorry for your loss" and offered to have GMM take responsibility for the environmental salvage and wreck removal if Alfouadi quickly opened a claim with his insurance company that GMM could collect from. *See id.* at 61:11–14.

43. Demarest claims that Alfouadi accepted the offer and said something to the effect of OK, let's get to work. *See id.* at 62:2–11.

44. Based on the evidence in the record, the Court does not believe that Demarest and Alfouadi had such a conversation on January 2.

45. Instead, Demarest was not present when Alfouadi and Pratt cut up the mast. *See* ECF No. 281 at 140:12–18; ECF No. 280 at 171:6–9.

46. Alfouadi and Pratt both credibly denied that any conversation about Demarest or GMM conducting the salvage occurred on January 2. *See* ECF No. 281 at 141:8–18; ECF No. 280 at 187:18–22, 188:1–12, 189:1–4.

47. Nevertheless, Demarest involved himself in the matter on the night of January 2, 2022, when he and State of Hawaii Department of Land and Natural Resources ("DLNR") officer Cory Fernandez spoke to Alfouadi on his boat. *See* ECF No. 281 at 148:2–20.

48. Apparently, Fernandez was asking Alfouadi about hazmat removal. *See id.*

49. The Court believes that Demarest was trying to figure out how to monetize the grounding and was injecting himself into the situation without being asked and without an agreement. *See id.* at 149:10 – 150:3.

**The Early Days of Wreck Removal – January 2 to January 6**

50. From the time of the storm and on each of January 3, 4, and 5, Alfouadi worked on scene from essentially sunrise to sunset. *See id.* at 154:1 – 158:3, 167:21 – 168:16.

51. During those days, the boat was strung with lines and hauled up onto the rock jetty. *See* Exs. 222, 223, 225, 226. Alfouadi, Pratt, and other people from the boating community assisted with the work. *See* ECF No. 281 at 154:1–24.

52. They were using supplies from Lahaina Welding, a shop near the wharf where Alfouadi was helping the owner fix the property and that Alfouadi had full access to. *See id.* at 94:2–12, 158:5–13.

53. The exact extent of Demarest's physical work on the boat between January 2–6 is somewhat unclear. ECF No. 280 at 179:21 – 180:10; ECF No. 281 at 165:11–15.

54. He is not depicted in any of the photographs taken on Pratt's phone from that time. Exs. 222–23, 225–26.

55. Instead, he seemed focused on purchasing things he thought he could use to remove the wreck like $140 garbage cans, a $373 wheeled cart, a $1224 dust extractor, and a $259 dust extracting skill-saw. *See* Ex. 2 at 1. He also spent $7 dollars to print an incident report for Alfouadi to fill out. *See id.*

56. However, on the night of January 4 into the early morning of January 5, Demarest collected flotsam from the site as rough conditions continued to break the boat apart. Exs. 27, 28, 101; ECF No. 279 at 83:25 – 84:11, 86:19 – 87:5, 115:13 – 117:18.

57. Around January 4 or 5, Demarest also asked Andre Espiritu, an experienced diver to help with the salvage job. *See* ECF No. 279 at 19:5–6, 21:2–10.

58. The Court found Espiritu credible based on his demeanor and obvious care for the reef around Mala Wharf. *See id.* at 21:22 – 22:5.

59. Espiritu testified that Demarest told him at some point in the early days of the salvage that Demarest would probably be able to pay him out of insurance claim money. *Id.* at 21:16–19.

60. Espiritu's work involved diving with a scuba tank to collect small pieces of debris, and then helping float larger pieces of debris using float bags. *Id.* at 25:18–25.

61. However, most if not all of Espritu's work occurred after January 6. *See id.* at 24:24 – 25:1.

Case 1:22-cv-00064-JAO-KJM Document 283 Filed 03/11/26 Page 13 of 40 PageID.5058

62. During January 3–5, Demarest was also running around trying to get papers signed and discussing potential insurance claims.

63. For example, Demarest printed out and presented Alfouadi with a U.S. Coast Guard Recreational Boating Accident Report, for Alfouadi to sign on January 4. Ex. 248; ECF No. 279 at 138:20 –139:5.

64. The Court fully believes Alfouadi when he testified that Demarest was "badgering" him to sign the report. *See* ECF No. 281 at 196:2–5.

65. As the Court sees it, Alfouadi was entirely focused on just doing the work of wreck removal from January 2 through January 6.

66. He was working out on the jetty "before the crack of dawn" until sunset. *See id.* at 151:7–18

67. Demarest meanwhile was trying to create a paper trail by emailing DLNR and Defendant's insurer and signing his emails as manager of GMM. *See* Exs. 24, 37; ECF No. 279 at 144:17 – 146:13.

68. According to Alfouadi, on the night of January 3, Demarest spoke with Alfouadi and proposed that if Alfouadi allowed Demarest to bill Alfouadi's insurer, Demarest would kick some of the proceeds back to Alfouadi. *See* ECF No. 281 at 155:15 – 156:3.

69. Alfouadi testified that he told Demarest he did not want to do that. *See id.* at 156:4–16.

Case 1:22-cv-00064-JAO-KJM Document 283 Filed 03/11/26 Page 14 of 40 PageID.5059

70. The Court does not necessarily believe that the conversation unfolded *exactly* as Alfouadi testified, but does think that the similarities between that conversation and Demarest's narrative about the alleged oral contract formation on January 2, suggests there is a lot of truth to the matter.

71. That Demarest spent those first couple days buying items and trying to get Alfouadi to sign things also suggests to the Court that he was trying to take advantage of Alfouadi's misfortune and start a new business.

**<u>The Argument and Demarest's Seizure of the Job – January 6</u>**

72. The whole nature of the salvage operation changed on January 6, after Alfouadi walked off the job and left Demarest to complete the task.

73. On the afternoon of January 6, 2022, much of the boat was up on the rock jetty. *See* ECF No. 281 at 212:1–5.

74. That day, Demarest heard that Alfouadi was using one of Demarest's circular saws with a generator on the rock jetty. *See* ECF No. 279 at 93:7–16.

75. Demarest thought that was unsafe, so he went to the site to confront Alfouadi. *See id.* at 93:13–23.

76. The two argued about the safe use of equipment and Demarest (possibly acting as GMM) emphasized that as the salvager of record or official salvager—as confirmed by the State—he was responsible for the salvage

and that if anything went wrong it would be on his shoulders. *See id.* at 91:14–25; ECF No. 281 at 192:4–21.

77. Alfouadi understood "salvager of record" to mean that the State had effectively selected or approved of Demarest or GMM for the job. *See id.* at 193:13–20. Alfouadi was shocked by this news and left the jobsite never to come back. ECF No. 281 at 197:9–10.

78. This argument likely occurred around 3:30 p.m. *See id.* at 197:11–12; ECF No. 279 at 94:19–20.

79. Based on Demarest's failure to respond to the 1RFA, he has admitted that on January 6 he represented to Alfouadi that he had been awarded a salvage contract by the State and that he was the salvager-on-record as to the sailboat. *See* Ex. 204 ¶¶ 26–27.

80. In fact, the State had not awarded him a salvage contract, yet Demarest intentionally misrepresented that to Alfouadi with the intent that Alfouadi would rely on it. *Id.* ¶¶ 29–33.

81. Alfouadi relied on this misrepresentation. *Id.* ¶ 34.

82. The evidence and effect of the admissions demonstrate that Alfouadi stopped working on the job because Demarest misrepresented that the State had placed him in charge of the salvage operation.

83. After Alfouadi walked off the job, portions of the boat that had been on the rock jetty, were back in the water just 45 minutes later. *See* ECF No. 281 at 233:7–10; Exs. 101, 295 (duplicates).

84. Alfouadi testified that a video taken shortly after the argument depicts pieces of the hull that had been up on the rocks "high and dry" were back in the water. *See* ECF No. 281 at 211:15 – 212:23.

85. During trial, Demarest never rebutted the implication that he intentionally released portions of the boat back into the water on the afternoon of January 6, but instead argued in his written closing statement that someone would have seem him put items back in the water. *See* ECF No. 272 at 16–17.

86. But in fact, Demarest testified that the jetty was difficult to walk on and that for some of the pieces of the boat it was easier to remove them from the water. *See* ECF No. 279 at 86:23 – 87:3, 119:15–18.

87. Alfouadi testified that the pieces on the jetty on January 6 were extremely light and that he and Pratt would have been able to carry everything off the jetty by the end of the day. *See* ECF No. 281 at 214:19–23, 216:8 – 219:8.

88. The Court finds Alfouadi's testimony more persuasive and finds that Demarest intentionally released portions of the boat back into the water after Alfouadi walked off the job during the afternoon of January 6, 2022.

Case 1:22-cv-00064-JAO-KJM Document 283 Filed 03/11/26 Page 17 of 40 PageID.5062

89. If Alfouadi had not stopped working after the argument, he also had a plan to remove the remaining large segments of the boat like the keel, diesel engine, and diesel tank, from the water within a couple days. *See* ECF No. 281 at 222:24 – 233:10.

**<u>Completion of Wreck Removal – January 6 through January 19</u>**

90. After Alfouadi stopped working, Demarest and the people he had helping him—including Espiritu—worked on the wreck removal until they completed the job on January 19. *See* ECF No. 279 at 157:12–20.

91. This work included diving to collect small debris from the water and using lift bags to float heavier items like the keel and engine to transport them around coral. *See id.* at 25:15 – 29:7.

92. Demarest also kept buying and renting things allegedly for the job, with the charges exceeding $21,000. *See* Ex. 2.

93. Some of the documented charges include replacement sandals, sunglasses, and a cell phone. *See id.*

94. They also included an alarming $700 dollar in medical supplies "for wounds," and nearly $5,500 in "rapid depreciation" of Demarest's girlfriend's truck. *See id.*

95. Alfouadi never told Demarest to stop working on the operation. *See id*. at 156:2–8.

Case 1:22-cv-00064-JAO-KJM Document 283 Filed 03/11/26 Page 18 of 40 PageID.5063

96. If the boat had not been removed, the State would have removed it and sought reimbursement. *See* ECF No. 261-1 at 13:3–9 (Depo. Trans. of Edward Underwood).

**Alfouadi's Correspondence with His Insurer**

97. As Plaintiff claims that Alfouadi breached the oral or implied contract by failing to file a claim with the boat's insurer, the Court examines the efforts Alfouadi undertook with regards to his insurance.

98. There's no dispute that Alfouadi only had liability insurance on the boat. *See* ECF No. 281 at 156:4–16; ECF No. 279 at 61:5–8.

99. The parties understood this to mean that Alfouadi would not be reimbursed for the loss of his boat. *See id.*

100. Yet, they were also under the impression that if Alfouadi filed a claim with his insurer, people who worked on the salvage operation may receive compensation. *See* ECF No. 281 at 239–43; ECF No. 282 at 53–54.

101. After the January 6 argument, Alfouadi started hearing that Demarest was bad-mouthing him in the community for preventing Demarest from billing Alfouadi's insurance company. *See* ECF No. 281 at 239:10–18, 241:21–25; ECF No. 282 at 54:15–18.

Case 1:22-cv-00064-JAO-KJM Document 283 Filed 03/11/26 Page 19 of 40 PageID.5064

102. These rumors in the community clearly upset Alfouadi as he got agitated anytime he talked about them, speaking even more quickly than he did throughout the rest of his testimony. *See id.*

103. At some point after the grounding of the boat, Alfouadi called his insurance agent and his takeaway from the call was that the insurance company's initial guess was that it would not pay for the wreck removal, but that Alfouadi needed to submit a claim to know for sure. *See* ECF No. 282 at 53:14–22.

104. Alfouadi understood that he could submit a claim online or over the phone, and that there was no deadline by which to submit the claim. *See id.* at 53:24 – 54:5.

105. Based on that understanding, Alfouadi resolved to file the claim later—after he was done with wreck removal—with the help of some type of professional. *See id.* at 54:5–13; ECF No. 281 at 240:13–24.

106. The Court generally believes that Alfouadi intended to file a claim when he got a "breather" from working on the wreck removal. *See* ECF No. 282 at 54:3–11.

107. His intent was to file a claim to allow anyone to seek compensation for their work on the wreck removal. *See id.* at 69:17 – 70:11.

108. When he started to hear what Demarest was saying in the community though, the matter took on more urgency. *See* ECF No. 282 at 54:14–18, 68:1–12; ECF No. 281 at 241:21–25.

109. Alfouadi understood that Demarest intended to bill the insurance company for his work. *See* ECF No. 282 at 52:24 – 53:6.

110. Around January 20, Alfouadi contacted a public adjuster to file an insurance claim. *See* ECF No. 281 at 241:25 – 242:1.

111. His impression from the public adjuster was that he would need to collect documents and photos from Demarest so that the adjuster could file the claim. *See id.* at 242:5–8; ECF No. 282 at 55:19–22.

112. Because Alfouadi and Demarest were not speaking, Alfouadi asked an intermediary to ask Demarest for the documentation. *See* ECF No. 281 at 242:15 – 243:12; ECF No. 282 at 55:23 – 56:7.

113. Apparently, Demarest never submitted anything. *See* ECF No. 281 at 243:11–14; ECF No. 282 at 56:3–10.

114. Alfouadi never filed a claim. *See* ECF No. 282 at 56:12–13.

115. All the while, Alfouadi was under the impression that the State had deemed Demarest the salvager of record. *See* ECF No. 281 at 243:15–25.

**Credibility**

116. In the event it isn't clear from the above, the Court outlines its general credibility findings. The Court did not find Demarest credible on key facts because his story conflicted with other witnesses' testimony that the Court found more believable. Further, at a basic level, Demarest's story is implausible: why would Alfouadi contract with GMM—a mushroom company with no experience of salvage work—when Alfouadi and Demarest did not like each other and Alfouadi was happy to do the bulk of work himself with his friend and other people in the community?

117. The Court also found Demarest motivated by taking advantage of an unfortunate situation. Further, Demarest admitted to misrepresenting to Alfouadi that he was the salvager of record, demonstrating that he's not above lying if it suits his purposes. Additionally, any reasonable person, acting above-board, would have handled the salvage situation differently and put aside personal differences to communicate with Alfouadi after their January 6 argument before expending the time and energy he or GMM did. Instead, Demarest apparently started bad-mouthing Alfouadi in the community. The nail in the credibility coffin is the extensive and unnecessary purchases Demarest made in the name of the "salvage" and the expenses he said he suffered. His willingness to claim some of these

expenses (e.g., the $700 in medical supplies and over $5,000 in depreciation to his girlfriend's truck) ruins his credibility.

118. The Court also did not find Alfouadi fully credible based on his scattered, stubborn, and combative demeanor. Alfouadi often seemed more motivated by winning semantic arguments than truthfully and directly answering questions. His ego and pettiness during the relevant time period exacerbated the salvage situation and contributed to the morass the Court must now wade through. In some ways, Alfouadi and Demarest are two peas in a pod.

119. Still, Alfouadi's testimony was consistent and painted a plausible picture: he was working to clear his wrecked boat until Demarest swooped in and seized control of the job based on misrepresentations.

## CONCLUSIONS OF LAW

As an initial matter, because the Court concludes that (1) Alfouadi did not manifest assent to any oral or implied agreement with Demarest—either with Demarest acting in his individual capacity or on behalf of GMM—and (2) Demarest's misconduct in taking control of the wreck removal flows to GMM, the Court does not need to, nor does it, definitively resolve whether GMM did any of the work at issue in this case. In other words, while there's no doubt that Demarest or the Demarest-controlled GMM ultimately performed the wreck removal, the Court need not decide which entity was doing the work.

Case 1:22-cv-00064-JAO-KJM Document 283 Filed 03/11/26 Page 23 of 40 PageID.5068

**A. Jurisdiction and Applicable Law**

1. The Court has jurisdiction over the instant action under 28 U.S.C. §§ 1333 (admiralty jurisdiction) and/or 1367 (supplemental jurisdiction). *See* ECF No. 76 at 6–10 (detailing basis for Court's jurisdiction).

2. When considering the contract and quantum meruit claims here, the Court turns to Hawai‘i law. *See S/Y Paliador, LLC v. Platypus Marine, Inc.*, 750 F. Supp. 3d 1187, 1198 (W.D. Wash. 2024) (explaining that in the exercise of admiralty jurisdiction, "[s]tate law may supplement federal maritime law when such federal common law is silent on an issue or when a dispute is inherently local." (citation omitted)); *MB Marine LLC v. Wiehle Indus. Inc.*, 2025 WL 1355261, at *4 (W.D. Wash. May 9, 2025) (applying Washington law to quantum meruit claim); *Great Lakes Ins. SE v. Raiders Retreat Realty Co., LLC*, 601 U.S. 65, 70 (2024) ("When no established [federal maritime] rule exists, and when the federal courts decline to create a new rule, federal courts apply state law." (citation omitted)); ECF No. 76 at 7 ("Ultimately, the Court concludes that it has admiralty jurisdiction under § 1333 and—as both parties agree—Hawai‘i law regarding contract formation applies.").

3. Federal maritime law governs the pure salvage claim. *See Bartholomew v. Crowley Marine Servs., Inc.*, 337 F.3d 1083, 1085 (9th Cir. 2003), *as*

Case 1:22-cv-00064-JAO-KJM Document 282 Filed 03/11/26 Page 24 of 40 PageID.5069

*amended* (Sept. 12, 2003) ("The doctrine of salvage has been part of our admiralty law since early in our nation's history.")

**B. Count I – Breach of Oral Contract**

**Law**

4. "[I]n order for an oral contract to be enforceable, there must be an offer, an acceptance, and consideration." *Douglass v. Pflueger Hawaii, Inc.*,110 Hawai'i 520, 525, 135 P.3d 129, 134 (2006) (citing *Shoppe v. Gucci Am., Inc.*, 94 Hawai'i 368, 384, 14 P.3d 1049, 1065 (2000)).

5. "It is a fundamental principle of law that there must be mutual assent or a meeting of the minds on all essential elements or terms in order to form a binding contract." *Carson v. Saito*, 53 Haw. 178, 182, 489 P.2d 636, 638 (1971); *see also* Restatement (Second) of Contracts § 50(1) (1981) ("Acceptance of an offer is a manifestation of assent to the terms thereof made by the offeree in a manner invited or required by the offer.").

**Analysis**

6. Beyond any other potential issues with GMM's breach of oral contract claim—such as whether it was a party to the purported contract—the Court concludes that GMM has not met its burden to prove by a preponderance of the evidence that Alfouadi accepted any offer and/or that there was mutual

Case 1:22-cv-00064-JAO-KJM Document 283 Filed 03/11/26 Page 25 of 40 PageID.5070

assent on the essential elements of the purported agreement. For this reason, it need not determine the extent to which GMM did any of the salvage work.

7. Plaintiff argues that the whole offer and acceptance process took place on the rock jetty on the evening of January 2, 2022, when Demarest was speaking to Alfouadi in the presence of Pratt.

8. But as stated above, the Court does not believe that such a conversation took place because both Alfouadi and Pratt denied it did.

9. Plaintiff offers no alternative conversation when Alfouadi could have assented to the terms of any offer.

10. As "contracting is a sentient process," *see S. Foods Group, L.P. v. State of Hawai'i, Dep't of Educ.*, 89 Hawai'i 443, 457, 974 P.2d 1033, 1047 (1999) (citation omitted), the absence of Plaintiff's purported offer and acceptance conversation doom his claim for breach of an express oral contract.

11. The lack of definiteness about any terms of the deal also bolsters the Court's conclusion that the parties never had a meeting of the minds.

12. Most obviously, even in Demarest's telling of the alleged contracting process, he and Alfouadi did not discuss price for or any expected duration of GMM's work. Specifically, the protagonists did not discuss hourly rate, whether GMM would hire anyone, that GMM would buy any equipment for

Case 1:22-cv-00064-JAO-KJM Document 283 Filed 03/11/26 Page 26 of 40 PageID.5071

the job, how long the work might take, or a rough ballpark estimate of cost. *See* ECF No. 279 at 195:8 – 196:18.

13. Instead, Demarest possibly acting for GMM, testified that he relied on an understanding that Demarest believed Alfouadi had from prior interactions between the two. *See id.* at 197:1–4.

14. But Demarest had never done paid salvage work, and there was no evidence that he and Alfouadi had worked on salvage operations together before.

15. Further, the Court finds it extremely unlikely that Alfouadi would have been keen to contract with Demarest considering that he did not respect him after their argument during their previous roofing job.

16. Similarly, as Demarest did not trust Alfouadi, the Court believes he would have sought to memorialize any agreement with Alfouadi if there were one.

17. On an even more basic level, there is no plausible explanation as to why Alfouadi would contract with GMM to perform the salvage.

18. Alfouadi had more experience on salvage jobs than Demarest did, access to equipment at Lahaina welding, and the free help of Pratt.

19. Based on those details, and the fact that Alfouadi performed the bulk of the work himself from January 2 until the January 6 argument, there is little indication that he would need the help of GMM.

Case 1:22-cv-00064-JAO-KJM Document 283 Filed 03/11/26 Page 27 of 40 PageID.5072

20. While Demarest also had some salvage experience—albeit minimal—as an individual, GMM was a mushroom company that had never conducted a salvage operation.

21. In sum, the absence of any credible evidence that GMM and Alfouadi explicitly agreed to any deal coupled with the circumstantial evidence that demonstrates the implausibility of such a deal, the Court concludes that Plaintiff has not established by a preponderance of the evidence that there was any mutual assent between the parties.

## C. Count II – Breach of Implied Contract

**Law**

22. In Hawai‘i, an implied contract exists where:

> [T]he intention of the parties is not expressed, but an agreement in fact, creating an obligation, is implied or presumed from their acts, as in the case where a person performs services for another, who accepts the same, the services not being performed under such circumstances as to show that they were intended to be gratuitous, or where a person performs services for another on request.

*Kemp v. State of Hawai‘i Child Support Enf’t Agency*, 111 Hawai‘i 367, 391, 141 P.3d 1014, 1038 (2006) (quoting *Durette v. Aloha Plastic Recycling*, 105 Hawai‘i 490, 504, 100 P.3d 60, 74 (2004)) (emphasis omitted).

23. The "essential element of an implied contract" is a "*mutual intent to form a contract*" that is implied from the "*actions* of the parties." *Id.* (emphases in original).

**Analysis**

24. The Court concludes that Plaintiff has not established by a preponderance of the evidence that Alfouadi's actions manifested assent to form a contract. Again, based on this conclusion, the Court need not determine the extent to which GMM did any of the salvage work.

25. Plaintiff argues that a contract can be inferred from the fact that Alfouadi never told Demarest or GMM to stop the salvage work and that Alfouadi understood that Demarest or GMM expected to be compensated. *See* ECF No. 272 at 11–12.

26. The Court recognizes that inaction may imply assent, *see* Restatement (Second) of Contracts § 4 (1981), but the Court must determine whether an implied contract exists based on circumstances, *see Durette*, 105 Hawai‘i at 504, 100 P.3d at 74.

27. Here, based on the totality of the circumstances, the Court concludes that Alfouadi's inaction or silence in the face of Demarest's (or GMM's) work does not establish assent to any agreement.

Case 1:22-cv-00064-JAO-KJM Document 283 Filed 03/11/26 Page 29 of 40 PageID.5074

28. The Court finds the more plausible explanation of Alfouadi's silence to be that he felt duped and angry by Demarest's misrepresentation that he or GMM was the salvager of record according to the State and that Demarest scolded him for using the power saw near the water.

29. The Court surmises as much because Alfouadi's behavior toward the salvage operation completely changed after the January 6 argument.

30. Prior to the argument, Alfouadi was constantly working to get the boat of out the water.

31. He took the lead on the operation, with help from Pratt, and progress was being made.

32. For those first few days after the grounding, Demarest meanwhile was peripheral to the work at Mala Wharf.

33. He was purchasing items, filling out papers, and sending emails.

34. Then, both Demarest and Alfouadi—in a rare moment of accord—testified that during the January 6 argument Demarest said something to the effect that he was the salvager of record and responsible for the operation.

35. The Court believes Alfouadi when he testified that he was shocked at that news.

36. His surprise suggests that in his mind there wasn't any agreement for Demarest or his company to lead the salvage operation before January 6.

37. Further, Alfouadi testified that he understood that being the salvager of record meant that the State had effectively selected Demarest (or GMM) for the job. ECF No. 281 at 193:13–19.

38. As such, the Court interprets Alfouadi's inaction in the face of Demarest's continued work after the January 6 as evidence that he thought the matter had already been decided by forces outside his control; not as definitive evidence of any implied agreement with Demarest.

39. Similarly, the Court does not think that Alfouadi's understanding that Demarest or GMM expected to be paid, or that Alfouadi made some efforts to open an insurance claim to compensate GMM, necessarily demonstrate assent to an implied contract.

40. Alfouadi seemed to be under the impression that Demarest or GMM may be entitled to seek compensation from his insurer because the State had selected him as the salvager of record.

41. As established by the admissions to the 1RFA though, that impression was based on Demarest's misrepresentation.

42. As such, any expectation that Demarest would seek recompense was based on the misrepresentation and not any implied agreement.

Case 1:22-cv-00064-JAO-KJM Document 283 Filed 03/11/26 Page 31 of 40
PageID.5076

43. Further, Alfouadi's motivation to file an insurance claim to allow Demarest to seek compensation seems derived from Demarest's bad-mouthing of him in the community.

44. In other words, Alfouadi largely acted based on peer pressure or concern for his reputation, rather than any understanding that he and Demarest had formed some type of contract.

45. In sum, Alfouadi's conduct does not evince any "mutual intent to form a contract," but rather suggests that he felt cornered by his understanding that Demarest was salvager of record and the pressure that Demarest was exerting on him by bad-mouthing him in the community.

**D. Count III – Quantum Meruit**

**Law**

46. In Hawai'i, "'[t]he basis of recovery on quantum meruit is that a party has received a benefit from another which it is unjust for him to retain without paying therefor.'" *Hawaii Ventures, LLC v. Otaka, Inc.*, 114 Hawai'i 438, 164 P.3d 696, 742 (2007) (quoting *Maui Aggregates, Inc. v. Reeder*, 50 Haw. 608, 610, 446 P.2d 174, 176 (1968)); *see also Durette*, 105 Hawai'i at 504, 100 P.3d at 74 (stating that to prove a claim for unjust enrichment a plaintiff must only establish that she conferred a benefit upon the opposing party and retention would be unjust).

47. "Under Hawaii law, whether the [d]efendants received some benefit in the exchange is key." *UCSF-Stanford Health Care v. Hawaii Mgmt. All. Benefits & Servs., Inc.*, 58 F. Supp. 2d 1162, 1171 (D. Haw. 1999) (citation omitted).

48. Yet, "[q]uantum meruit is an equitable claim," and "[u]nder the doctrine of unclean hands, it is expressed that 'he who comes into equity must come with clean hands[.]'" *See Wagner v. World Botanical Gardens, Inc.*, 126 Hawai'i 190, 203, 268 P.3d 443, 456 (App. 2011) (quoting *7's Enters., Inc. v. Del Rosario*, 111 Hawai'i 484, 494, 143 P.3d 23, 33 (2006)).

49. To invoke the unclean hands defense, the misconduct of the person seeking compensation must relate to the matter at hand:

> The maxim, considered as a general rule controlling the administration of equitable relief in particular controversies, is confined to misconduct in regard to, or at all events connected with, the matter in litigation, so that it has in some measure affected the equitable relations subsisting between the two parties, and arising out of the transaction; it does not extend to any misconduct, however gross, which is unconnected with the matter in litigation, and with which the opposite party has no concern.

*7's Enters.*, 111 Hawai'i at 495, 143 P.3d at 34 (citation and emphasis omitted).

50. "The unclean hands doctrine 'closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he

Case 1:22-cv-00064-JAO-KJM Document 283 Filed 03/11/26 Page 33 of 40 PageID.5078

seeks relief, however improper may have been the behavior of the defendant.'" *Adler v. Fed. Republic of Nigeria*, 219 F.3d 869, 876–77 (9th Cir. 2000) (quoting *Precision Instr. Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945).

51. Any claim of unclean hands "must be judged on its particular facts and circumstances." *Shinn v. Edwin Yee, Ltd.*, 57 Haw. 215, 230–31, 553 P.2d 733, 744 (1976) (citing *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240 (1933)).

52. In applying the maxim, courts "are not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion." *Keystone Driller Co.*, 290 U.S. at 245–46.

53. "Generally, the defendant has the burden of proof on all affirmative defenses, which includes the burden of proving facts which are essential to the asserted defense." *U.S. Bank Nat'l Ass'n v. Castro*, 131 Hawai'i 28, 41, 313 P.3d 717, 730 (2013) (citation omitted); *see also E*Trade Bank v. Gibson*, 152 Hawai'i 111, 2022 WL 17850138, at *6–7 (App. Dec. 22, 2022).

**Analysis**

54. While Demarest or GMM completed the wreck removal after Alfouadi stopped working, the Court concludes that Defendant has met its burden and

Case 1:22-cv-00064-JAO-KJM Document 283 Filed 03/11/26 Page 34 of 40
PageID.5079

sufficiently established that Demarest's unclean hands infected the entire job and preclude GMM from recovering anything.

55. As alluded to above, Admissions Nos. 26 through 35 to the 1RFA (Ex. 204) establish that Demarest intentionally misrepresented to Alfouadi that the State had awarded him a salvage contract or deemed him salvager of record.

56. And even if the admissions are technically only binding as to Demarest, equity would not be served if the Court were to allow GMM to benefit from Demarest's misconduct merely based on its distinct corporate existence: it bears repeating that GMM is a single member LLC with Demarest as its sole member. *See Scudder v. Pierce*, 2013 WL 4711530, at *10 (Haw. App. Aug. 30, 2013) ("A business association has unclean hands, for the purpose of denying equitable relief, if 'persons exercising general control over its affairs' have knowledge of the inequitable conduct of those acting on its behalf. (citing *Associated Press v. Int'l News Serv.*, 240 F. 983, 989 (S.D.N.Y. 1917) (Augustus Noble Hand, J.), *modified*, 245 F. 244 (2d Cir. 1917), *aff'd*, 248 U.S. 215 (1918))).

57. Thus, in the Court's view, whether Demarest was speaking individually or on behalf of GMM when he made that misrepresentation is largely irrelevant because what matters is the intent behind the statement and its expected effect on Alfouadi.

Case 1:22-cv-00064-JAO-KJM Document 283 Filed 03/11/26 Page 35 of 40 PageID.5080

58. Demarest—whether individually or as the representative of GMM—was trying to control Alfouadi's actions via the misrepresentation.

59. By misrepresenting to Alfouadi that the State had awarded Demarest a salvage contract, Demarest was trying to get Alfouadi to stop doing the wreck removal as Alfouadi wanted to, and to permit Demarest to run the show.

60. In other words, Demarest used the misrepresentation to take control of the wreck removal.

61. That ploy worked as it clearly changed Alfouadi's behavior.

62. Prior to the misrepresentation, Alfouadi was tirelessly working to remove the wreck, but abruptly stopped when he heard Demarest's misrepresentation.

63. For that reason, the Court has no trouble concluding that Demarest acted inequitably with regard to the matter being litigated—compensation for the wreck removal—in such a way that "affected the equitable relations" between Alfouadi on the one hand and Demarest on the other. *7's Enters.*, 111 Hawai'i at 495, 143 P.3d at 34.

64. Demarest's misdeeds did more than "affect[] the equitable relations" between him and Alfouadi; they totally flipped things on their head.

Case 1:22-cv-00064-JAO-KJM Document 283 Filed 03/11/26 Page 36 of 40 PageID.5081

65. Every indication is that Alfouadi and his friends would have completed the wreck removal with Demarest as a peripheral figure at best.

66. But Demarest's misrepresentations allowed him to usurp control in an attempt to profit.

67. Even aside from the misrepresentations, the Court concludes that Demarest acted inequitably.

68. First, as mentioned throughout, Demarest immediately tried to take advantage of Alfouadi's misfortune and tried to turn the grounding of the boat into a business opportunity.

69. This is evidenced by the fact that within a day of the grounding, Demarest tried to involve Alfouadi in some type of scheme to extract payments from Alfouadi's insurance company, a part of which Demarest would then channel to Alfouadi.

70. Further, during those initial days after the grounding, Demarest repeatedly badgered Alfouadi into signing various documents.

71. This suggests that Demarest's main motivation was opportunism rather than any concern for getting the wreck removal done quickly.

72. The Court also finds that Demarest was trying to drive up costs of the operation at basically every stage.

Case 1:22-cv-00064-JAO-KJM Document 283 Filed 03/11/26 Page 37 of 40 PageID.5082

73. For example, he purchased or claimed expenses for unreasonable things like two different pairs of replacement sandals.

74. Most concerningly, Demarest didn't sufficiently rebut Alfouadi's testimony that Demarest intentionally released segments of the boat back into the ocean further complicating and extending the operation.

75. The fact of the matter is that Demarest disrupted the wreck removal when he coopted the operation by means of deception.

76. The Court concludes as a matter of equity that GMM should not recover under a theory of quantum meruit based on that deception.

77. Even if Alfouadi left the job before it was done, it's clear that he would have finished the work at some point with help from others in the community.

**E. Count IV – Pure Salvage**

78. Because the Court concludes that GMM's other claims fail, it turns to GMM's alternative claim that it is entitled to an award for pure salvage. *See* ECF No. 274 at 24 n.3.

**Law**

79. In "[t]he most recent complete judicial definition in this circuit of the elements for a [pure] salvage claim," *Bay & Delta Tractor Tug Co. v. Barge Pac. Trader*, 1997 WL 797935, at *1 (N.D. Cal. Dec. 16, 1997), the Ninth Circuit held:

> The elements of a salvage claim are as follows: [(1)] There must be a maritime peril from which the ship or other property could not have been rescued without the salvor's assistance. [(2)] The salvor's act must be voluntary—that is, he must be under no official or legal duty to render the assistance. [(3)] The act must be successful in saving, or in helping to save, at least a part of the property at risk.

*U.S. Dominator, Inc. v. Factory Ship Robert E. Resoff*, 768 F.2d 1099, 1104 (9th Cir. 1985), *superseded by statute on other grounds* (quoting The Law of Admiralty § 8–2 (2d ed. 1975) (citing 3A Benedict on Admiralty § 2 (1983)) (internal quotation marks omitted).

80. But "[t]he salvor who seeks a reward for his services in rescuing property on navigable waters[] must act in entire good faith and with honesty of purpose. He must come into court with clean hands." *Columbus-America Discovery Grp.* v. *Atl. Mut. Ins. Co.*, 56 F.3d 556, 569 (4th Cir. 1995) (citing 3A Martin J. Norris, Benedict on Admiralty § 99 (7th ed. 1993)).

81. "Admiralty courts have traditionally been vigilant in protecting mariners from unscrupulous and dishonest salvors." *Jackson Marine Corp. v. Blue Fox*, 845 F.2d 1307, 1309 (5th Cir. 1988) (citations omitted).

82. "Because of the heightened vulnerability of a distressed ship and crew to exploitation by salvors, the law cannot tolerate salvors['] dishonesty, corruption, fraud, falsehood, either in rendering the service, or in their

proceedings to recover the salvage." *Id.* (internal quotation marks, alterations, and citation omitted).

**Analysis**

83. Assuming without deciding that GMM has met the elements of its pure salvage claim, the Court nonetheless concludes that it is not entitled to recovery because it only seized control of the salvage job via Demarest's misrepresentations.

84. The Court (again) emphasizes that from the January 2 grounding of the boat until the argument on the afternoon of January 6, Alfouadi was doing the bulk of the work himself with his friend Pratt.

85. If not for Demarest's misrepresentation about being the salvager of record, Alfouadi almost certainly would have continued to do most of the work himself.

86. The intent and effect of Demarest's misrepresentations were to get Alfouadi out of the way to position GMM to profit from Alfouadi's misfortune.

87. In an analogous context, courts have concluded that a salvor that intentionally misrepresented the terms of a salvage contract to obtain the job should be barred from recovery. *See Jackson Marine Corp.*, 845 F.2d at 1309; *St. Claire Marine Salvage, Inc. v. Bulgarelli*, 2014 WL 3827213, at *9 (E.D. Mich. Aug. 4, 2014), *aff'd*, 796 F.3d 569 (6th Cir. 2015).

88. Likewise, here, Demarest or GMM seized control of the job by misrepresenting a material fact.

89. The Court will not reward such "unscrupulous and dishonest" conduct and therefore finds against Plaintiff on its pure salvage claim.

**CONCLUSION**

Based on the foregoing, the Court finds against Plaintiff and in favor of Defendant on all claims.

IT IS SO ORDERED.

DATED: Honolulu, Hawai'i, March 11, 2026.

Jill A. Otake
United States District Judge

CIV. NO. 22-00064 JAO-KJM, *Green Mountain Mycosystems, LLC v. Alfouadi*; Findings of Fact and Conclusions of Law